IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| **IRVING ALVIN DAVIS,** | § | |
| Petitioner, | § | |
| | § | |
| v. | § | EP-14-cv-121-KC |
| | § | |
| **LORIE DAVIS,** Director, | § | Capital Case |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

**CONSOLIDATED AMENDED PETITION
FOR WRIT OF HABEAS CORPUS**

JOE A. SPENCER, JR.
Attorney at Law
1009 Montana
El Paso, TX 79002
(915) 532-6741

RICHARD D. ESPER
Esper Law Office
801 N. El Paso St., Second Floor
El Paso, TX 79902
(915) 532-5562

MATTHEW STIEGLER
7145 Germantown Avenue, Suite 2
Philadelphia, PA 19119
(215) 242-1450

# TABLE OF CONTENTS

Procedural History ................................................................................................1

Grounds for Relief

I.  Irving Davis was denied a fair trial before an unbiased jury because a juror
did not disclose that he stood accused of a serious crime, that these
accusations were pending before the same office prosecuting Davis, and that
he decided to find Davis guilty to curry favor in his own case. ......................... 3

II.  The State's failure to disclose its investigation and eventual prosecution of
Juror Santini for aggravated sexual assault of a minor violated Davis's Fifth,
Sixth, Eighth and Fourteenth Amendment rights to due process and a
fair trial. .................................................................................................18

III.  Irving Davis's counsel failed to competently investigate and present
substantial, readily available mitigation evidence, including evidence of
serious abuse and his dysfunctional family life. This failure denied Davis his
right to effective assistance was counsel at the penalty phase.......................... 25

IV.  Trial counsel was ineffective for failing to challenge pathology testimony
that was erroneous and critical to the prosecution's case. ...............................67

V.  Davis was sentenced to death in violation of the First, Fifth, Sixth, Eighth
and Fourteenth Amendments to the U.S. Constitution because proof of his
religious affiliations was improperly admitted against him during the penalty
phase of trial ...................................................................................................76

VI.  Davis was convicted of capital murder and sentenced to death in violation of
the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution
because the trial court erroneously admitted Davis's confession and denied
his motion to suppress. ................................................................................. 85

VII.  Davis has been convicted of capital murder in violation of the Fifth, Sixth,
Eighth and Fourteenth Amendments to the U.S. Constitution because his
trial counsel rendered ineffective assistance during voir dire at his first trial.... 88

VIII.  Davis has been sentenced to death in violation of the Fifth, Sixth, Eighth and
Fourteenth Amendments to the U.S. Constitution because his trial counsel
rendered ineffective assistance during voir dire at his capital resentencing. ..... 89

IX.     Davis was convicted of capital murder and sentenced to death in violation of
        the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution
        because the trial court erroneously failed to sustain his *Batson* challenges at
        his first and second trials.................................................................................91

X.      Davis was sentenced to death in violation of the Fifth, Sixth, Eighth and
        Fourteenth Amendments to the U.S. Constitution because the trial court
        erroneously refused Davis's challenges for cause with respect to three
        disqualified jurors at his second trial. .............................................................. 94

Conclusion .................................................................................................................95

Certificate of service .................................................................................................97

## Procedural History

Irving Davis was tried in 2002 in El Paso, Texas, for capital murder in the course of aggravated sexual assault committed when he was eighteen years old. He was represented at trial by Francisco Macias and Matthew DeKoatz. Davis was found guilty and sentenced to death. On appeal, the Texas Court of Criminal Appeals affirmed his conviction but vacated the sentence and remanded for a new penalty-phase hearing. *Davis v. State*, No. AP-74393, 2007 WL 1704071 (Tex. Crim. App. June 13, 2007). The resentencing hearing was in 2008. Davis was represented by Macias and Ruben Morales, and again he was sentenced to death. This time the Court of Criminal Appeals affirmed, *Davis v. State*, 329 S.W.3d 798 (Tex. Crim. App. 2010), and the Supreme Court of the United States denied certiorari, *Davis v. Texas*, 565 U.S. 830 (2011).[1]

Davis filed a state habeas corpus application in 2004 after his trial and first sentencing, represented by Louis Lopez. He filed a second state habeas petition in 2010 after his resentencing, now represented by Robinson Norris Jr. Norris's application raised eight issues and was three pages long. Am.Ex. B. Norris later filed a brief in support of the three-page petition. In 2013 the state court held a one-day evidentiary hearing on the petition. Norris presented two witnesses—Macias and Morales. The court adopted the state's proposed findings of fact and conclusions of law without

---

[1] The exhibit citations in this consolidated amendment are in the following format:
- Exhibits to Davis's 2017 amendment, ECF No. 112, are cited here as 'Ex. ___.'
- Exhibits to Davis's March 9, 2015, amendment, ECF No. 18, are cited here as 'Am.Ex. ___.'
- Exhibits to the Director's answer, ECF No. 26, are cited as 'Dir.Ex. ___.' Transcripts of Davis's trial and resentencing are cited as 'N.T. ___,' and citations to the state-court record are cited as ' ___ R.R. ___.'

This consolidated amendment adds no new exhibits. Counsel for the Director informed counsel for Davis that he does not object to Davis citing to the prior-filed amendment exhibits rather than re-filing them here.

change. Am.Ex. C. The Court of Criminal Appeals denied state habeas relief in an unsigned, unpublished order less than two pages long. Am.Ex. D, *Ex Parte Davis*, Nos. WR-61, 445-01, WR-61, 445-02 (Tex. Crim. App. March 12, 2014) (per curiam).

In federal habeas corpus proceedings, this Court appointed Joe Spencer, Jr. and Richard Esper to represent Davis. ECF No. 3. Davis filed a motion seeking investigative services, ECF No. 5, which the state opposed, ECF No. 6, and which the Court struck as deficient, ECF No. 7. Davis filed a habeas corpus petition, ECF No. 12, which the Court found deficient, ECF No. 13, and Davis filed a corrected habeas corpus petition, ECF No. 15. This initial habeas petition raised four issues, all related to a juror at Davis's 2002 trial, Severiano Santini. Davis filed an amended petition with exhibits on March 11, 2015, raising 12 issues. ECF No. 18.

This Court appointed Matthew Stiegler as third counsel to represent Davis and stayed the briefing schedule. ECF No. 23. The Director filed an answer to the amended petition with six exhibits. ECF No. 26. Davis filed a motion for discovery, ECF No. 53, which the state opposed, ECF No. 59, and which the Court granted, ECF No. 76, although after a hearing the Court thereafter granted a third-party motion to quash certain discovery, ECF No. 102.

Davis filed his second amended habeas petition on November 6, 2017, ECF No. 112. After the Director filed a motion for a more definite statement, ECF No. 116, and Davis filed a response not objecting, ECF No. 118, the Court ordered Davis to file a consolidated petition and granted an extension through October 2, 2018.

## GROUNDS FOR RELIEF

**I.   Irving Davis was denied a fair trial before an unbiased jury because a juror did not disclose that he stood accused of a serious crime, that these accusations were pending before the same office prosecuting Davis, and that he decided to find Davis guilty to curry favor in his own case.**

One of the jurors for Irving Davis's trial, Severiano Santini, was facing prosecution himself for aggravated sexual assault. Before Santini was selected and while he sat on the jury, El Paso police were investigating him for sexually molesting two young girls. Santini was well aware of the accusations—he had been caught in the act. And he knew that the same district attorney's office prosecuting Davis would also decide whether to prosecute him. So Santini formed a desperate plan to serve on Davis's jury because, in his own words, "finding the guy guilty was my chance to prove to them"—the district attorney's office responsible for both cases—"that I'm a law-abiding citizen." Ex. A ¶ 7 (Declaration of Severiano Santini). By concealing this from the court, Santini served on the Davis jury and voted the prosecution's way. Santini was a biased juror, and habeas corpus relief is warranted.

## Factual Allegations

An El Paso, Texas, jury found Irving Davis guilty in 2002 of capital murder. To convict Davis, the jury had to find that the prosecution had proven beyond a reasonable doubt that he committed the murder in the course of committing or attempting to commit aggravated sexual assault. N.T. 6/21/02 at 151, 154 (jury instructions). Davis was also charged with aggravated sexual assault as a stand-alone crime. *Id.* at 156.

Jurors were selected for Davis's trial by the following process. First, prospective jurors received initial instructions and some were eliminated as unqualified. Second, they each filled out a questionnaire. Third, they were questioned individually, which took several weeks. Fourth, the remaining prospective jurors were brought back to court, each side exercised peremptory strikes, and the jury was chosen.

One of the jurors who was chosen and who found Davis guilty was Severiano Santini. Santini had himself committed two sexual assaults prior to sitting as a juror. He committed the first assault, putting his finger on the genitals of two six-year-old girls, about a year and a half before the trial. He committed the second assault, masturbating over the same two girls as they slept, during the period after his individual voir dire in Davis's case and before being chosen to serve.



Severiano Santini, arrest photograph, July 18, 2002. Dir.Ex. C.

Among the questions posed to the potential jurors on their questionnaires was whether they had ever been accused of a felony. Santini responded that he had never been accused of a felony. Am.Ex. E p.15 (Santini questionnaire). And although jurors were told to notify the court if any of their questionnaire answers needed to be changed, Ex. B, N.T. 5/9/02 at 95–96, Santini never informed the court of either of the felony accusations leveled against him, even when he was reported to El Paso police for the second sexual assault during jury selection.

Santini made a conscious decision not to tell the court what had happened—he wanted to serve on Davis's jury because he hoped that finding Davis guilty would curry favor with the prosecution:

> A few days after [being accused of masturbating over his common-law wife's seven-year-old granddaughters] they brought all of us back to the jury. I thought about telling the judge what happened. I knew maybe I was supposed to but I decided not to. The DA's office for this trial was the same one that would decide what to do in my case. I figured that being on the jury and finding the guy guilty was my chance to prove to them that I'm a law-abiding citizen. I didn't want to lose my government job, I didn't want people calling me a child molester, I didn't want to be prosecuted, and I didn't want to spend the rest of my life in prison, especially not for that. So I kept my mouth shut and hoped that I'd get picked to be on the jury, and I was.

Ex. A ¶ 7.

And in fact Santini did receive a favorable plea deal after he found Davis guilty. For twice sexually assaulting two young girls, Santini faced a sentence of 5 to 99 years, or life, in prison. Ex. C, *State v. Santini*, 20020d06000, N.T. 11/5/03 at 4. Santini's plea deal gave him a deferred adjudication, work release, and supervised release. Dir.Ex. F. Instead of spending the rest of his life in prison, he received no prison.

Below is a timeline of Santini's crimes, his jury service, and his prosecution. To opposing counsel's credit, key parts of this timeline first came to light during federal habeas corpus proceedings when the Director attached over 100 pages of Santini-related records as exhibits to its answer, ECF No. 26-1.

| | |
|---|---|
| January 1, 2001 | **The first assault.** Santini puts his finger on the genitals of two six-year-old sisters. As he later described it to police, he arrived home after midnight and found the girls asleep: "Both of the daughters had covers over them, but one was laying there with her legs apart. I touched her pussy over the blankets and moved my hand back and forth a couple of times," and said, "what a small pussy you have." Dir.Ex. D p. 41. |
| February 11, 2001 | The girls tell their mother, Camille Dickson, what Santini did. Santini hears Dickson angrily confronting his girlfriend, flees the house, and stays away overnight. Ex. A ¶ 4; Ex. D attachment A ¶ 5 (Declaration of Naomi Terr). |

| | |
|---|---|
| February 12, 2001 | Dickson reports what Santini did to El Paso police. Police interview the two girls. Police then take Dickson and the two girls to the Advocacy Center for Children, where the girls are interviewed on videotape by a social worker, an El Paso police officer, and an El Paso assistant district attorney. The head of the El Paso district attorney's office's sexual crimes unit is Penny Hamilton. Dir.Ex. A pp.7–11. |
| | Santini is not charged at this time. *Id.* at p. 12. Dickson was told by police that the case was closed because it was the girls' word against Santini's word. Ex. D att. A ¶ 5. |
| May 29, 2002 | **Jury selection begins** in Irving Davis's capital murder trial. The investigating agency in Davis's case is the El Paso Police Department, the prosecuting office is the District Attorney's Office of El Paso, and the lead prosecutor is Penny Hamilton. |
| | Santini is in the jury pool and is put under oath. N.T. 5/29/02 at 3. Jurors are instructed they would not be qualified if they "have a bias or prejudice in favor of or against the Defendant in any way whatsoever," and to disclose if they are not qualified, and Santini remains silent. *Id.* at 7, 10. |
| | The jury pool is ordered to complete a questionnaire honestly and fully. *Id.* at 101. Santini completes a juror questionnaire. Am.Ex. E. On the questionnaire, Santini denies that he has ever been "accused of, charged with, or arrested for" any felony or any other criminal offense above a traffic ticket. *Id.* p. 15. He denies that he would be distracted by any personal problems. *Id.* p. 19. He denies anything that would prevent him from being a fair and impartial juror. *Id.* p. 25. |
| | Potential jurors are instructed to notify the court "[i]f at any time during the voir dire process between now and the beginning of trial you think of anything that needs to be added or changed in your questionnaire." Ex. B, N.T. 5/9/02 at 95–96. |
| June 3, 2002 | Santini is questioned individually for Davis jury selection. Am.Ex. F, N.T. 6/3/02 at 178–241. Both sides |

describe and question him in detail about aggravated sexual assault. *Id.* at 206, 235. Santini again does not disclose the 2001 sexual-assault accusation against him. Asked if he can hold the prosecution to its reasonable-doubt burden, he responds, "I don't think, I know I can." *Id.* at 187. Santini is sent home while jury selection continues. *Id.* at 241.

June 12, 2002    **The second assault.** Santini is caught by Camille Dickson standing over Dickson's sleeping seven-year-old daughters, masturbating. Dickson angrily confronts Santini, telling him, "If I catch you, you are going to die. If not the cops will catch you." Santini barricades himself in his bedroom and flees the house by crawling out the bedroom window. Ex. A ¶ 6; Ex. D attachment 1 ¶ 7–8.

That night Dickson reports this incident to El Paso police, detailing the incident, detailing Dickson's ensuing confrontation of Santini, and identifying Santini by name, address, physical description, and employer. Police prepare a report and schedule to interview Dickson at the station. Dir.Ex. B pp. 7, 11–12; Dir.Ex. C p. 8.

June 18, 2002    Dickson is interviewed by El Paso police about Santini's June 12 crime, and police type up a report the same day. Dir.Ex. B pp. 8–9; Dir.Ex. C pp. 6–7.

Santini returns to court for the Davis case. The judge reminds the prospective jurors that voir dire questioning was "primarily . . . about any biases or attitudes or opinions that might interfere with your ability to serve as fair and impartial jurors." Ex. E, N.T. 6/18/02 at 8–9. Santini is selected as a juror, takes an oath to render a true verdict based on the law and evidence, and is empaneled. *Id.* at 11, 19, 20. Santini does not disclose either the 2001 or 2002 assaults. **The Davis trial begins.**

June 20, 2002    El Paso police interview Santini's victims, Dickson's daughters. The police prepare a report which states, "Undersigned will now attempt to obtain warrants for the suspect." Dir.Ex. C pp. 8–9.

7

| June 22, 2002 | The jury, including Santini, finds Davis guilty of capital murder and aggravated sexual assault. The penalty phase of the trial begins. |
| June 23, 2002 | The penalty phase ends. The jury, including Santini, returns a penalty-phase verdict and Davis is sentenced to death.[2] |
| July 9, 2002 | The June 12 and June 20 Santini police reports are approved by a police supervisor. Dir.Ex. B pp. 7–9; Dir.Ex. C pp. 8–12. |
| July 11, 2002 | A warrant for Santini's arrest, which police had decided to seek on June 20, issues. Dir.Ex. E. |
| July 18, 2002 | El Paso police arrest Santini. Santini tells police that in the 2001 assault "he did touch her on her vagina because he was horny." Dir.Ex. D, *State v. Santini*, 20020d06000, N.T. 6/12/03 at 41. |
| November 12, 2002 | El Paso district attorney Penny Hamilton formally accepts the charges against Santini for prosecution. Dir.Ex. A p.1. Santini faces 2 to 10 years in prison for indecency by exposure, 2 to 20 years for indecency by contact, and 5 to 99 years or life for aggravated child sexual assault. Ex. C, *State v. Santini*, 20020d06000, N.T. 11/5/03 at 4. |
| November 5, 2003 | Santini pleads guilty to indecency and receives deferred adjudication. *Id.* at 6; Dir.Ex. F. He serves 90 days of work release and 10 years' supervised release. Dir.Ex. F. |

On September 29, 2017, Santini made a sworn, notarized declaration. Ex. A. Santini's declaration confirms several key points:

---

[2] On direct appeal to the Texas Court of Criminal Appeals, the death sentence is vacated but the conviction is upheld. *Davis v. State*, No. AP-74,393, 2007 Tex. Crim. App. Lexis 808 (June 13, 2007). Thus the jury on which Santini sat is the one responsible for Davis's conviction, and habeas corpus relief would result in vacating his conviction.

- Santini was aware at the time he completed his juror questionnaire that he had been accused of sexually molesting the girls the year before. *Id.* ¶ 4 ("I heard Camille tell Irma that I messed around with the girls, touching their privates. . . . I knew at the time that she went to the police about it . . . .);

- He consciously decided not to disclose the first accusation on his juror questionnaire. *Id.* ¶ 5 ("I thought about whether I had to say anything about what happened the year before, but I didn't.");

- Santini was aware, before he was selected as a juror, that he had been reported to police, again, for sexually molesting the girls days earlier. *Id.* ¶ 6 ("She said she was going to call the cops or kill me herself.");

- He consciously decided not to disclose the second accusation. *Id.* ¶ 7 ("I thought about telling the judge what happened. I knew maybe I was supposed to but I decided not to.");

- The reason why Santini decided not to disclose the 2002 accusation was that he wanted to serve on Davis's jury. *Id.* ¶ 7 ("So I kept my mouth shut and hoped that I'd get picked to be on the jury, and I was.");

- And the reason he wanted to serve on Davis's jury was that Santini hoped that if he voted to convict Davis the prosecution would treat *him* more leniently. *Id.* ¶ 7 ("The DA's office for this trial was the same one that would decide what to do in my case. I figured that being on the jury and finding the guy guilty was my chance to prove to them that I'm a law-abiding citizen. I didn't want to lose my government job, I didn't want people calling me a child molester, I didn't want to be prosecuted, and I didn't want to spend the rest of my life in prison, especially not for that.").

**Legal Allegations**

**A. Davis's Fifth, Sixth, Eighth and Fourteenth Amendment rights to a fair trial before an impartial and unbiased jury and a reliable jury verdict were violated because Santini concealed material information that would have provided a valid basis for a challenge for cause, and he was a biased juror, requiring reversal of Davis's conviction.**

Facing imminent prosecution for aggravated sexual assault by the same district attorney's office that was prosecuting Irving Davis, Severiano Santini could not be an unbiased juror, and he admits that he was not. On these facts, Santini's bias is implied by law and Davis is entitled to reversal of his conviction without an evidentiary hearing; alternatively, Santini's admissions establish his actual bias.

**1. Santini's bias is implied by law.**

No juror in Santini's situation could be unbiased. He was accused of a serious felony, caught in the act. He was being investigated by police before he was chosen and while he sat as juror. He faced losing his government job, he faced the stigma of being a felon convicted of sexually assaulting young children; he faced being targeted for prison violence as a child molester; and he faced spending the rest of his life in prison. What happened to him next was up to the same prosecutors' office prosecuting Davis: they would decide whether to prosecute him, what crimes to charge, and what sentence to seek within an extraordinarily broad discretionary range. Santini's future rested in the prosecution's hands.

Serving as a juror at Davis's trial gave Santini an opportunity to show the prosecution that he was good and law-abiding, and to help the prosecution win a conviction in a high-profile case. By helping the prosecution win a conviction in a death-penalty case, he could help himself. Just as importantly, any juror in Santini's shoes would have feared the consequences for himself of *not* voting the prosecution's way. To be biased, a juror need not believe the prosecution might go easy on him if he votes their way—it is enough to fear that things might go worse for him if he does not. Santini had

grave accusations hanging over his own head, and he sat as a juror before the same prosecutors who held his fate in their hands. Voting "not guilty" when he was being investigated himself for the same felony that elevated Davis's charge to capital murder would have taken real courage.

While Santini's admissions establish his actual bias, as explained in the next section, Davis's entitlement to habeas corpus relief does not depend on those admissions because the extraordinary circumstances here establish Santini's bias as a matter of law. *See Smith v. Phillips*, 455 U.S. 216, 223 (1982) (O'Connor, J., concurring); *Brooks v. Dretke*, 418 F.3d 430 (5th Cir. 2005). In *Brooks*, the Fifth Circuit found a juror impliedly biased and vacated the petitioner's death sentence after a juror was arrested for misdemeanor gun-possession during the sentencing phase of trial. The key fact in *Brooks* was that the trial defendant and the juror both faced prosecution by the same district attorney's office. The opinion's opening sentence stated that the juror "faced prosecution by the district attorney's office then prosecuting Brooks." *Id.* at 431. And the heart of the analysis in *Brooks* explained:

> As he listened to the evidence in the sentencing phase and participated in the jury's decision of the State's contention that Brooks should be put to death he was facing a stunning turn of events in his own life. He could have been sentenced to a year in jail; worse yet, he could have faced a felony prosecution . . . . True enough he was not an employee in the district attorney's office, but in practical ways his future was even more in its hands. . . .

> We do not suggest that being charged with unlawfully carrying a weapon alone disqualified Garcia for jury service under state law or that any outstanding misdemeanor charge should support a finding of implied bias. It is rather the sum of all factual circumstances surrounding this juror—in particular, the power of the District Attorney, and the timing and sequence of events—that compels this conclusion. As Lord Coke put it, a juror must be as "indifferent as he stands unsworn." That there is no evidence that the District Attorney did anything to exploit his power over juror Garcia is of no moment. That the power presents an intolerable risk of working its will without the raising of a hand or a nod is the vice here.

*Id.* at 435 (cleaned up).

The "risk" arising from the *Brooks* prosecutor's leverage over the juror was "intolerable," but in Davis's case it was even greater, because the "power of the District Attorney" over Santini was so much greater. The *Brooks* juror faced a sentence of up to one year; Santini faced up to life in prison. The *Brooks* juror faced prosecution for gun possession,; Santini for aggravated sexual assault for molesting two young children. So while the *Brooks* juror indeed faced a "stunning turn of events," it was nothing compared to what Santini suddenly faced. The *Brooks* juror's crime was unrelated to the defendant's crime, while Santini's crime was the same one underlying Davis's capital charges, which increased the prosecutor's power over Santini still further. And, unlike Santini, the *Brooks* juror testified that his vote was based solely on the evidence, and the state court found as fact that the juror "did not vote . . . in a fashion designed to ingratiate himself with the District Attorney's Office." *Id.* at 431–32. The *Brooks* juror was biased as a matter of law; Santini was even more so.

In *United States v. Scott*, 854 F.2d 697 (5th Cir. 1988), the Fifth Circuit confronted similar facts and also found the juror biased as a matter of law. The potential juror in *Scott* was the brother of a deputy in the Sheriff's Office that had investigated the defendant's case. When the court asked potential jurors whether any of them had close relatives serving as law enforcement officials, the prospective juror failed to report his relationship. Like Santini, he was aware that his relationship to law enforcement would likely result in his removal from the jury pool, but unlike Santini, who wanted to use his opportunity to serve on Davis's trial to earn favor with the State, the juror in *Scott* believed his judgment would not be affected by the relationship. The Fifth Circuit found that, despite his protestations of impartiality, "there was a sufficient implication of [the juror] David Buras's bias to require a new trial":

> This case presents us with a combination of two means of proving juror bias, a juror (1) with connection to the circumstances in the case

(2) whose express explanation of his failure to disclose that connection creates a legal presumption of bias or "implied bias."

. . .

Buras's explanation of his failure to disclose his brother's job limps badly. Buras did not simply misunderstand the question asked. Nor did he simply forget the question or forget that his brother was a deputy sheriff in a law enforcement agency involved in the investigation. Rather, juror Buras consciously censored the information. He believed that it was *his* place, and not the place of the court or defense counsel, to determine whether his relations were a bar to jury service in this case. There is a strong inference that Buras wanted to serve on this jury and thought it unlikely that the court or defense counsel would permit him to do so.

Buras was hostile to what he correctly perceived to be the interests of the defense and the court. This in itself constitutes bias. As other circuits have recognized, "certainly, when possible non-objectivity is secreted and compounded by the untruthfulness of a potential juror's answer on *voir dire*, the result is a deprivation of the defendant's right to a fair trial." *United States v. Perkins*, 748 F.2d 1519, 1533 (11th Cir. 1984), *quoting United States v. Bynum*, 634 F.2d 768, 771 (4th Cir. 1980).

*Id.* at 699–700.

The implication of bias on Santini's part is, again, stronger than in *Scott*. Santini has not claimed that he believed he could be, or was, impartial when he withheld information that he was under investigation for aggravated sexual assault. Indeed, he has now admitted that he had a motivation to find Davis guilty of committing murder in the course of committing or attempting to commit aggravated sexual assault *because of* his hopes and fears related to the district attorney's imminent prosecution against him. A juror operating under the influence of factors external to the evidence in the case is challengeable for cause and biased as a matter of law. *See Jones v. State*, 982 S.W.2d 386, 390 (Tex. Crim. App. 1998) (under Tex. Code Crim. Proc. Art. 35.16(a)(9), "litigants

are entitled to jurors who will be genuinely open-minded and persuadable, with no *extreme* or *absolute* positions regarding the credibility of any witness").

Because Santini's bias is implied by law, no hearing is necessary to determine that Davis is entitled to habeas corpus relief. *See Brooks*, 418 F.3d at 434 (holding that juror's conduct was "not salvageable by post event hearings"); *Turner v. Louisiana*, 379 U.S. 466, 473 (1965) (finding implied bias when sequestered jurors that found defendant guilty and sentenced him to death had eaten with, and were driven to hotel by, two sheriff's deputies that were also key prosecution witnesses: "the potentialities of what went on outside the courtroom during the three days of the trial may well have made these courtroom proceedings little more than a hollow formality"); *United States v. Bishop*, 264 F.3d 535, 554 (5th Cir. 2001) (implied or presumed bias is appropriate in extreme circumstances, and "[i]ndicia of partiality are particularly problematic when coupled with the juror's lies or other efforts to hide a potential disqualification."); *United States v. Jones*, 854 F.2d at 699 (adopting Justice O'Connor's concurring statements in *Smith v. Phillips*, 455 U.S. at 222, that, *inter alia*, "[w]hile each case must turn on its own facts, there are *some extreme situations that would justify a finding of implied bias*.") (emphasis in *Jones*); *see also Reese v. State*, 739 So.2d 120 (Fla. 1999) (prejudice presumed where juror was arrested during trial, knew the arrest was imminent, and prosecution was being handled by same prosecutor trying case against defendant).

### 2.  Santini was actually biased.

Even if the Santini's bias were not implied by law, Davis is entitled to a new trial based on Santini's actual bias. Santini admitted in his sworn declaration that he "hoped that I'd get picked to be on the jury" because he knew that "[t]he DA's office for this trial was the same one that would decide what to do in my case," and he "figured that being on the jury and finding the guy guilty was my chance to prove to th[e district

14

attorney] that I'm a law-abiding citizen." Ex. A ¶ 7. When a juror decides to save himself by "finding the guy guilty," without regard for the evidence, that juror is biased.

Santini's sworn statement makes clear that his bias was powerful. The first incident was so stressful that he did not return to his home until days later when his accusers moved out. *Id.* ¶ 4. The second incident was even more stressful. He was caught in the act of masturbating over the girls and was chased through the house, the girls' mother "screaming and hollering." *Id.* ¶ 6. He barricaded himself in his bedroom and escaped by crawling out of a window, and again he waited until the victims moved out before returning. *Id.* He was "scared" when he was caught, *id.,* and he was scared of the consequences: "I didn't want to lose my government job, I didn't want people calling me a child molester, I didn't want to be prosecuted, and I didn't want to spend the rest of my life in prison, especially not for that." *Id.*

And his bias was so strong that he consciously hid the truth from the trial judge. He "decided not to" reveal the accusations pending against him even though he "thought about telling the judge" and even though he "knew maybe I was supposed to." *Id.* He believed finding Davis guilty was his only "chance" to save himself, "[s]o I kept my mouth shut and hoped that I'd get picked to be on the jury, and I was." *Id.* Santini's deliberate choice to hide the accusations underscores his own awareness of bias, and that he appreciated that, had he reported his situation truthfully, he would not be allowed to serve on Davis's jury.[3]

---

[3] Santini's instincts were correct. Under Texas law in effect at the time of Davis's trial, a juror was challengeable for cause if he or she harbored any biases or prejudices in favor of or against a defendant. Tex. Code Crim. Proc. Art. 35.16(a)(9). This provision guarantees litigants "jurors who will be genuinely open-minded and persuadable." *Jones v. State*, 982 S.W.2d 386, 390 (Tex. Crim. App. 1998).

Santini's admissions establish his actual bias. *See, e.g., Smith v. Phillips*, 455 U.S. 216, 217 (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it . . . ."); *Remmer v. United States*, 347 U.S. 227, 229 (1954); *Brooks v. Dretke*, 418 F.3d 430, 434 (5th Cir. 2005). To obtain habeas relief on this claim, a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for challenge for cause. *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). Santini denied that he had pending felony accusations against him, and later failed to alert the court that new felony accusations of aggravated sexual assault had been filed. He swore that nothing prevented him from being fair and impartial. He sat mute when the judge asked if anyone had any bias whatsoever. He listened as the judge instructed again and again that the primary purpose of voir dire was to ask about any biases that would interfere with the potential jurors' impartiality. He listened as the judge instructed the venire to reveal any changes affecting their responses before the start of trial. But, after being caught in the act committing a terrible felony, Santini secretly decided that serving on Davis's jury and finding Davis guilty was his chance to curry the prosecutor's favor in his own case. And with that motivation, he "kept [his] mouth shut and hoped that [he'd] get picked to be on the jury, and [he] was." Ex. A ¶ 7.

Even the existence of two active complaints made against Santini for aggravated sexual assault of minors, and the ongoing investigation into those complaints, would have been sufficient to establish his bias. *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976) ("Actual bias can come to light during voir dire in two ways: by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed." (citations omitted)). But had Santini admitted the truth—that he had a purpose to get onto Davis's jury in order to benefit his own precarious position with the same district attorney's office that was

prosecuting Davis, and that he planned from the start to find Davis guilty—his unfitness to serve would be obvious.

**B.    Alternatively, juror Santini's intentional untruthfulness on a material issue during voir dire violated Davis's constitutional due process rights to exercise his peremptory challenges or request additional peremptory challenges, requiring reversal of his conviction.**

"For more than a century, the Supreme Court has recognized that '[the] making of [peremptory] challenges [is] an essential part of the trial[,]' *Lewis v. United States*, 146 U.S. 370, 376 (1892), and has described the right of peremptory challenge as 'one of the most important of the rights secured to the accused.' *Pointer v. United States*, 151 U.S. 396, 408 (1894)." *United States v. Annigoni*, 96 F.3d 1132, 1136 (9th Cir. 1996), *overruled on other grounds by Rivera v. Illinois*, 556 U.S. 148 (2009). While peremptory challenges are not constitutionally mandated, impairment of a state statutory right may be grounds for reversal because the right provided is a means to achieve the ends of insuring an impartial jury and a fair trial. *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988).

Accordingly, the erroneous denial of a defendant's proper use of a peremptory challenge violates due process protections when the denial prohibited the enjoyment of the defendant's rights to a fair trial before an impartial jury. *Rivera v. Illinois*, 556 U.S. 148, 158 (2009).

In this case, had Santini honestly informed the court of the ongoing investigations into him for felony sexual assault, and that he hoped that by serving on Davis's jury he would be able to impress the prosecutors, Davis would have challenged him for cause, and the challenge would have been granted.[4] But, even if Santini had not been struck for cause, Davis would have exercised one of his peremptory challenges. Because Santini

---

[4] *See supra* claim I.A.

materially misrepresented himself during voir dire, and Davis was accordingly denied his right to both challenge Santini for cause and, if necessary, remove him with the proper exercise of a peremptory challenge, the deprivation of Davis's state right is one of constitutional dimension. Santini ultimately served on Davis's jury, therefore tainting the jury with bias and depriving Davis of his Fifth, Sixth, Eighth and Fourteenth Amendment rights to an impartial jury and reliable verdict. Davis's conviction must be reversed. *See Ross v. Oklahoma*, 487 U.S. at 85-86.

II.     **The State's failure to disclose its investigation and eventual prosecution of Juror Santini for aggravated sexual assault of a minor violated Davis's Fifth, Sixth, Eighth and Fourteenth Amendment rights to due process and a fair trial.**

### Factual Allegations

In 2001, El Paso police received the first accusation that Severiano Santini had sexually assaulted two young girls living in his home. Dir.Ex. A p. 7. The police were first contacted by the girls' mother, Camille Dickson, on February 12. *Id.* That same day, police interviewed the girls, then brought them to the El Paso Child Advocacy Center so that each girl could be interviewed again, on video. *Id.* at 7–8. Present at both interviews was El Paso police detective Earl Arbogast. *Id.* at 10. Also present for both interviews was Bill Anderson, an El Paso assistant district attorney then in the rape and child abuse unit. *Id.*

After the first girl was interviewed, Arbogast "agreed with the DA" not to pursue her case. *Id.* at 11. After the second girl was interviewed, "[t]he DA also agreed" not to pursue her case, either. Arbogast wrote up a report, which was approved by his superior three days later. *Id*. at 10–11.

Irving Davis's trial began the following year. The lead prosecutor was El Paso assistant district attorney Penny Hamilton. Hamilton was the chief prosecutor of the El Paso DA's rape and child abuse division. She supervised Anderson. Santini was in

Davis's jury pool, and his individual voir dire took place on June 3. Am.Ex. F. Hamilton was present for Santini's voir dire. *Id.* at 179.

On June 12, 2002—nine days after Santini was individually questioned by the prosecution and defense, but before jurors had been chosen—El Paso police received the second accusation that Santini had sexually molested the two girls. A report summarizing this second accusation was completed that same day. Dir.Ex. B p. 11–12. It detailed the accusations, and it identified Santini as the suspect by full name, address, race, age range, and physical description. *Id.* The report was copied to Child Protective Services and the Child Advocacy Center. *Id.* at 11. It was written by a different police officer, but soon the case was re-assigned to Earl Arbogast, the same officer who had handled the first Santini investigation. Dir.Ex. C p. 8.

On the morning of June 18, Arbogast had Dickson, the girls' mother, come to the station. She described to Arbogast what Santini had done in vivid detail. Arbogast immediately prepared a written statement which she signed. Dir.Ex. C p.6–7. He also prepared a report that identified Santini by full name, date of birth, home address, and complete physical description (race, height weight, eye color, and hair color). Dir.Ex. B p. 8.

Later that same morning, Davis's jury selection resumed. N.T. 6/18/02 at 7. Individual voir dire had ended the day before, and now all the remaining venire members, including Santini, were present. Hamilton and her co-counsel neither reported the Santini investigation to the court nor removed him with a peremptory strike. *Id.* at 11. Santini was empaneled as a juror. *Id.* at 19.

Two days later, Arbogast interviewed one of the girls. *Id.* (The other girl was interviewed by A. Bowling, a detective in the Crimes Against Children unit who also had interviewed the girls after the first accusation. *Id.*; Dir.Ex. A p. 10.) This time, unlike after the first accusation, the victims were interviewed with no assistant district attorney present.

19

Arbogast prepared his report of these interviews the same day, June 20. Dir.Ex. C p. 8–9. This report stated that he "will now attempt to obtain warrants for the suspect," Santini. *Id.* at 9. Unlike the first time Santini was accused, this time Arbogast apparently made the arrest decision without input from the district attorney's office. And whereas Arbogast's 2001 report was approved by his supervisor within three days, this time approval took 19 days, until July 9. *Id.*

The Davis trial ended on June 23. The jury, including Santini, voted to find Davis guilty and sentence him to death.

On July 11, Arbogast finally obtained a warrant for Santini's arrest, although Arbogast's June 20 report had stated that he would seek the warrant "now." Dir.Ex. E. After he was arrested, the charges against Santini were formally accepted by ADA Hamilton. Dir.Ex. A p.1. Although Santini faced life in prison, the prosecution offered him a plea deal resulting in a sentence with no prison time. Ex. C at 4, Dir.Ex. F. Santini accepted.

During the present habeas corpus proceedings, Davis sought discovery of the El Paso district attorney's file from the Santini case, which this Court initially granted. ECF No. 53, 76. The district attorney's office filed a motion to quash, and the Court ordered the office to submit the complete case files for *in camera* review. ECF No. 91, 93. At a hearing on the motion, the Court explained that the file contained essentially no work product:

> There is essentially very little, if any, work product in here. And I don't know how the DA's office works, but it appears to me there are -- other than -- as I indicated to counsel for Mr. Davis, other than emails talking about they're requesting the Santini file, there's no emails among DA's office staff, there's no emails between DA and police department, there's no emails between the DA and CPS. There's no written notes. I mean, other than perhaps on a police report, a little scribble or something, but there's, like, no notes in here.

ECF No. 108, N.T. 7/31/17 at 23-24.

## Legal Allegations

**The prosecution committed misconduct when it did not disclose the accusations and investigation pending against Santini.**

When the prosecution knows of facts that show a juror's unfitness to serve, but does not disclose these facts to the defense and the court, it commits misconduct that violates the defendant's right to due process. *See Williams v. Taylor*, 529 U.S. 429, 442 (2000); *Donnelly v. DeChristoforo*, 416 U.S. 637, 647–48 (1974).

The lead prosecutor at Irving Davis's trial, Penny Hamilton, knew during jury selection and during Davis's trial that juror Severiano Santini was accused of committing a serious felony by a credible witness who caught him in the act, that El Paso police were actively investigating this accusation, and that Santini himself did not reveal this to the court. Her failure to disclose what she knew was prosecutorial misconduct.

ADA Hamilton's knowledge is shown by the following facts and circumstances, taken together:

1. Hamilton was the head of the El Paso district attorney's rape and child abuse unit;

2. Hamilton was aware of each child-molestation case from the time any allegation was made to the El Paso police;

3. Consistent with #2, when police received the first allegation against Santini in 2001, an assistant district attorney was involved immediately. The assistant district attorney helped interview both victims and participated in the decision whether to pursue the case.

4. But when police received the second allegation against Santini in 2002— after Santini's individual voir dire—the district attorney's office deviated significantly from its prior practice, even though the same police officer, Detective Arbogast, handled both. This time, an assistant district

attorney was *not* present when the victims were interviewed and did *not* participate in the decision to pursue the case. And the victim interviews were done at the police station, not the Child Advocacy Center. Neither the police file nor the district attorney's office in opposing discovery provided any explanation for these departures from prior practice. These unexplained departures indicate that Hamilton was aware of the Santini investigation and made a deliberate decision to keep that knowledge hidden.

5. The June 12 police report was copied to child protective services and the Child Advocacy Center. The fact that the police copied the report to two other El Paso agencies that worked closely with Hamilton's unit makes it even more implausible that Hamilton was unaware of the active Santini investigation.

6. The police report documenting the second accusation against Santini was prepared and approved on June 12, while Davis jury selection was under way. The report with complete identifying information of Santini was typed on June 18 at 9:38 a.m. Dickson's signed statement, more fully detailing the second accusation, was typed minutes later, at 9:45 a.m.— before Davis's jury selection re-convened at 10:07 a.m., and before court recessed at 10:36 a.m. for the lawyers to make their peremptory strikes. All of this confirms that Hamilton had the opportunity to be fully informed about the pending accusation against, and investigation into, Santini before deciding not to peremptorily strike him.

7. The police delayed approving the June 12, June 18, and June 20 police reports for weeks, until after Santini's service on Davis's jury ended. Although Arbogast decided to get a warrant to arrest Santini on June 20, he did not do so until July 11, after the Davis trial was over. By contrast,

22

the police report from the first accusation was approved in just three days. The long delay is even stranger given that police decided to pursue the case after the second accusation, yet they left the accused repeat child-molester remain free for weeks. The unexplained and inexplicable delay in arresting Santini until after his jury service ended suggests that the timing was coordinated with Hamilton.

8.  In their motion to quash, the district attorney asserted that its Santini-case file contained the personal cellular telephone number of an unnamed assistant district attorney. ECF No. 91 at 4. There is a phone number hand-written on copy of the June 12 police report filed by the Director. Dir.Ex. B at 11. The Director has asserted that the documents it filed were "obtained with the advice and consent of the El Paso District Attorney's Office." ECF No. 82 at 4. This indicates that an assistant district attorney's phone number was written on the district attorney's copy of the June 12 police report, supplying additional evidence that Hamilton was informed about the second accusation and the investigation.

9.  The district attorney's Santini-case file contains essentially no work product. This defies innocent explanation. This was a major felony case: Santini was prosecuted for multiple counts of aggravated sexual assault on minors, and he faced up to life in prison. It was factually complicated—the victims and their mother had moved out of state, the first accusation had been deemed unfounded. There was a suppression hearing at which Santini testified. And Santini ended up receiving a plea deal, the terms of which the prosecution recommended, that gave him a sentence that was shockingly lenient. Given all that, the absence of work

product is irregular, even bizarre. It suggests either a deliberate decision to create no record of the office's work in this case or file destruction.

While direct evidence that Hamilton knew about the accusations and ongoing investigation before into Santini and during Davis's trial has not come to light yet,[5] the record as a whole provides sufficient circumstantial evidence of her knowledge. Tex. Disc. Rules of Prof. Cond. Rule 3.06 *Maintaining Integrity of Jury System*, cmt. 4 ("Because of the extremely serious nature of any actions that threaten the integrity of the jury system, a lawyer who learns of improper conduct by or towards a venireman, a juror, or a member of the family of either should make a prompt report to the court regarding such conduct."). Alternatively, knowledge should be imputed to the prosecution due to the El Paso police's active investigation into the second accusations. *See*, *e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (holding prosecutors have an express "duty to learn of any favorable evidence known to others acting on the government's behalf in a case"); *Giglio v. United States*, 405 U.S. 150, 155 (1972) (due process violation results from prosecutor's failure to correct false testimony whether failure resulted from "negligence or design").

Reversal of Davis's conviction is warranted.

---

[5] In light of the disclosure that the district attorney's Santini case files contain no notes and very little, if any, work product, Davis intends to file a follow-up motion for discovery.

**III. Irving Davis's counsel failed to competently investigate and present substantial, readily available mitigation evidence, including evidence of serious abuse and his dysfunctional family life. This failure denied Davis his right to effective assistance was counsel at the penalty phase.**

The guilt phase of a capital trial is about whether the defendant committed the crime—it focuses on the homicide. The penalty phase is about whether the defendant will be sentenced to life in prison or execution—it focuses on his life history.

The facts of the homicide of Melissa Medina by Irving Davis have been told. They were presented in great detail by the prosecution at trial, and they are recited in the state court opinions issued since then. With one significant exception,[6] the facts of the crime are not disputed by the parties.

But the story of Irving Davis's life has not been told. Fragments were presented at trial, and fragments were presented during state habeas corpus proceedings. Other fragments have not been presented before.[7]

Irving Davis began life with great promise. As a young boy, he had a winning personality and startling academic ability. But Irving's bright future was stolen away when he was still a child, for two fundamental reasons. First, Irving was subjected to off-the-charts abuse at home, primarily by his own father—savage physical abuse, cruel emotional abuse, and serial sexual abuse so damaging that even as an adult he cannot bear to remember it. This abuse likely damaged his brain; it certainly changed him forever. Irving tried to kill himself for the first time at age 11, and in a very real sense he

---

[6] *See infra* claim IV.

[7] Davis acknowledges that, given the byzantine complexity of habeas corpus litigation, different pieces of this story have different legal significance when it comes to assessing the effectiveness of trial counsel and state habeas corpus counsel, deciding whether to hold an evidentiary hearing, applying 28 U.S.C. § 2254(d) and (e), and analyzing procedural defenses. He recognizes that analyzing how those different inquiries apply to his evidence is necessary for the Court to adjudicate his claims, and he anticipates detailing his positions on how they apply in a future filing as directed by the Court.

has never stopped trying. Second, young Irving was failed by the people who should have protected him. The danger Irving was in was quite clear: to social workers in two states, to teachers and neighbors, and to his own mother. Nobody rescued him.

The jury that sentenced Irving Davis to death hardly knew him. What follows is the truth they should have been told.

### Factual Allegations

### A.  Promise

Irving Alvin Davis was born at a naval hospital in North Carolina in September of 1982. Irving weighed six pounds, nine ounces. He was born with his identical twin brother, Oscar IV. Both babies were healthy.

Irving's parents were Oscar Davis III—known in the family and referred to here as "Buddy"[8]—and Carol Fuller. Buddy and Carol met in 1974 in a night club. At the time, Buddy was in the Army; Carol worked at a hosiery and had an infant child, Carl, by another man. Buddy and Carol married later that year, but the marriage was troubled from the start, and by the following year they had already separated for the first time: Buddy left the Army and moved to South Carolina, while Carol and Carl moved to Anthony, Texas, to live with Carol's mother. Two years later, Buddy joined the Marines and reconciled with Carol, and they moved to California. But Buddy soon began physically abusing Carol, and before the year was out Carol took Carl and moved back to

---

[8] This is done mainly to reduce confusion between Irving's father, Oscar III, and Irving's twin brother, Oscar IV. Both are sometimes referred to in the record simply as Oscar, and brackets clarifying who is being discussed have been added. Buddy also was known in the family as Big Oscar.

In this amendment, "Davis," appearing alone, refers only to the petitioner. Other members of his family are referred to by their first names, again to reduce confusion. "Irving" is used to refer to the petitioner when he was a child.

Texas while Buddy remained stationed in California. Am.Ex. K ¶¶ 3–9 (Affidavit of Carol Davis).

But Carol took Buddy back again, and in 1978 their first child was born, Veronica Davis. Buddy was deployed for a year overseas, and when he returned he was stationed in Cherry Point, North Carolina. Carol moved with Carl and Veronica to be with him, and the family sank back into chaos. Buddy began beating Carol again, and Carol was out of the house so much that eight-year-old Carl was Veronica's primary caretaker. After Carol became pregnant again with Irving and his twin Oscar, Buddy's abuse of Carol and the two kids got worse. Am.Ex. N ¶ 13 (Affidavit of Carl Fuller). "It seemed that every time I got pregnant," Carol recalled, "things would go to hell in a handbasket." Am.Ex. K ¶ 13 (C. Davis aff.). During this time, Buddy got into a drunken brawl at a cookout. Someone was shot dead with Buddy's gun, and Buddy was beaten so severely with a two-by-four that he needed facial reconstructive surgery. *Id.* ¶ 15.

When Irving and Oscar were born, their half-brother Carl was nine years old. The same night that Carol was at the hospital giving birth to Irving and Oscar, Buddy was at home raping Carl for the first time:

> I [Carl] was at home with Oscar [Buddy] and Veronica. Oscar took me into his bedroom so I could sleep with him. This was because I was crying because I wanted my mom. He got upset and that was when he pulled my pants down, pulled his pants down, he put baby oil and put it on his dick and slipped his dick into my butt. I was screaming and crying. He told me I better not tell anyone or he would kill me and my mom. That happened and I put my face in the pillow so I wouldn't scream because of the pain.

Am.Ex. N ¶ 15 (C. Fuller aff.).

As an infant, Irving was healthy and normal. He smiled at two months, rolled over at four or five months, and sat up at five-and-a-half months. A doctor who examined him at eight months after a febrile seizure reported that Irving was current on his shots, well-nourished, and developmentally normal. Ex. F at 5, 22 (National Personnel records).

When Irving was two months old, his family moved from North Carolina to Anthony, Texas, where Carol's family lived. Buddy shipped out from there for overseas duty in Japan. Carl remembers this as a great year, a peaceful time for the family without Buddy. Am.Ex. K ¶ 16 (C. Davis aff.); Am.Ex. N ¶ 8 (C. Fuller aff.).

### Virginia

When Irving was one year old, Buddy returned from his deployment overseas and was stationed in Virginia Beach, Virginia. Carol moved herself and her four kids there to live with him. They lived in Virginia Beach from 1983 to 1989, until Irving was seven. For Irving, these years were comparatively good—hard, but not nearly as hard as what came after.



Irving, right, with his twin brother Oscar during a visit
to their grandmother's around age five. Ex. G.

The Davis's next-door neighbor in Virginia Beach was Jan Phillips, and no outsider
had a clearer picture of the Davis family during these years. She lived on the other side
of the duplex wall, she was friends with Carol, and their families socialized together
regularly. Phillips's children played with Irving and his siblings all the time. While
Buddy and Carol worked, she babysat Irving and Oscar all day, every day, for several
years. Ex. H ¶¶ 2–7 (Declaration of Jan Phillips).



Irving and Oscar making Christmas cookies at Jan Phillips's house. Ex. G.

Phillips witnessed Buddy's "full-blown alcoholi[sm]," seeing him passing out in the driveway and their trashcan filled to the top with empty bottles of Thunderbird liquor. She remembers that Buddy was "very hard on the kids" and "very strict with the twins." Carol confided to her that Buddy was physically abusive to her. *Id.* ¶¶ 8, 9, 11, 13.



Irving and Oscar (matching shirts—Oscar is in front with his arms raised) with Jan Phillips's children and other neighborhood kids. Ex. G.

As Irving's primary day-time caretaker, Jan Phillips knew Irving uniquely well during those years. She saw how well Irving did socially: "Irving played with my children and other children in the neighborhood. The other children liked Irving. Irving got along with the other children. There were never any problems between Irving and the other children." *Id.* ¶ 7. She remembered that Irving "could be silly and funny. His face would light up when he felt he'd done well." *Id.* ¶ 18.

And Irving did well often. Phillips remembers Irving being "as capable and on track as anyone his age." She taught the twins shapes, numbers, and colors, and she watched them play, and "Irving picked up on things I taught him just like my kids." *Id.* ¶ 17. "Irving had a lot of potential." *Id.*

31

Phillips recognized that Irving and his twin brother were under a lot of stress at home, but still "[t]hey were happy boys for the most part." *Id.* ¶ 16. "Irving and Oscar were sweet boys." *Id.*

Jan Phillips's observations match up with what members of Davis's family remember of these years. Carl remembers these years as mixed and unpredictable. Buddy and Carol still fought a lot, but now he pushed her instead of hitting her. Some days, Buddy would come home from work and play catch in the yard with Carl and Veronica; other days, he would come home drunk and would fly into a rage if there was toothpaste in the sink or someone had sat in his chair. Am.Ex. N ¶ 18 (C. Fuller aff.). Carl had it the worst, because Buddy resumed sexually abusing him:

> It was at Virginia Beach that "the new punishment" which was called "our little secret" started again. My mother was working two jobs, one at Beverly Enterprises and the night job was at K-Mart. She was often away. The sexual abuse was not always for punishment. When it was for punishment, Oscar would give me a choice between a beating or "our secret." The times when I wasn't being punished, Oscar would simply order me to his room. This never occurred when my mother was at home. It was not only anal sex, but Oscar made me perform oral sex on him. Oscar would warn me not to bite him or he would "beat the shit out of me."

*Id.* Carol recalled that Virginia Beach was where "things got out of hand between Oscar [Buddy] and Carl," observing that the "level of emotional abuse increased" and that Carl "started to confront Oscar about the treatment that the kids, as well as myself, suffered at the hands of Oscar." Am.Ex. K ¶ 17 (C. Davis aff.). When Irving was around two years old, Carl walked in on Buddy raping Carol. Ex. I ¶ 20 (C. Fuller dec.).

Despite everything at home, Irving showed real promise when he started school. Even though he did not go to kindergarten, his performance in first grade was impressive. On a standardized test one month into the school year, Irving tested in the 99th percentile for non-verbal communication. Ex. J p. 14 (school records). At the start

of the first-grade school year, his verbal ability was tested in the 35th percentile, but by December, he scored in the 72nd percentile for vocabulary. *Id.* pp. 14–15. By the end of the year he earned a B in mathematics and an A- in reading. *Id.* at 25.

After the first marking period, his first-grade teacher wrote on his report card that "Irving is doing well academically in first grade but I would like to see a great deal of improvement in his conduct and work habits. His inability to get along and cooperate hamper his efforts to achieve to the best of his ability." *Id.* at 27. By the second marking period, Irving already was doing better: "Irving has begun to improve his conduct and work habits and when he truly tries — he excels. Keep up the good work, Irving!" *Id.*

Irving's first years in Virginia Beach show the promise he had. While violence and chaos surrounded him already, he still was able to flourish. Irving shined in school, he made friends easily, and he was happy and sweet.

### California

After Irving finished first grade, Buddy was re-stationed to the Marine base in 29 Palms, California, and the rest of the family left Virginia Beach with him. On the way out to California, they passed back through Anthony, Texas, and Carl insisted on staying there, unwilling to live with Buddy any longer. Buddy was enraged when he realized that Carl, the target of his sexual abuse, was leaving. Buddy, Carol, Veronica, Oscar, and Irving continued on to California without him. Am.Ex. N ¶ 18–19; Am.Ex. K ¶ 18 (C. Fuller aff.); Ex. K ¶ 18 (Declaration of Geraldine Laster).



Irving's father, Oscar Davis III, known as Buddy. Ex. G.

In California, the chaos and violence in Irving's home intensified, and Irving began

to feel its full impact. Buddy was a Marine drill sergeant who brought home bizarre

notions of discipline. He regularly would force his sons, just second-graders, to spend hours at a time on their hands and knees, picking pieces of lint from the rug with tweezers. Am.Ex. L ¶ 4.e (O. Davis dec.). Buddy would get in the boys' faces, and "call them 'fucking pukes' screaming all the time." Am.Ex. M ¶ 4.e (V. Davis aff.). Fueled by alcohol, he punished any imagined misdeed with violent fury. Veronica recalled:

> He would [order] me to remove my pants and underwear and lay face down on the bed, with my feet on the ground, butt in the air. The whupping was not always immediate. The waiting could be for hours. This only increased the pain. It was tiring to have to lay in that position. Fear would increase. It was emotionally punishing. The twins got the worst of this . . . .

*Id.* Irving and Oscar were subjected to the same perverse ritual. Am.Ex. L ¶ 4.e (O. Davis dec.); Ex. L p. 62 (Reynolds report). As an adult, Oscar still "remember[ed] the fear and anguish anticipating what was to come," and he remembered the belt his father used to beat them: "He would use the same belt, a light brown leather belt with a silver belt buckle with a blue mood stone in the middle of the buckle." Am.Ex. L ¶ 4.e (O. Davis dec.).

For young Irving, these beatings were horrific:

> Irving reported that his father did not like to hit in the same spot, and instead, tried to hit Irving all over his buttocks, back and legs. He described, "he'd pretty much hit you everywhere over and over and over. "Irving never knew how many times his father would hit him, and so did not know when the beating would end. He described that his father seemed to hit him until he tired himself out.
>
> He described feeling intense, unbearable physical and emotional pain during his father's beatings. Irving remembers crying, screaming and begging for his father to stop, and telling his father how sorry he was for whatever his transgression had been. While this did not stop his father from continuing, if Irving did not cry, or if he involuntarily became numbed or dissociated, his father would keep beating Irving until he broke down into tears.

Ex. L p. 17 (Reynolds report).

One New Years' while the family lived in California, Carol left the children in Buddy's care and went to Nevada. While she was gone, Buddy left the children with neighbors and went out on his own with a woman named Dawn who lived across the street. Dawn soon accused Buddy of sexually assaulting her, and military police found him passed out on Dawn's bed with a blood-alcohol level of .27. *Id.* at 33. Buddy was held in the brig on the Marine base for two weeks and then faced a court martial trial. He was acquitted of rape but found guilty of indecency and demoted. Buddy insisted that he was innocent and that the woman was lying, and Irving believed his father. Ex. L p. 38 (Reynolds report).

In second grade in his new school in California, Irving's promise still shone through. That fall, Irving was named most-improved student, and he entered a short story contest and won first place. On standardized tests that year, his scores ranged from the 81st percentile in spelling and 80th percentile in word analysis down to the 25th percentile in science. On his second-grade year-end report card, he did well on his academic subjects and received top marks for reading and spelling. Behaviorally, in the first half of the year he graded high-satisfactory for respecting authority and respecting others. But by the end of the year, as Irving's savage belt-beatings added up, those grades fell to satisfactory. Ex. J at pp. 1, 5.

A couple weeks after he started third grade, Irving came to school with red marks on his face, his back, and his bottom. An anonymous complaint was filed with the local child protective services department, alleging that Buddy left these marks by beating Irving with a belt. After an investigation—"Worker did observe red marks to the face"—social services ruled the abuse allegation "unsubstantiated." Ex. P p. 11.

Less than three months later, a second attempt was made to get social services to intervene. A later report described:

> They received a second report on 12/11/90 because Oscar was hysterical when it came time to ride the bus. He stated that his father was trying to throw him across the room and beat him. . . . Worker observed him [Buddy] to be very strict and controlling.

*Id.* But the result was the same: "This report was unsubstantiated and closed." *Id.*

While in California, Carol obtained a restraining order against Buddy, issued by the Marine base's provost marshal's office. Ex. M at 1 (1992 El Paso Sheriff's Department report).

Irving was still a good student in third grade, but the chaos at home was taking its toll. In standardized testing that year, Irving still scored in 85th percentile nationally in word analysis, but now his lowest scores, language and math, were in the bottom 10th percentile. On his end-of-year report card, his grades were lower than the year before, and now he graded low-satisfactory on completing assignments and needless talking. His teacher—it is unknown if this was the same person who discovered the belt marks covering his body earlier that year—wrote, "Irving needs to continue to put more effort into each area. He needs to allow his ability to come through." Ex. J at pp. 2, 3, 30.

### *Texas*

Early in Irving's fourth grade school year, Irving was moved again: Carol and the three children left California and left Buddy. Irving, his mom, and his siblings returned to Anthony, Texas, moving back into Carol's mother's home.

On Irving's school-withdrawal report, his fourth-grade teacher in California wrote, "Irving needs a lot of encouragement to stay on task & get homework turned in. His grades could be higher if he turned more work in. When Irving is in the right frame of mind he can add a lot to a class discussion." Ex. J. at p. 10.

Irving, his mother, and his siblings spent the next eight months or so in Anthony, without Buddy. This was a period of relative calm at home. Carol remembered it long after as a peaceful and happy eight months for them:

> Things were going smoothly after Oscar [Buddy] was, once again, out of the picture. The kids were doing well in school, they loved being with their grandmother and aunts and uncles and cousins and[] their big brother. Most importantly, there was peace. We moved to our own house on Jaime Street in Anthony. The kids had friends and could just be kids.

Am.Ex. ¶ 25 (C. Davis aff.).

But not all was peaceful during that year in Texas. In January, Buddy passed through town, and Buddy and Carol had another terrifying fight. After midnight, El Paso police received a call about a family fight at their home. Ex. M p. 1 (sheriff's report). When the police arrived, Carol "was crying and yelling at me to do something about her husband." *Id.* Carol reported that Buddy had assaulted her during an argument, pushing her to her bed and then pushing her face into the carpeting. *Id.* The officer saw that she had a swollen lip, rug burns on her face, and swelling around her eye. *Id.* Carol was "very upset" and begged the officers to arrest Buddy. *Id.* When one officer said he was going to let Buddy go, she showed the officers a prior restraining order against Buddy by the provost marshal's office from the military base where they lived in California, and she said she had been assaulted by him in the past. *Id.* The officer arrested Buddy for Assault Class A (family violence). Carol gave a written statement:

> I would like to state that my husband Oscar Davis and I are currently separated, we have been separated for approx. 4 mos. I do have a temporary restraining order against my husband issued out of the state of Calif. My husband is on active duty military. On 01-04-91 at approx. 2340 hrs, my husband Oscar Davis was at my residence in Anthony TX. He had been drinking, we had gotten into a verbal argument. My husband grabbed me by the hair of my head and forced me face down onto the bedroom floor. My husband had his knee on my back and was forcing my face into the floor. This act caused me a great deal of pain to the left side of my face.

*Id.* p.3. She added, "I would like to state that this is not the 1st time that this sort of thing has happened." *Id.* But in the end the charges against Buddy were dropped. Am.Ex. ¶ 26 (C. Davis aff.).

In school, Irving in fourth grade showed both strength and decline. His grades were in the 80s and 70s, and his standardized test scores ranged from a high in the 76th percentile for word usage down to just the 3rd percentile for math. Ex. J pp. 8, 34.

For all the abuse, chaos, terror, and lack of love that Irving had already survived as a young boy, Irving at nine years old probably still had a chance to flourish. If the relative stability and peace he had when living without Buddy in Anthony in fourth grade were the childhood Irving got to have, his story might have been very different.

It was not to be.

## B.  Horror

The summer after Irving's fourth grade, Buddy came to back to Texas. Buddy insisted that the family come with him to his new deployment at Camp Lejeune, North Carolina, or else his retirement money would be in danger. The children did not want to go, but Carol's financial dependence on Buddy trapped them all. So they moved to a new state again, and, for the fourth time, Carol took Buddy back. She said years later, "I should have known better." Am.Ex. ¶ 26 (C. Davis aff.).

*North Carolina*

In North Carolina, the relative peace the family had enjoyed in Texas without Buddy now "all came to an end." Am.Ex. ¶ 26 (C. Davis aff.). In Carol's words:

> The household was a very different one when we moved to North Carolina. First, we lived in a 1 bedroom apartment with the five of us. There was lots of verbal and physical abuse.

> We moved to a house on Warren Court. While at this residence, we went to counseling, but only stayed together as a family for Oscar's [Buddy's] benefit, not ours. I was working two jobs and had little time for my children. They were involved in school activities and I had hoped that their father would assume a positive role in their lives. This did not happen. His harsh treatment of all of us continued, as did his drinking. There was seldom a time when he was at home that he wasn't drunk.

*Id.* ¶¶27–28.

The summer they moved to North Carolina, Irving was sexually abused for the first time, by a neighbor who claimed to be a pastor running a summer church camp. Ex. M p. 34 (Reynolds report); Ex. N. p. 2. (Report of Arthur Ramirez, M.D.); Ex. R p. 8 (prison medical records). As an adult, Irving described what happened:

> Irving described the pastor, an "older, balding white haired-white guy." He drove a Winnebago to their housing complex one summer to offer kids food, activities and games. . . .

> Irving remembered that the pastor showed interest in him and recalled that he took Irving aside as the other kids were leaving to go home. Irving was pleased that this nice man was "showing him favor." He wanted positive attention from adults. This was something he couldn't get from his parents at home. Irving recalled that the pastor took his hand and offered to show Irving the inside of the Winnebago, which Irving was eager to see. Once inside, the pastor offered him juice and showed him a jar of pickled eggs, which he'd never seen before, and told him that he could eat as many as he wanted. He sat Irving on his lap and asked him questions. At some point, while holding Irving on his lap, he touched his penis and put his hands down Irving's pants.

Ex. M pp. 34–35 (Reynolds report). At the time, Irving thought that something about him made him a target for abuse: "'They can smell it [the weakness] on me, I'm like chum in the water,'" and he began to believe "'someone *will* touch me, someone *will* hurt me.'" *Id.* at 37. As an adult, Davis believed he should have known better than to trust the man, and therefore he deserved what happened to him. *Id.* at 36. He was nine years old.

Like his half-brother Carl, Irving was sexually abused by his father. As is common with victims of childhood sexual abuse, Davis fiercely avoids remembering or discussing this abuse: "'if I talk about it, I will try to kill myself. If I get to the bottom of this and acknowledge it, I will want to die.'" *Id.* at 41; *see also* Ex. N. p. 2 (Ramirez report) ("The examinee did not disclose the details of the sexual abuse."). Although Davis has never described his father's sexual abuse to anyone, he has acknowledged it several

times, including to a court-appointed psychiatrist in 2008, to a defense psychologist in 2008, to a Department of Corrections psychologist in 2014, and to a psychologist retained by his present counsel. Ex. N. at 2 (Ramirez report); Am.Ex. O ¶ 5 (Schutte aff.); Ex. L at 40 (Reynolds report).

As an adult, Irving's twin brother Oscar admitted to a single close friend, Lisa Copus, that Buddy sexually abused both of them. He told her that Irving and Oscar were "raped for years" by their father. Oscar once showed Copus a childhood photograph of the twins, and he told her the photo was taken during the years when their father was sexually abusing him; to Copus, the boys appeared to be around eight years old. Ex. D attachment C ¶ 10 (Unsigned declaration of Lisa Copus).

When did his father begin abusing Irving sexually? Buddy raped Carl for the first time when Carl was nine. Oscar's admission to Copus indicates Buddy was molesting both twins by the time they were eight. And, as described below,[9] Buddy sexually molested his niece's son when the boy was seven. So the available evidence suggests Buddy was sexually molesting Irving by the time they were in North Carolina and Irving was nine years old.

---

[9] *See infra* pp. 54



Irving, right, with Oscar, cooking in the kitchen in North Carolina
around age 10, in fifth grade. Ex. G.

That fall, 1992, Irving started fifth grade. In November, the county child protective
services (CPS) in North Carolina opened an investigation for neglect. Ex. P. The CPS
investigation was triggered by a report, apparently from a teacher, of a domestic violence
dispute involving the Davis children and that Buddy drinks a lot. *Id.* at 5. CPS assigned a
caseworker, who interviewed Irving and Oscar and prepared an intake report. She
wrote:

> H[istory] of child abuse in CA & Georgia. Mr. Davis returned
> from deployment on Oct 5/6. The boys state that things were ok
> until then. At progress report time, the boys were scared to death for
> their dad to see the grades.

> Yesterday, Ervin[10] came to school with bags under his eyes &
> red eyes. He states his parents got into a fight last night (Sun[day])
> & he was up all night checking to make sure his mom hadn't been
> killed. Mr. Davis drinks a lot. Sun[day] he broke a glass bell & cut

---

[10] The CPS reports initially misspell Irving's name as 'Ervin.'

Mrs. Davis up. He then threatened to kill her. Mom woke the kids up so that they could witness it. Dad "tortured the kids" to find out who Veronica's real dad was.

Ervin adds that dad mixes alcohol w/ everything in the refrig[erator] & they are afraid to drink anything but milk & koolaid. Dad hits, beats & thumps the back of their ears.

* The children express great fear for DSS intervention, but want dad to get help.

H[istory]: CA Ervin was hospitalized from dad throwing him across the room.

*Id.* at 2–3. The case worker later prepared a written report that added details about the initial interviews:

Oscar advises that his parents had an argument but they made up yesterday. The argument involved cuss words. Irving believes that his dad had one drink before the argument. He usually drinks Gin. Oscar believes that they may move out because his mom said so. Oscar states that during the argument his mom knocked a bell off and it broke. The glass cut her finger and hand. Irving adds that they were screaming and yelling at each other and then he hit her. Neither has any idea where he hit their mom. Oscar believes that their dad chased their mom out of the house at this point, while she was yelling for someone to call the police.

Oscar informs that his parents fight a lot. He adds that things are okay when he's gone.

Irving advises that they get spankings and "thumped behind their ear".

Irving states that Department of Social Services investigated them in California when their dad punched him in the chest. As a result, he was hospitalized and his dad was sent to the barracks. (This occurred in California.) Oscar denies ever being punched, but states that he is "spanked lot with a thick belt". Irving adds that Department of Social Services also was involved because of bruises to his bottom, legs and back from a spanking.

They have an older brother, Carl, in Texas, however, Oscar [Buddy] is not his biological father.

43

Oscar advises that they can't go to their dad for anything, but states that he's not afraid. Irving states that he is afraid. Oscar adds that during the fight his father said to his mom "you lay another finger on me, I'll break your neck".

Irving states that he is going to tell his dad about "our talk" so that he can get his "spanking over with". Oscar states that his father mixes alcohol with orange juice and leaves it in the refrigerator. He usually has 2-3 drinks a week and sometimes get drunk, but not usually.

The boys left at this point and Irving came back in saying Oscar was crying. Oscar came back in extremely scared. He stated that he was going to tell his father tonight because he wanted to get his beating over with. He kept stating "it's all my fault, those things wouldn't have happened if ..." He also stated over and over "I should have kept my mouth shut." Oscar continued to appear more scared and terrified about going home.

*Id.* at 5–6.

When school ended that day, the caseworker received a phone call, apparently from a school employee, reporting: "Oscar was screaming and yelling when school ended. He refused to get on the b[us].[11] He kept screaming 'I just want to get my beating over with'. It took them ½ hour to get Oscar on the bus." *Id.* at 6.

That evening, the caseworker went to the Davis's house and interviewed Buddy. She reported:

Mr. Davis presented the two boys, Oscar and Ervin, and then asked Veronica to come to the door. He stated, "here are my three kids—they are here and alive—do they look mistreated?" Then Mr. Davis sent them away from the door.

Mr. Davis then proceeded to ask who had made the report. Social Worker, once again, responded that the reporter's identity would not be revealed.

---

[11] The original reads "bed."

> Mr. Davis said he was insulted by the report and became very defensive. Social Worker explained that she was only there to hear the family's side of the story. Mr. Davis stated that he was refusing to cooperate with this type of nonsense and to tell the reporter to come see him.

*Id.* The caseworker noted that Buddy "was extremely angry" throughout the interview.

*Id.* at 7. That same night, she interviewed Irving's mother at work by telephone:

> Mrs. Davis stated that she and her husband had an argument Sunday night. Mrs. Davis said they argued on their back deck and the children were inside. Mrs. Davis denied the allegations of domestic violence between she and her husband. Mrs. Davis also denied a glass being broken or her being cut.
>
> Mrs. Davis stated that she and her husband have some personal problems. She said it takes him some time to readjust when he returns home from deployment.
>
> Mrs. Davis stated that Mr. Davis had been to school concerning the twins' progress.
>
> Mrs. Davis advised that Mr. Davis does drink, however, she would not elaborate to what extent.
>
> Mrs. Davis denies all other allegations. . . .
>
> Mrs. Davis stated that her children slept comfortably every night and got up with good attitudes in the morning. Mrs. Davis does not see the need for removal of her children.

*Id.* In a follow-up interview that night, Irving's mother reiterated that "everything at home was okay" and "reassured the Social Worker, several times, that her children are in no danger at home by the father." *Id.* In her report, the caseworker wrote that she and her supervisor "originally thought that filing a petition for removal of the children would be best." *Id.* at 8. Irving was only 10 years old, but this is one of the most important moments of his entire life. The report continues: "However, with Mrs. Davis's continual reassurance of the children's safety, it was decided to make a home visit with the entire family" the next day instead. *Id.*

At that visit, Buddy was "still resistant and hostile. Social worker observed very controlling behavior by him to Mrs. Davis." Buddy again said he would not cooperate, and he told her she "was not to ask the children anything." *Id.* at 9. The caseworker left. Later that day she confirmed that social services in California had investigated the family because Irving "had marks from a belt spanking." *Id.* She noted, "Mrs. Davis claimed she did not know the details." *Id.*

After Buddy's commanding officer told him to cooperate with the CPS investigation, the caseworker re-interviewed Buddy and Carol:

> Mrs. Davis states that they had an argument on Sunday but denies any physical confrontation between the two. She denies being "beaten or threatened in any way". She adds that the "worker's information was wrong and I resent my sons being called out of class and being made a spect[acle]". She appeared angry and defensive towards worker. She added "I bet you think I'm hostile now". Worker responded by saying "it appears that you are extremely angry". Mr. Davis adds "You haven't seen hostile yet".

*Id.* Buddy and Carol both claimed the boys were making it up:

> Mrs. Davis advises that Irving worries about everything and wants to "check on everyone". She denies the allegations completely and states that her "children are safe".

> Mr. Davis, basically, remained silent during the interview and smiled every once in awhile.

> Mr. Davis states that Irving has a strong imagination about events and things. He denies any spouse abuse or domestic violence incidents.

*Id.* at 9–10. At the end of the interview, Buddy said he had ordered his children not to speak to the case worker unless a parent was there, instructing them to tell her, "'You must speak to my father.'" *Id.* at 10.

When the social worker tried to interview Oscar the next day, Oscar refused to look at her and "stated several times 'I have nothing to say,'" which he admitted his father told him to say. *Id.* at 11. Irving, meanwhile, told her that he wanted to speak with her but was not allowed to. *Id.*

Uncertain what to do, social services decided to wait until they received records from California social services. A couple of weeks later, the case worker spoke to a California social services employee who had reviewed their records. She learned that, as described above,[12] the California records involved similar allegations and confirmed injuries to Irving's face. *Id.*

With this information, the case worker met with her supervisor and together they reached a decision: they deemed the allegations unsubstantiated. The case was over.

The reason? "Because both parents deny the allegations and due to insufficient evidence." *Id.* The case worker ended her final report thus:

> Mr. Davis is very controlling & has little ability to see things in any way other than black or white. His boys voice great fear of him & are at [time]s terrified to go home. Wkr see's this family as high risk.

*Id.* at 18.

Irving Davis was born with real promise, but his childhood overflowed with terror and horror. Many grown-ups saw the danger that little boy was in—saw it clearly—and had the power to save him. But his mother, his aunts and uncles, neighbors and teachers, the military, the police, social workers in two states, all the adults who had the chance to come to Irving's rescue, all failed. When social services in North Carolina

---

[12] *See supra* at p. 36.

failed to protect ten-year-old Irving, it was not the first time, and it was not the last, but it may be the hardest to explain.



Oscar's back as an adult, still covered with the scars left
by one his father's beatings. Ex. Q attachment.

Within a year, at age 11, Irving attempted suicide for the first time. He had gotten in trouble at school for not getting his report card signed, and he knew when he got home his father would beat him again. Irving went into the school bathroom, took off his belt,

slung it over one of the bathroom stalls, and tried to hang himself. He was discovered and taken to the school office. Irving was sobbing; the guidance counselor kept telling him that everything was going to be okay once his parents came. Buddy came, took him home, made him strip and lie on the bed for hours, and then beat him. Ex. R at 1 (prison medical records); Ex. L p. 61–62 (Reynolds report).

Irving began to struggle in school as never before, flunking sixth grade. Ex. S pp. 16, 29. In standardized testing, he scored in the 32nd percentile in reading, 27th percentile in math, and the 2nd percentile in science. *Id*. The following fall he started seventh grade anyway.

Oscar remembers being embarrassed to go to school—their neighbors could hear the beatings in their house from down the street, and their classmates would talk about it at school. Am.Ex. L ¶ 4.e (O. Davis aff.). Chris Jenkins was a classmate whose friend lived two houses down the street from the Davis's, and he confirmed Oscar's memory: "When we would play outside at my friend's house, we could hear yelling and screaming coming from inside Irving's house." Ex. T ¶ 3 (Declaration of Chris Jenkins).

In November, Carol sought another domestic violence protective order. Ex. U p. 2, 10 (divorce file).

In February 1995, when Irving was 12, Buddy and Carol had one final, terrifying fight. Buddy had a loaded shotgun in the house, and Carol was "fearful for her life." To escape, she had to crawl out of her bedroom window. Police were called. *Id*. at 9. A few days later, Buddy moved out for good, and that summer Carol filed for divorce. *Id*. at 3.

Carol's divorce complaint alleged that Buddy:

- physically and verbally abused her, often in the children's presence;
- threatened her "so as to place her and said minor children in imminent danger,"
- struck and punched her throughout the marriage;

- abused alcohol chronically and consumed large quantities of alcohol each week;

- "verbally and mentally abused the minor children against the protestations of the plaintiff," and

- posed "a danger of serious and immediate injury" to Carol.

*Id.* at 9–10. The state court granted the divorce and made findings of fact that Buddy "was a chronic abuser of alcohol and consumed large quantities of alcohol each week" and that Buddy physically abused Carol, threatened to injure her numerous times, and Carol "is frightened of [Buddy] when he is consuming alcohol and fears for her physical safety." *Id.* at 2–3.

Once Buddy was gone, Carol spiraled into severe alcoholism herself and left the children to fend for themselves. Am.Ex. J ¶ 21–22 (Gonzalez dec.); Am.Ex. K ¶ 36 (C. Davis aff.); Am.Ex. M ¶ 4.c (V. Davis dec.); Ex. I ¶¶ 5–8 (C. Fuller dec.); Ex. Q ¶ 7 (O. Davis dec.); Ex. D att. C (Copus unsigned dec.). Every evening, Carol would come home from work and go right to her bedroom with a bottle of alcohol, gone until emerging the next morning to leave for work. Am. Ex. L ¶ 6 (O. Davis aff.); Ex. L p.33 (Reynolds report). Carol's sister remembered that, while Carol tried to hide her problem, she drank "as much as Big Oscar drank" and had to be hospitalized for her drinking twice. Ex. K ¶¶ 15–16 (Laster dec.). A friend and co-worker recalled that Carol had a drinking problem, would drink enough to slur her words talking on the phone, and showed up at work smelling like alcohol. Ex. V ¶¶4–5 (Declaration of Felicia Morris).

Irving was sexually abused by a third abuser when he was somewhere between ages 14 and 16. This time, his abuser was a family friend. Again, Davis is able to admit it happened, but unable to relive it. Ex. L pp. 42–43 (Reynolds report); Ex. N. p. 2 (Ramirez report); Ex. R p. 8 (prison medical records).

At 14, Irving tried to hang himself again, with a jump rope. A year later, at his grandmother's house, he tried and failed again. Ex. L p. 70 (Reynolds report). He tried yet again to kill himself at age 16:

> His mother had summoned his father back to the house in order to try to control Irving's behavior. He recalled that his father immediately resumed his psychological abuse, but stopped short of physically beating Irving. Irving felt so unsafe with his father in the house again that he decided to get his father to leave. He described going into his father's bedroom one day while his father was sleeping and picking up his father's gun. His father woke and caught Irving holding his gun, at which point Irving, overcome with disbelief, shame and horror that he had even thought to harm his father, dropped the gun and ran to the laundry room and began drinking Pine Sol. Irving recalled that his father came into the laundry room and watched him drink the Pine Sol, while asking him, "What are you doing? What are you doing?" Irving had drunk so much that he immediately began throwing up. He cried and told his father, "I don't want to be here anymore." Irving next recalled that his mother came home. Neither his father nor mother spoke to Irving about this desperate behavior, took him to the hospital or sought psychological treatment for him.

*Id.* at 70–71.

Irving began cutting himself, slashing his arms deeply with knives and razor blades. He also held burning cigarettes against his flesh until they went out. *Id.* at 58. Oscar was cutting himself too. This led his mother to drive Irving to a local mental-health facility. It is unclear if he was ever evaluated, but what is clear is that she never followed up and Irving received no treatment. Am.Ex. K ¶ 31 (C. Davis aff.). Carol told a co-worker that she was concerned about Irving but could not afford to get him any help. Ex. V ¶ 8 (Morris dec.).

Irving's grades and standardized test scores continued to decline. He passed seventh grade, but he failed eighth grade. He passed his state competency test in math with the lowest passing score, but he failed the reading test. After summer school, he

advanced to ninth grade, which he also failed. In tenth grade, he was absent for 26 days. Ex. S.

In spite of everything, as a teenager Irving still showed glimmers of his promise. In school, he loved performing in plays and singing in the chorus. Am.Ex. J ¶ 19 (V. Gonzalez aff.); Am.Ex. M ¶ 4.h (V. Davis dec.); Ex. T ¶ 5 (Jenkins dec.). A friend remembered he loved to sing karaoke and was an excellent dancer who knew every dance step to every song. Ex. D att. C (Copus unsigned dec.).



Irving, age 16, with his sister Veronica. Ex. G.

At age 16, Irving was caught at school with marijuana in his wallet and sock. Ex. S at 10 (NC school records). As punishment, he was barred from being in the chorus. His mother recalled that, as a result, he "lost contact with many of his positive influences" and he took a downward turn. Am.Ex. K ¶ 33 (C. Davis aff.). He dropped out of school early in eleventh grade. Ex. S at 1, 4, 8 (NC school records); Ex. W at 9–10 (2009 NC CPS report). He was arrested for possession of stolen property and placed on probation. Am.Ex. K ¶¶ 33–35 (C. Davis aff.).

*Texas*

When Irving was 17, Carol decided to move back to Anthony with Veronica and Irving. Am.Ex. K ¶ 34 (C. Davis aff.). This move left Irving socially and culturally isolated. A nerdy outsider by nature, now Irving as a teenager was dropped into a community where he started with no friends and where he was one of few African Americans in an overwhelmingly Hispanic community. Not long after they moved, Irving made two more serious suicide attempts, hanging himself in his grandmother's carport and then a month later swallowing an overdose of sleeping pills.

Still, Irving did his best. He made friends with a boy named Martin Oscar and he briefly dated Martin's sister Reyna. Reyna remembered that her mother liked Irving—he was polite, and he would volunteer to help her with chores—and she often would invite him over for meals. Ex. X ¶¶ 8–9 (Declaration of Reyna Oscar Ayala). Reyna remembered how, in Anthony, Irving made a lot of friends in a short time, and how he was always trying to make other people laugh: "One of the things I remember most about Irving is that he was mostly joking around. He was a goofball, silly, always joking around. It seemed like he was always dancing. He broke into dances even when there was no music." *Id.* ¶ 10.

The event that led to Davis's conviction and death sentence occurred on June 4, 2001, when Irving was eighteen years old. Irving was at a teenage drinking party at a friend's house; one of the other kids there was 15-year old Melissa Medina. At the party, Irving showed interest in Melissa; others who were at the party later testified that she did not show interest in him. When the party broke up, she began to walk home alone, and he joined her. They began to have sexual intercourse, and she was a willing participant. But she changed her mind and stopped. She told him not to tell anyone they had had sex, and that, if he did not keep her secret, she would claim he had raped her. Irving "lost [his] mind," "blacked out," and "was in a haze," and he strangled her until she died. After a panicky, abortive effort to prevent the body from being identified by

cutting off her fingertips, he left her body in the field and fled home, where he was arrested the following day. He quickly confessed to killing her, expressed extreme sorrow, and said he thought about committing suicide every day.

On appeal, the Texas courts affirmed Davis's conviction but vacated his death sentence and remanded for a new capital sentencing hearing.

In 2006, more than a year and a half before Davis's resentencing, Buddy was convicted of sexually abusing his niece's son. Ex. Y at 3 (court file); Ex. Z at 6 (police file). The seven-year-old boy, Brian described to police what happened:

> He stated that he and his mom's uncle, Oscar Davis III, b/m 49 y.o.a., were getting Brian's bicycle out and realized it had a flat tire. Mr. Davis said he had a tire pump at his place at [address]. At about 1730 hours, Mr. Davis drove Brian in his Ford truck SC tag 775-DKP to get the pump. Upon arrival, Brian noticed an exercise bike in one of the bedrooms, not Mr. Davis's master bedroom, and began to use it. Brian became hot and took off his shirt. When Brian was done, he laid down on the bed which had white sheets. At this point, Mr. Davis apparently began to fondle Brian in the groin area. He took of Brian's pants and then sodomized Brian. When this act was complete, Mr. Davis asked Brian to "suck his dick" but Brian refused. Brian spelled out dick to me not wanting to say a "bad word."

Ex. Z at 6 (police file). After a trial, North Carolina, Buddy was convicted of felony indecent liberties with a child and received a sentence of 16 to 20 months in prison and lifetime registration as an aggravated sex offender. Ex. Y at 3; Ex. AA (DOC file).



Buddy's mug shot from North Carolina's sex-offender registry after his conviction for indecent liberties with his niece's seven year-old son. Ex. AA.

•

While Davis was in prison between his trial and his resentencing, he was evaluated by numerous prison mental health professionals. Their reports were available to penalty-phase counsel but apparently not obtained by them.

In 2004, Davis told a triage evaluator, "Been trying to kill myself for a long time...but now I don't need to kill myself because the State's gonna do it for me." Ex. R p. 1 (prison medical records). The evaluator talked with Davis about his history of suicide attempts and self-mutilation and his first suicide attempt at age 11, and noted Davis's low self-esteem, self-worth, and sense of hopelessness *Id.*

A 2005 prison medical record noted, Davis "states 'I want to die, the sooner the better, I am looking forward to it. I don't want treatment.' The patient looks/acts very depressed." *Id.* p. 2.

A 2006 mental-health triage report noted that Davis had been flagged by the prison as a suicide risk. Davis told the interviewer that he attempted suicide at 11 and "that he had been molested." *Id.* p. 4.

Prior to the start of Davis's resentencing hearing, court-appointed psychiatrist Arthur Ramirez evaluated Davis to determine if he was competent. Ex. N (Ramirez report). Davis told him he had no desire to live, that he saw a psychiatrist once at 15 after an argument with his brother he began cutting his arm with a knife, and that he experienced no warmth or empathy during his developmental years. *Id.* 1–2.

Davis also disclosed that he had been abused physically, emotionally, and sexually:

> Developmental history is significant as the examinee was reared in a chaotic and dysfunctional family unit. He related that his father was extremely physically abusive of all his siblings and his mother. The examinee briefly described that his father would beat him and his siblings with a belt. He stated, "If we cried he would hit us more . . .". In addition, the examinee described a father who was extremely emotionally abusive. Secondly, the examinee stated he was sexually abused periodically from the ages of five through age eighteen. The examinee stated he was sexually abused by a "family member", "a neighbor", and a "friend". The examinee did not disclose the details of the sexual abuse.

*Id.* at 2.

Also before Davis's 2008 resentencing, Davis underwent a partial mental-health examination with James Schutte, a psychologist retained by the defense. Davis told Schutte he had been sexually abused, including being raped by a male, from ages six to 18. Am.Ex. O ¶5, Ex. BB at 1 (Schutte notes).

•

In the course of preparing this petition, Davis was evaluated by two mental health experts: a psychologist with expertise in trauma, Victoria Reynolds; and a neuropsychologist, Dale Watson.

### Trauma evaluation

A clinical psychologist, Dr. Victoria Reynolds is an expert in assessing and treating trauma, with particular expertise in trauma suffered by soldiers in combat and males who have been sexually abused. Dr. Reynolds reviewed records and interviewed Davis

for 16 grueling hours. The affidavit that summarizes her findings, with her curriculum vitae attached, is Exhibit L.

Dr. Reynolds reviewed the trauma that Davis suffered as a child in the following categories:

- physical abuse by his father

- psychological torture, control, and emotional abuse by his father

- exposure to domestic violence by his father towards his mother

- physical abuse by his brother

- neglect by his mother

- parental alcoholism

- sexual abuse by a pastor

- serial sexual abuse by his father

- sexual abuse by a family friend

- sexual exploitation by an adult

- institutional neglect by social services

*Id.* at 16–45. Dr. Reynolds concluded that Davis's history of trauma is extreme:

1. Irving experienced prolonged and severe physical, verbal and psychological abuse from his father. Though labeled "punishment" by his father, the severity of his methods went well beyond any form of reasonable consequences and instead constituted child abuse.

2. Irving's father whipped him with a belt to the point of injury, punched him with his fists, slapped and pushed him; he repeatedly belittled and intimidated his son, called Irving a "fucking maggot," and a "fucking puke," and threatened to kill him. His father also perpetrated extreme forms of psychological abuse that involved exerting total control of Irving's needs to eat, drink, sleep and affiliate with members of his own family. Irving was also made to witness the abuse of all of his other family members, including the torture of the family pet and severe physical abuse of his mother and twin brother.

3. Finally, Irving was a victim of repeated sexual abuse by at least four different caretakers and adults, including his father, starting when he was 6 years old and continuing until he was around 15 years old.

4. This extreme exposure to physical violence occurred within the context of traumatic neglect by his mother, which persisted through his childhood into his adolescence. Whether due to her own victimization, her alcoholism or her need to work to support her family, Irving's mother nevertheless failed to take measures to protect Irving from his father or brother's violence, to validate his fear and distress, or to help soothe and repair the damage of these experiences. Perhaps most psychologically damaging were the times she left the house while he was being beaten, when she supported her husband's violence by blaming it on Irving's behavior, and when she denied the abuse within the family to child protective services, who would have been in a position to help the family.

*Id.* at 72–73.

Dr. Reynolds then analyzed the *impact* of that trauma on Davis, applying scientific research on the harm caused by childhood exposure to abuse and violence. *Id.* at 45–72. She concluded that the trauma he experienced "would be objectively overwhelming to even the most stable adult":

5. These forms of child maltreatment expose the child to levels of indifference, physical pain, helplessness, anger, fear and betrayal that would be objectively overwhelming to even the most stable adult--never mind a child without the brain and behavioral capacities, or the physical or interpersonal resources of an adult. The combined violence of his father and the neglect of his mother meant that Irving had no recourse to a parent who was minimally reliable, capable and protective.

6. Irving's development and behavior show several debilitating impacts that result from his traumatic abuse and neglect. He started to show these negative impacts at a very early age, the most obvious of which was signaled in his first suicide attempt at age 11. Even before this attempt, he experienced significant distress including chronic anxiety, fear and problems concentrating. The collateral damage of his traumatic abuse showed in his rapidly declining test scores and grades at school, such that he went from scoring in the superior

range in several areas of intellectual functioning to scoring well-below his peers by the 4th grade.

7. As well, his abuse impacted Irving's sense of his developing identity. He developed an increasingly pervasive sense of self-hatred, guilt and self-blame for his own abuse and for not being able to prevent his brother's and mother's abuse. By the time he entered adolescence, he believed the mere fact of his existence caused pain to others. At the same time, he sought out ways to reduce his fear of pain and abandonment by eliciting and re-creating such experiences in order to master them in what he felt was a controlled way.

8. The imprint of Irving's physical and sexual abuse is most apparent in his sexual encounters and his attempts at forming intimate relationships in late adolescence and early adulthood. Equipped only with experiences of accommodating the sexual needs and violence of supposedly "caring" adults, Irving instead repeatedly re-enacted them. He re-experienced the physical pain and emotional betrayals his childhood perpetrators induced in an attempt to manage the intrusion of emotional terror, numbness and dissociative symptoms into his sexual life. However, as with all traumatic re-enactments, such attempts fail, and instead increase feelings of confusion, desperation and -- in Irving's case -- his reliance on self-harm and suicide as solutions to his extreme distress.

*Id.* at 73–74.

Dr. Reynolds concluded:

Irving's exposure to severe parental violence and violation must be integrated into any understanding of his adult behavior. When viewed in this context, his crime for which he is convicted can be seen as an extension of adaptations and reactions to the extreme pain, danger, betrayal, and absence of respect for one's humanity that were enacted by his caretakers. Because Irving's abuse was not stopped, nor the impacts treated, his traumatic childhood and adolescence continued to actively impinge upon his perceptions, emotions, somatic state, and behavior at the time of his crime.

*Id.* at 77.

### Neuropsychological evaluation

Over three days, Dr. Watson administered a comprehensive battery of four dozen neurological tests to measure Davis's brain function. His findings, test data, and

59

curriculum vitae are Exhibit CC. Dr. Watson is a renowned neuropsychologist who has tested over 600 capital prisoners. Davis's test results, he said, were "complex and remarkable." *Id.* ¶ 3.

On the one hand, he found that Davis has "solid intellectual capacities" and "college-level academic skills," well above-average even when compared not just to prisoners but to the population at large. *Id.* ¶. In a test of his acquired knowledge, he scored in the 86th percentile. In tests measuring his ability to remember things he had seen, he scored well above-average. *Id.* ¶ 4. In a test of his academic skills, he scored above the 12.9 grade level, literally off the scoring chart. *Id.* ¶ 7.

On the other hand, Dr. Watson found that Davis suffers from "specific deficits that are very significant." *Id.* ¶ 3. In sharp contrast to his strength at remembering what he sees, Davis is severely impaired when it comes to remembering words he hears, scoring in the 1st percentile on multiple tests. *Id.* ¶ 4. He has similarly severe impairments in verbal fluency and specific motor functions. *Id.* ¶ 5. And Davis is terrible at interpreting other people's facial expressions and tone-of-voice to understand emotional communications. *Id.* ¶ 6.

Dr. Watson noted that Davis's brain function—a profile with real strengths side-by-side with sharp deficits—was "rare" and "surprising." *Id.* ¶¶ 3, 7. To Dr. Watson, Davis's different deficits formed a clear pattern. The main things Davis's brain struggles with are things done in the frontal part of his brain's left hemisphere; the things it does well happen elsewhere, especially the right hemisphere. That pattern is consistent with head trauma, such as repeated blows to the head during childhood: it indicates that Davis likely suffers brain damage. *Id.* ¶¶ 3, 8.

**Legal Allegations**

**Counsel's failure to reasonably investigate and present mitigation evidence denied Davis his constitutional right to the effective assistance of counsel at the penalty phase.**

The jurors that sentenced Irving Davis to death had only a grossly incomplete picture of Davis's life history outlined above. They never knew the horrifying depths of the physical and sexual abuse he suffered at his father's hands. They never were given a clear picture of how young Irving was failed time and again by the adults responsible for protecting him from the horrors he suffered. They never heard how the trauma Irving suffered impacted his mental health and damaged his brain.

The jurors never knew this because the lawyers charged with representing Davis at the penalty phase of his capital trial also failed him. Counsel's mitigation investigation and their penalty-phase presentation were both far below prevailing professional norms. Their duty was to conduct a mitigation investigation that was thorough, but they failed to take even the most rudimentary steps: they did not gather records, did not hire a mitigation investigator, did not have a mental health expert evaluate Davis, and did not adequately interview even the most obvious and available mitigation witnesses, the members of Davis's immediate family who were at the resentencing hearing. Counsel's performance was deficient, and the mitigation evidence they failed to find and present was exceptionally compelling. The jurors were not introduced to Irving Davis, but instead received only random bits of his life, without context, connection, or meaning. If counsel had performed reasonably, there is a reasonable probability that at least one juror would have voted against sentencing Davis to death.

Davis was denied his right to effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. *See Strickland v. Washington*, 466 U.S. 668 (1984). Davis's death sentence should be vacated, and he is entitled to habeas corpus relief on this claim.

### A. Counsel's performance was deficient

Counsel's overarching penalty-phase duty was to conduct a thorough investigation of the defendant's life history and present the fruits of that investigation to the jury. *Sears v. Upton*, 561 U.S. 945, 953–54 (2010); *Rompilla v. Beard*, 545 U.S. 374, 388 (2005); *Wiggins v. Smith*, 539 U.S. 510, 522 (2003); *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *Strickland*, 466 U.S. at 690–91. Irving Davis's penalty-phase counsel fell far short:[13]

- Counsel failed to collect any social services, medical, or mental-health records, and failed to collect significant school and prison records. Am.Ex. J ¶¶ 13, 15, 19, 25 (Affidavit of Vincent Gonzalez); Am.Ex. K ¶ 40 (Affidavit of Carol Davis); Ex. DD N.T. 5/17/13 at 55–56 (testimony of Morales); Ex. DD N.T. 5/17/13 at 83–84 (testimony of Macias).

- Counsel failed to conduct searching interviews of Davis's mother and siblings. Am.Ex. J ¶¶ 13, 17, 18 (Gonzalez aff.); Am.Ex. K ¶ 40 (C. Davis aff.); Am.Ex. L ¶¶ 4, 5, 8–10 (Affidavit of Oscar Davis IV); Am.Ex. M ¶ 4, 10 (Affidavit of Veronica Davis); Am.Ex. N ¶¶ 20-21 (Affidavit of Carl Fuller); Ex. DD N.T. 5/17/13 at 106 (testimony of Macias).

- Counsel failed to investigate Davis's father and learn he was convicted of sexually molesting his niece's seven year-old son. Am.Ex. J ¶¶ 24, 25 (Gonzalez aff.); Ex. DD N.T. 5/17/13 at 61 (testimony of Morales); Ex. DD N.T. 5/17/13 at 86, 105 (testimony of Macias).

---

[13] These bullets contain clusters of facts that support Davis's claim for relief that counsel's failure to investigate and present mitigation was ineffective. The facts are organized in this way for the Court's convenience. The bullet points are not separate ineffective-assistance claims.

- Counsel failed to interview other key, readily available mitigation witnesses. Am.Ex. J ¶¶ 13, 18 (Vince Gonzalez); Ex. K ¶¶ 2–4 (Geraldine Laster); Ex. T ¶ 6 (Chris Jenkins); Ex. H ¶ 21 (Jan Phillips); Ex. V ¶ 11 (Felicia Morris); Ex. D att. C (Lisa Copus).

- Counsel sexually harassed Davis's aunt. Am.Ex. K ¶ 42 (C. Davis aff.) (describing how Macias invited aunt to sit on his lap; she researched his disciplinary record and found prior sexual-harassment complaints); Am.Ex. J ¶ 17 (Gonzalez aff.);

- Counsel failed to retain the services of a mitigation specialist. Am.Ex. J ¶ 13 (Gonzalez aff.); Ex. DD N.T. 5/17/13 at 21–22, 74–76 (testimony of Morales and Macias).

- Counsel failed to begin any mitigation investigation until after jury selection had already started. Am.Ex. J ¶¶ 8, 25 (Gonzalez aff.).

- Counsel failed to develop and present key mitigation evidence even when they were aware of it. Ex. DD N.T. 5/17/13 at 36 (father's alcoholism), 36 (father's verbal abuse) (testimony of Morales); *id.* at 37, 82, 98, 100 (father's beatings), 83, 98 (suicide and cutting), 83–84 (North Carolina child protective services investigation) (testimony of Macias); Ex. N (Ramirez report).

- Counsel failed to develop evidence of Davis's childhood trauma history and failed to undertake any analysis of the impact of that trauma on Davis's mental health and culpability. Am.Ex. J ¶¶ 27–28 (Gonzalez aff.); Am.Ex. O ¶ 6 (Schutte aff.).

These were basic responsibilities that any competent death penalty counsel would have performed.

At the evidentiary hearing held during state habeas corpus proceedings, counsel embraced the Director's suggestion that their penalty-phase strategy was "personal

accountability." Ex. DD, N.T. 5/17/13 at 39, 101. But counsel was in no position to formulate a reasonable strategy because their investigation was so slapdash. *Strickland*, 466 U.S. at 690–91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."). Counsel had no idea what records were available or what they contained. They had little idea what the available mitigation witnesses knew. When they obtained critical mitigation leads, they did not work to develop and corroborate them through credible witnesses and contemporaneous records. Macias admitted that "the mother told us that CPS had intervened in the Carolinas," but they never obtained the records. Ex. DD, N.T. 5/17/13 at 83–84. Macias admitted that "people in the Carolinas told us" that "his father had been very, very strict,"—Macias "knew [Buddy] had beat him [Irving] with a belt and he made him stand like in a corner or something, and I know he made him take his pants down for the beating,"—but they chose not to investigate it further: "we took a different strategy in trying to show what [Irving] was like." *Id.* at 82, 96. Different indeed. Ignorant about their client's life and the available mitigation evidence, counsel decided that Davis would testify and he would explain everything on his own. *Id.* at 40 ("I guess the strategy at that point was just try to humanize him as much as possible to the jury and have them kind of understand who he was and what he thought, through his testimony . . . ."); *id.* at 96 ("I think most of our strategy was based on working with this young man and going in front of the jury and explaining himself.").

Macias was asked at the hearing if he had "any reason to believe that [Davis] had been sexually assaulted," and he answered "No." *Id.* at 99. But before the resentencing hearing, the court-appointed competency expert wrote in his report that Davis said "he was sexually abused periodically from the ages of five through age eighteen," by a friend, a neighbor, and a family member. Ex. N at 2 (Ramirez report). Macias apparently was unaware of this. Davis also admitted that he had been sexually abused to the

defense's psychologist, Am.Ex. O ¶ 5. Macias did not realize this, either. Davis also admitted to a prison interviewer in 2006 that he had been molested, but counsel never got those records. Deficient performance does not get much clearer.

Counsel's failure to investigate and present mitigation was unreasonable and fell far short of prevailing professional norms.

### B. Davis suffered prejudice

If counsel had reasonably investigated and presented the available mitigation evidence, there is a reasonable probability that the jury would have chosen not to sentence him to death.

Vince Gonzalez, the mitigation investigator retained by state habeas counsel, summarized in matter-of-fact language the evidence of Davis's life that he had collected:

> "His entire minority is best described as a period of uninterrupted instability, punctuated by the intermittent absences of his father, the regular physical, sexual, and emotional abuse to which he was subjected when his father was present, and neglect by an exhausted, abused, and clinically depressed mother when his father was away. On two occasions while the family resided in Jacksonville, North Carolina, and again at 29 Palms, California, the family was subject of an investigation by the Department of Family Services for suspected abuse or neglect. These pressures and abuses led Irving to engage in acts of self-mutilation as a teenager, cutting his body with razor blades, and in turn eventually to multiple suicide attempts by the same means. Taken for psychological evaluation to the Carteret Behavioral Health Center for depression, Irving did not return, or was not returned there by his mother, for appropriate follow-up or treatment, a process which might have helped to avoid his continuing descent into social dysfunction, isolation, and despair."

Am.Ex. J ¶ 21 (Gonzalez aff.). Irving's struggle to flourish, he wrote, "was mainly brought about by the brutality of his childhood." *Id.*

The person Gonzalez described was the same person the court-appointed psychiatrist described more briefly before the resentencing, and the same person

described more fully in this amendment. That person bears no resemblance to the one the jurors were told about. The jurors heard little about Davis's childhood, and most of what they did hear was from Davis himself, uncorroborated. The prosecutor was able to sweep it away by arguing at closing, nine times, that Davis is a "con man." N.T. 2/26/08 at 103, 105, 106, 107, 108, 109, 111.

It was easy for the prosecution to dismiss Davis's testimony as self-serving, but if counsel had provided jurors with credible witnesses and contemporaneous records, things would have been different. The marks all over Irving's body in third grade were not a "con." Nor were Jan Phillips's memories of a promising young boy and trashcans overflowing with empty liquor bottles, nor the long string of police reports and protective orders from Buddy's brutality against his family, nor the early potential and tragic decline shown by Irving's report cards, nor the results of neuropsychological testing showing brain damage, nor his father's conviction for raping a seven-year-old boy. Nor were the records of the investigation launched by the social services in North Carolina in 1992, initiated after 10-year-old Irving revealed that the night before he had been up all night making sure his father did not kill his mother. That evidence would have mattered to jurors.

The prosecution's case for death was not compelling. It relied heavily on Davis's religious affiliation, which was improper, and on the pathologist's testimony that Davis raped the victim, which was junk science. *See infra* grounds for relief IV, V. The prosecution had none of the powerful future-dangerousness evidence that often forms the core of a capital prosecution—prior murders, a long and violent criminal history, careful premeditation, and no remorse. Instead, it was forced to rely on vague teenage incidents and minor childhood transgressions like shoplifting, smoking marijuana, and passing through school grounds while suspended.

The mitigation evidence that counsel missed was extraordinary. Death row prisoners often have tragic life histories, but very, very few capital petitioners have

66

mitigation this compelling. If Irving Davis's lawyers had done their job, at least one juror would likely have voted against a sentence of death.

## IV.   Trial counsel was ineffective for failing to challenge pathology testimony that was erroneous and critical to the prosecution's case.[14]

To make Irving Davis eligible for the death penalty, the prosecution had to prove beyond a reasonable doubt that the murder of Melissa Medina occurred in the course of committing or attempting aggravated sexual assault. *See* N.T. 6/21/02 at 151, 154 (jury instructions). At trial, it was undisputed that Davis killed her, and it was undisputed that before he killed her they had sexual relations, but it was disputed—and remains so to this day—whether the sexual contact was consensual. Davis confessed that he killed her, and he remorsefully pleaded with the jury to sentence him to death, but from the day of his arrest he has unwaveringly maintained that their sexual relations were consensual.

The prosecution had no eyewitness, video, or similar evidence to the sexual contact. The prosecution's main evidence it was not consensual was the testimony of pathologist Dr. Corinne Stern, the medical examiner who performed the autopsy. At Davis's 2008 capital resentencing, Dr. Stern testified that her opinion was that the victim had been sexually assaulted because her sexual contact with Davis was non-consensual; her conclusion of non-consent, in turn, rested squarely on her autopsy finding that the victim's vagina had abrasions and redness. N.T. 6/20/02 at 90 ("She had multiple abrasions of the mucosa with surrounding erythema. Erythema is just a fancy word for redness."). When asked what scientific evidence she relied to reach her expert opinion that the sex was not consensual, she stated, "The evidence that we have is that she has some serious injuries to her vaginal mucosa. That's the scientific

---

[14] This ground for relief was not asserted in Davis's petition or first amended petition.

evidence we have." N.T. 2/19/08 at 110.[15] She told the jury, "Healthy consensual sex shouldn't leave injuries." *Id.* at 106.

Dr. Stern's testimony was dead wrong. For decades, scientists have known that vaginal abrasions and redness are a normal occurrence during intercourse that is consensual. The prosecution's theory that Davis raped the victim rested on junk science from a flawed witness. If the jury had known the truth, it would not have convicted Davis of sexual assault and thus could not convicted him of capital murder. And even if Davis had been convicted of both counts, he would not have been sentenced to death. Trial counsel's failure to challenge Dr. Stern's false testimony was ineffective assistance of counsel.

### Factual Allegations

***What the jury heard***

At Davis's capital trial in 2002, the prosecution presented Dr. Stern to testify about the autopsy she performed on Medina. She testified that during the autopsy she examined inside Medina's vagina: "She had many injuries to her perineal area…. She had mucosal abrasions….Those are just like scrapes inside the vagina with—and it was very red surrounding this. We use the word—we call it erythema, but it just means redness around from the irritation." N.T. 6/20/02 at 161. She testified that Medina was sexually assaulted, and that her opinion was based on the injuries she had observed. *Id.* at 163, 170. The prosecution emphasized this testimony in closing arguments: "[H]e did it while he was raping her. There was nothing consensual about it. Dr. Stern told you it was sexual assault. It wasn't consensual." N.T. 6/21/02 at 162.

---

[15] She gave substantially the same testimony at Davis's 2002 trial. N.T. 6/20/02 at 161, 163 (testifying that the victim had mucosal abrasions and redness, that in her opinion she was sexually assaulted, and that her opinion was based on the injuries she'd observed).

At Davis's capital resentencing in 2008, consent was again a key issue. It was undisputed that Davis and the victim had sexual relations before her death. Davis himself admitted as much. N.T. 2/25/2008 at 232. He admitted that he killed her. *Id.* at 234–35. His remorse was extreme: he called himself "a piece of crap," and he begged the jurors repeatedly to sentence him to death. *Id.* at 243–44.

But he never wavered from his insistence that their sexual contact had been consensual. He testified that as they were walking home together he was flirting with her, and then they began "making out." *Id.* at 232–33. He said they undressed and began to have sex, "not for long, but we had started." *Id.* at 233. He said they stopped when "she froze up on me" and told Davis that she could not do this because she had a boyfriend." *Id.* When she threatened that if he told anyone she would accuse him of rape, he "just snapped" and strangled her. *Id.* at 234.

To persuade the jury beyond a reasonable doubt that the sex had not been consensual, the prosecution relied again on Dr. Stern.

First, Dr. Stern described her autopsy vaginal examination: "I did a speculum examination of her vagina, and in the mid-upper vaginal vault, or the opening of the vagina, she had multiple abrasions of the mucosa with surrounding erythema." N.T. 2/19/08 at 90. She took color photographs of the inside of the corpse's vagina, one of which the prosecution displayed for the jury during her testimony. *Id.* at 91.; Ex. EE (graphic autopsy photograph). Describing the intra-vaginal photograph, she stated, "This shows -- this is the speculum. It's just a plastic tool we use to open the vaginal area here, and you're seeing abrasions or scrapes and that erythema or redness surrounding this area in the upper vaginal vault." N.T. 2/19/08 at 91. So the sum total of the injury she described was redness and more than one intra-vaginal abrasion.

Dr. Stern then testified that her opinion was that around the time of death[16] the victim was sexually assaulted. *Id.* at 92. On cross-examination, she explained the basis for that opinion: "Healthy consensual sex shouldn't leave injuries." *Id.* at 106. Again: "Because consensual healthy sex, however vigorous it is, should not leave injury like that. Those are serious, painful injuries." *Id.* at 107. While she qualified that she was "not a hundred percent sure" the sex had not been consensual, she said it was her opinion was that the scientific evidence was not consistent with consensual sex. *Id.* at 109. Asked what scientific evidence she had, she stated, "The evidence that we have is that she has some serious injuries to her vaginal mucosa. That's the scientific evidence we have." *Id.* at 110.

The defense did not present any expert to discuss the autopsy evidence.

In the prosecution's closing arguments, the consent issue was critical. The prosecution maximized its inflammatory impact: "Let's say somebody moved in next door to you who had raped a child. Do you think you'd get alarmed and think, bull, you're not moving in next to me?" N.T. 2/26/08 at 40; *accord id.* ("This is a sexual deviant and now having raped and murdered a 15-year-old kid. . . . If your kid was near him, you'd be terrified.").

***What the jury did not know***

At Davis's request, Dr. Stern's testimony was reviewed by Dr. Lindsey C. Thomas, a nationally renowned forensic pathologist. Dr. Thomas found:

> There have been numerous articles published in the medical literature documenting the finding of injuries just like Ms. Medina's with sexual intercourse that is consensual. Dr. Stern was wrong in her

---

[16] Dr. Stern later clarified that the sexual intercourse occurred prior to death, *id.* at 103–04, and that she could not be more specific than that it occurred two hours or less pre-mortem, *id.* at 117.

testimony in light of the science available at the time of the trial, at the time of the re-sentencing and even more so now.

Ex. FF ¶ 3 (Declaration of Dr. Lindsey Thomas).

Dr. Thomas cited extensive scientific literature demonstrating that vaginal injuries cannot be used to infer the absence of sexual consent, including numerous scientific articles published both before Davis's 2002 trial and before his 2008 resentencing. *Id.* ¶¶ 17–22. For example, a 1999 study in the journal *Human Reproduction* found that abrasions and erythema occurred and were "not surprising" after consensual intercourse." *Id.* ¶ 19. A 2003 study in the journal *Academic Emergency Medicine* found that 73 percent of women had genital injuries after consensual intercourse. *Id.* ¶ 19. It concluded, "Clearly, the presence of anogenital trauma suggests that penetration has occurred and implies nothing about consent." *Id.* A similar 2006 study published in the *Journal of Forensic Nursing* compared vaginal injury after sexual activity and found "no statistical difference in the presence of injury between the consensual and nonconsensual groups." *Id.* A subsequent study collecting these studies and many others like them concluded, "Post-coital injury in healthy women is a not-so-rare event," and, "the presence or absence of genital injury should not be used to render an opinion regarding consent to sexual intercourse." *Id.* ¶ 21.

Dr. Thomas concluded:

> Dr. Stern's testimony is contradicted by robust scientific literature and I found no articles that support her conclusion that the presence of these abrasions and erythema prove nonconsensual sexual activity.
>
> . . . .
>
> My opinion, to a reasonable degree of medical certainty, is that Dr. Stern's assertion that the abrasions and erythema of the vagina are inconsistent with consensual sex was unreliable and incorrect. The evidence that she relied on to conclude that the victim had been raped did not provide any support for her conclusion.

*Id.* ¶¶ 23, 25.

This is not the first time that grave questions have emerged about Dr. Stern's work in a case where a defendant's life was at stake. The year after Dr. Stern's testimony at Davis's resentencing, similar concerns emerged about her work in another capital murder case—including her reliance on bad science. In Alabama in 2006, Dr. Stern performed the autopsy on a baby who had died, and she concluded that the baby was killed by suffocation. Bruises on the baby's forehead and mouth indicated use of force, Dr. Stern found. Based on Dr. Stern's autopsy finding, the baby's mother was charged with capital murder and jailed for nine months.

But in that case, before trial the defense lawyer questioned Dr. Stern's findings. Concerned, the prosecutor had other experts review the case, and based on their findings the charges against the defendant were thrown out. According to a news report of the court hearing where the defendant was released, "six different forensics experts found the baby died of pneumonia caused by an infection and was stillborn. What Stern thought were bruises were actually signs of decomposition." Jay Reeves, "Past cases open after Ala. murder charge dropped," *Associated Press* (April 10, 2009) (Ex. GG). "The judge said in 30 years of law practice he had never seen an expert make a mistake so bad." *Id. T*hat was not all:

- Stern "did not notice pneumonia in the baby's lungs," pneumonia that was "obvious" to the six other medical examiners. Stephanie Taylor, "Dismissal of charges raises questions about doctor," *Tuscaloosa News* (April 10, 2009) (Ex. HH).
- Stern "performed a 'float test' on the baby's lungs, during which they floated when completely submerged in water. Dr. Gregory Davis, a director at the University of Kentucky College of Medicine, noted in his review that the test has been unreliable for years, and cited a 1985 textbook that said

that the test was suspect even in 1900." Dr. Davis wrote, "This test has

been held as non-reliable for over a century." *Id.*

The prosecutor said, "It was almost unbelievable that a mistake of this magnitude could

be made in a case like this." *Id.* The judge said, "This causes the court great concern

about what may have happened in other cases." *Id.*

**Legal Allegations**

**Counsel provided ineffective assistance at trial and resentencing by leaving
unchallenged Dr. Stern's testimony that the presence of vaginal injury proved the
absence of sexual consent.**

Dr. Corinne Stern told the jury that the vaginal abrasions and redness she found

during her autopsy proved that the victim had not consented to sexual intercourse, and

the prosecution leaned heavily on this testimony in 2002 to persuade the jury to convict

Davis of murder in the course of aggravated sexual assault and in 2008 to sentence him

to death. Her testimony flew in the face of decades of scientific consensus that injuries

exactly like these occur commonly during consensual intercourse. Irving Davis's death

sentence depended on the prosecution proving beyond a reasonable doubt that their

sexual contact was a rape, and the main evidence it relied on to prove it was junk

science.

If trial counsel had done their job competently, this never would have happened. If,

like the trial lawyers in the Alabama capital case discussed above, Davis's lawyers had

secured a pathology expert of their own, they would have demolished Dr. Stern's

consent opinion and with it the prosecution's case for the death penalty. Counsel's

failure to challenge her testimony was unreasonable, and if they had so there is a

reasonable probability that Davis would not have been convicted of capital murder and

would not have been sentenced to death. Habeas relief is warranted.

Counsel's performance was thoroughly deficient. Even though it was obvious that

Dr. Stern's testimony would be central to the prosecution's case, counsel failed to

obtain a pathologist of their own to consult or testify at trial or at resentencing. Their failure is even more inexplicable as to resentencing, after counsel already had seen Dr. Stern and knew what she would say and how damaging it would be. Consent was one of the key factual disputes in the case, but counsel did no relevant investigation, presented no pathologist of their own, and offered no effective cross-examination of Dr. Stern on the consent issue. To the contrary, at the resentencing defense counsel affirmatively elicited her most harmful testimony on consent.

Their own client insisted that the intercourse had been consensual, from the beginning and never wavering. He had been honest and cooperative with them, and he was the polar opposite of a client lying to save his own skin—he was consumed with remorse and self-hatred and wanted a death sentence. Counsel had every reason to believe that Davis was not lying about consent, and thus every reason to look more closely at the reliability of Dr. Stern.

If the jury at Davis's 2002 trial had known that the victim's vaginal injuries did not show that the sexual contact had been non-consensual, there is a reasonable probability that the outcome of his 2002 trial would have been different. The prosecution had to prove non-consent beyond a reasonable doubt for the jury to convict him of aggravated sexual assault, and the jury had to find him guilty of aggravated sexual assault to convict him of capital murder. Instead of just hearing the prosecution's expert's testimony that the victim had been sexually assaulted, the jury would have heard defense expert testimony establishing that the vaginal injuries did not show non-consent. If counsel had performed reasonably, there is a reasonable probability that Davis would not have been convicted of aggravated sexual assault and thus would not have been convicted of capital murder, either.

If counsel had performed reasonably at the 2008 resentencing, there is a reasonable probability that Davis would not have been sentenced to death. Dr. Stern told the jury that vaginal abrasions and redness she found during her autopsy examination proved

that the sexual contact could not have been consensual. If counsel had been effective, the jury would have realized that Dr. Stern's testimony was dead wrong. In reality, the victim's vaginal injuries provided no support for the prosecution's position on consent.

Dr. Stern's testimony was the clearest and most powerful evidence the prosecution presented to show that Davis committed rape and that he lied when he denied it. She likely was a persuasive witness in the jury's eyes: she had been the chief medical examiner for El Paso County, she claimed to have performed over 3,000 autopsies, and she was qualified by the court as a forensic pathology expert. N.T. 2/19/08 at 45–49. Her testimony was gripping and emphatic: "Healthy consensual sex shouldn't leave injuries." *Id.* at 106. And no other expert, prosecution or defense, testified about whether the sexual contact was consensual.

Besides Dr. Stern's testimony, the prosecution did present other evidence that it used to argue that the sexual contact was not consensual, but none of this other evidence was as powerful. This included testimony that Medina was fifteen, that she had a boyfriend, that she had no prior sexual experience, and that she had behaved distantly towards Davis at a party that evening. The prosecution also argued that the nature of the killing itself showed non-consent, although it did explain the basis for this position, and that position would have been much weaker if counsel had effectively investigated and presented mitigation.[17]

Against this inconclusive evidence of non-consent, the jury had Davis's detailed and consistent assertion that their sexual contact was consensual. And Davis expressed profound remorse for killing Medina, to the point of pleading with the jury to sentence him to death. The fact that Davis forthrightly accepted responsibility for the murder added significantly to his credibility when he denied having also committed rape.

-----------------------

[17] *See supra* claim III.

On this record, there is a substantial likelihood that the jury would have concluded that the prosecution did not prove beyond a reasonable doubt that the murder occurred during sexual assault, and Davis was prejudiced both at this trial and his resentencing.

**V.   Davis was sentenced to death in violation of the First, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution because proof of his religious affiliations was improperly admitted against him during the penalty phase of trial.**

The State's theory relating to Davis's future dangerousness at his penalty retrial was that his religious affiliation demonstrated the probability that he would be a continuing threat to society. It therefore argued from the outset that proof of Davis's religious affiliation was admissible, as long as the State could demonstrate that Davis's religious group had engaged in or approved violent activities. 24 R.R.2d 8–16. Because Davis was a member of the Church of Satan at the time of his resentencing, the prosecution proposed to prove that Satanism is just such a religion.[18]

To connect Davis with the Church of Satan, the State introduced books seized from his prison cell, SX 285–89; 27 R.R.2d 36–38; a written inquiry from him to a satanic church in San Francisco about membership, SX 300; 27 R.R.2d 46–47; a change of religious preference at TDCJ from Buddhism to Satanism and Thaumaturgy; a written request that authorities furnish him with items necessary for the performance of satanic rituals in his cell; a glimpse of the pentagram tattooed on his chest, 27 R.R.2d 69-2; and various personal writings and works of art authored by him while in prison.[19] SX 290–91,

_____

[18] Davis no longer is a member of the Church of Satan or a believer in Satanism. In 2015 he changed his designated religious affiliation back to Buddhism.

[19] Most of the latter were received by the court as evidence that Davis was a Satanist, but some may have been offered by the State to prove Davis's future dangerousness for reasons unrelated to his affiliation with Satanism. To the extent, but only to the extent, that such exhibits were offered and admitted at trial for a purpose other than to prove Davis's religious affiliation, they are not subject to the present claim.

293–399, 301; 27 R.R.2d 38–48. To establish that the Church of Satan is violent or advocates violence, the State's sole evidence came from Donald Vaughn Haley, a former employee of the Virginia prison system and various law enforcement offices. Shockingly, Haley was qualified by the court as an expert in the dangers of Satanic practice.

At the time of Davis's trial, Haley was a community college teacher from Virginia Beach, in charge of the criminal justice department, where he trained aspiring policemen in criminal law and procedure. 26 R.R.2d 128, 130. He supplemented his income there by lecturing policemen, firemen, and constables in El Paso County about Satanism, 26 R.R.2d 129, 152, a subject in which he had evidently been interested since 1989. 26 R.R.2d 129–30. Although he held associate, bachelors, and masters degrees, none were in the discipline of religion or psychology, or involved a curriculum offering courses on Satanic practice. 26 R.R.2d 128, 142–43.

Nevertheless, some of the classes in criminology that Haley taught at the community college did include sections on the "subject of Satanism." 26 R.R.2d 129. For example, a textbook he once used to teach a class "mentioned" Satanism somewhere "in there." 26 R.R.2d 132–33. His scholarly qualifications to teach were apparently based on his own untutored reading of two journal articles, for which he was unable to provide a citation, one on "what you should know" about "cult-related violence," by Michael Langos, and the other by William Swatos on "Adolescent Satanism" as a form of "extreme deviance."[20] 26 R.R.2d 131. Mostly, however, his

_____

[20] *See* Swatos, Willliam H. (ed.) ENCYCLOPEDIA OF RELIGION AND SOCIETY, "Satanism" (Altamira Press 1998), *available at* http://hirr.hartsem.edu/ency/Satanism.htm: "There has been a huge interest in the past decade or so in Satanism, with an outpouring of books, many by Christian fundamentalists, claiming that Satan is alive and well in the United States. Related claims are that satanic groups have organized a major national or even international conspiracy, taking over selected institutional structures in society

knowledge of the subject came from his own reading and interpretation of primary Satanic literature, in which he apparently had no formal training, including various publications of Anton Szander LaVey, 26 R.R. 131, and Aleister Crowley, two notable proponents of Satanism as a religious practice. 26 R.R.2d 132, 151. He also knew and frequently consulted with other so-called experts in the field, apparently all policemen or retired policemen from Virginia Beach. 26 R.R.2d 135. And he was even made an honorary member of the Virginia Gang Association for his expertise in "Satanism and the occult." 26 R.R.2d 136.

Although he had never before testified as an expert or written any scholarly work on Satanism, he did claim to have assembled a short manual on the subject, which he passed out at the various El Paso law enforcement agencies where he occasionally lectured. 26 R.R.2d 136–37, 146, 149. He could not locate a copy, however, and he was not sure that his own office could furnish a copy for examination by the court and the parties. 27 R.R.2d 216–18.

Outside the presence of the jury, Haley testified that Satanism is an established religion that advocates violence in the form of ritual human sacrifice and the practice of seven deadly sins condemned by some Christian sects. 26 R.R.2d 137–38. He identified two organized Satanic Churches, Anton LaVey's Church of Satan and the Temple of Set, established by retired Lt. Col. Michael Aquino when he broke from LaVey over ideological differences. 26 R.R.2d 153. Based on his review of court documents in other cases, Haley expressed his opinion that more than ten cases of murder have been

---

(such as children's day care) and operating hundreds if not thousands of 'satanic cults' that abuse people and engage in all sorts of despicable acts. Virtually all scholarly examinations of these claims have resulted in little or no evidence being found for such claims (Carlson and Larue 1989, Richardson et al. 1991, Hick 1991, Jenkins 1992, La Fontaine 1994, Richardson 1997). But proving a negative has been difficult, and the claims persist."

committed "in the name of Satan or Lucifer" or "the prince of darkness." 26 R.R.2d 138–39, 154–63. But he could not say that any of those crimes were connected to the rituals or practices of a "satanic church." 26 R.R.2d 167. Nevertheless, the trial judge ruled that Haley's testimony was relevant to the issue of future dangerousness and outside the protection of the First Amendment. 26 R.R.2d 171; *see also* 27 R.R.2d 199.

During his testimony in front of the jury, Haley read passages from LaVey's Satanic Bible which described the circumstances under which human sacrifice is allowed. He was also permitted to testify that Satanists are admonished by the Nine Satanic Statements to practice the seven deadly sins condemned by "mainstream Christianity because they are desirable for emotional, mental, and physical satisfaction," 27 R.R.2d 202–03, and that the Eleven Satanic Rules of the Earth authorize the cruel treatment and destruction of individuals who are persistently annoying, 27 R.R.2d 204, contrary to the Christian teaching that one should turn the other cheek. With this, the prosecution concluded its direct examination of Haley, having elicited from him only an explicit contrast between excerpts of Satanic writing and conventional Christian beliefs likely shared by jury members.

On cross-examination, Haley made it clear that, while he has had no formal training in the subject area, he is a literalist in the interpretation of any scripture. For example, his own study of apologetics convinced him that the Christian Bible is "from a historical standpoint, extremely accurate," including its claim that the world was created by God in seven days. 27 R.R.2d 208. In similar fashion, he took the word "destroy" in the Satanic Bible to mean causing physical death, which he surmised might be accomplished by cutting off someone's fingertips, and that it was not susceptible of a ritual or symbolic interpretation. 27 R.R.2d 210–11. In the end, Haley's testimony was thus limited to his amateur personal interpretation of primary Satanic writings. Not a word was spoken by him on direct or cross-examination before the jury to prove, or from which it could reasonably be inferred, that devotees of the Church of Satan to which Davis belonged, or

of any other Satanic group, had ever actually engaged in or advocated "violent and illegal activities" of any kind, including ritual human sacrifice or the physical destruction of annoying human beings.

To counter Haley's amateur exegesis of Satanic texts, the defense called an authentic expert in the field of American religious history. John Gordon Melton was director of the Institute for the Study of American Religion in the Department of Religious Studies at the University of California, Santa Barbara. He holds a Masters of Divinity from the Garrett Theological Seminary and a Doctorate from Northwestern University in the history of religious literature. He is the author of some 35 books and 50 journal articles on American religion, and is best known for his work researching cults and new religions in America. 27 R.R.2d 228–29. *See Curriculum Vitae of John Gordon Melton* (May 31, 2012), *available at* http://www.baylorisr.org/wp-content/uploads/melton_vitae1.pdf; WIKIPEDIA page for John Gordon Melton, http://en.wikipedia.org/wiki/J._Gordon_Melton.

Dr. Melton testified that, apart from pop-culture phenomena involving teenage vandals and hysterical claims of demonic influence or possession, Satanism is an organized religious practice identified mainly with the Church of Satan in California, found by Anton LaVey in 1966, 27 R.R.2d 229–32, and with the Temple of Set, an offshoot of the LaVey church, established by Michael Aquino, a decorated army officer who holds a doctorate in political science. 27 R.R.2d 232–33, 256. Neither church has ever had more than a few thousand members. 27 R.R.2d 232, 255. The Temple of Set, to which Davis did not belong, 27 R.R.2d 263, differs from the Church of Satan mainly in that its founder insists on the physical reality of Satan, whom he regards as a Christian version of the ancient Egyptian god Set. In this respect, but only in this respect, his beliefs are more like those of some Christian denominations, including the United Methodist Church, in which Dr. Melton himself is an ordained minister. 27 R.R.2d 246–

47. LaVey did not hold this view, a disagreement which produced a schism between him and Aquino in the early 1970s. 27 R.R.2d 256.

All of the Satanic texts seized from Davis's prison cell and introduced against him at his punishment trial for the purpose of proving he is a dangerous Satanist are publications of the Church of Satan. 27 R.R.2d 265–72. The beliefs of that Church are anti-Christian and humanist. It holds that the values of Christianity in the United States contradict the American dream, and that indulgence is preferable to abstinence. Neither the Eleven Satanic Rules, written by LaVey's successor, Lance Barton, nor the Nine Satanic Statements of LaVey's Satanic Bible itself contain "any call to violence." 27 R.R.2d 222, 271–72. Rather, the ritual practices of the Church are magical and symbolic. 27 R.R.2d 234–36. Thus, the human sacrifice described on page 88 of the Satanic Bible is a ritual of destruction. It is outlined later in the same book and involves a magical curse directed against a disagreeable human subject in which the emotional energy of the devotee, typically ager, is focused and released, achieving in him a cathartic response and thus dissipating his rage in a peaceful manner. 27 R.R.2d 236–38, 253. Other Satanic rites, such as the ritual of compassion, are similarly symbolic and cathartic. 27 R.R.2d 239. None involve any actual physical harm. 27 R.R.2d 241.

Settled Supreme Court jurisprudence prohibits proof of a criminal defendant's religious or group affiliations at trial, no matter how unpopular they may be to others, unless they are relevant to a material issue in the case. *Dawson v. Delaware*, 503 U.S. 159, 163–68 (1993). *Dawson* elaborated the principle first enunciated in *Zant v. Stephens*, 462 U.S. 862, 885 (1983), that "[a]n aggravating circumstance is invalid if it authorizes a jury to draw adverse inferences from conduct that is constitutionally protected." *Romano v. Oklahoma*, 512 U.A. 1, 10–11 (1994). That means that evidence of Davis's religious affiliation was not admissible unless it was probative of his continuing propensity to commit violent crimes. The Texas Court of Criminal Appeals has rightly interpreted this rule to mean that a criminal defendant's membership in a group is not

relevant without proof both of the group's "violent and illegal activities" and of the defendant's membership in it. *Mason v. State*, 905 S.W.2d 570, 577 (Tex. Crim. App. 1995).

Neither Haley nor anyone else testified about any violent or illegal activities engaged in or advocated by the Church of Satan. Moreover, Haley admitted outside the presence of the jury that none of the violent, so-called Satanic crimes of which he was aware were connected in any way with either of the Satanic churches he described in his testimony, including the Church of Satan, to which Davis belongs. 26 R.R.2d 167. Haley's testimony does not meet any of the criteria of materiality required by the First and Eighth Amendments.

Many religions, including Christianity, have rituals similar to those described by the Satanic texts, which, if read literally, are equally susceptible of misunderstanding by anyone unfamiliar with the actual practice of the religion. To mention only one of the most obvious and familiar examples, Christian devotees consume the body and blood of Christ in a ritual known as the Eucharist. It is a rite of cannibalism, believed literally by Catholics and symbolically by most other Christians, in which devotees of Christ participate personally in what they take to be the physical sacrifice of their God in human form as an expiation of sin for all believers. CATECHISM OF THE CATHOLIC CHURCH 334–56 (Liberia Editrice Vaticana 1994); John A. Hardon, S.J., THE CATHOLIC CATECHISM 457–81 (Doubleday 1975). It is true, of course, that testimony from an ersatz expert to the effect that Christians are a threat to society because their church advocates cannibalism on a sacrificed human body would be excluded from a capital murder trial. Haley's testimony that members of Satanic churches advocate human sacrifice, based on an amateur literalist reading of isolated passages from the Satanic Bible and other texts, was just as preposterous.

Nor would it be enough for admissibility of Haley's testimony that some Satanists, whether or not actually associated with the Church of Satan, have committed violent

crimes in the name of their belief. Members and factions of all major religious groups have engaged in violent, even reprehensibly violent, activities at one time or another in their history. Yet few would argue that the prosecution may offer proof of a person's affiliation with, for instance, a Christian or Muslim religion as evidence of his dangerous character, at least without also showing that such religious belief was somehow the motive or inspiration for his crime. *Cf. Wisconsin v. Mitchell*, 508 U.S. 476, 490 (1993) (punishment may be enhanced with proof that the actor was motivated by racist beliefs).

Proof of a religious organization's violent and illegal activities is not made by presenting evidence that a handful of members of the group have committed crimes, or even that the members who committed those crimes claimed to be acting on principles of the group. Rather, the violent and illegal activities must somehow characterize the group, making it reasonable to infer that membership in the group is itself evidence of support for the violent activities, even if the defendant did not participate in the activities himself.

The state courts misunderstood this. In upholding the introduction of Haley's testimony at Davis's punishment trial, the Texas Court of Criminal Appeals held on direct appeal, "some members of the Satanic religion advocate violence, that Satanic religious publications like the ones found in [Davis's] cell discussed 'rituals of destruction' for performing 'human sacrifice' on 'undesirable [and] obnoxious individual[s],' and that various people had committed murder and mutilation 'in the name of Satan.'" *Irving v. State*, 329 S.W.3d 798, 805 (Tex. Crim. App. 2010). This is an objectively unreasonable determination of the facts, because the State presented no evidence that the Church of Satan had ever committed or endorsed any acts of violence. Whether some individuals professing to believe in Satanism committed murder or other violent acts is irrelevant for the same reason that the fact that crimes have been perpetrated by individuals in the name of their Christian religion do not make evidence of a capital defendant's Christianity admissible to prove future dangerousness.

In short, religious beliefs are relevant and admissible in a capital murder prosecution only to the extent relevant specifically to the motivation for the crime or the likelihood that the defendant would commit criminal acts of violence in the future. Davis was not a Satanist at the time of the commission of the crime, so he was not motivated by his membership in the Church of Satan to commit the offense. And mere membership in the Church of Satan at the time of sentencing cannot be presented to convince a jury that he is likely to commit violent acts in the future without violating the United States Constitution.

The State devoted more than a third of its testimonial and physical evidence, other than that offered to prove the crime itself, to establishing that Davis was a Satanist. It did so without any evidence or argument that he was inspired or motivated by Satanism to commit the murder for which he was convicted, and in spite of the fact that he was not a Satanist when he committed the offense. Moreover, the State argued that Davis should be sentenced to death on account of his Satanic beliefs, even though it failed to show that he at any point had belonged to a faction of Satanism that actually practices or espouses any violence. The only claims made by the State that Satanists engage in violent and illegal activities came in the form of testimony from Haley that Satanic writings advocate human sacrifice if read literally, with no evidence that such acts had ever been performed in reality. Its only evidence that Satanists have engaged in violent or illegal activities, all of it produced outside the presence of the jury, is that some ten incidents of violence in America may have been committed by people who made reference to the Devil or were fascinated by demonic symbology, without any attempt to connect them to Davis's religious affiliation.

The State's attempt to place Davis in a bad light with the jury was improper. It was not for the prosecution to distinguish between "good" and "bad" non-violent religions. Donald Haley's description of Satanist beliefs was unfounded, and merely the result of his personal hobby studying Satanic scripture. The State failed to meet its burden of

demonstrating that any sect of Satanism engaged in or approved violent activities, or that Davis was a member in such a sect.

Religion is a personal matter that has no place in a death penalty trial absent specific circumstances. *Dawson*, 503 U.S. at 167–68. Those circumstances were not present in this case. Davis's sentence must be reversed because his rights to religious freedom and free association, and to be free from cruel and unusual punishment, were violated by the prosecution's use of his unpopular religious affiliation to secure a death sentence.

**VI.**   **Davis was convicted of capital murder and sentenced to death in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution because the trial court erroneously admitted Davis's confession and denied his motion to suppress.**

After the victim's body was discovered, El Paso Police Detective Ron Nanos found Irving Davis at his home in Anthony, Texas and told him he wanted to talk to him "in reference to where he was in the last twenty-four hours." 4 R.R. 25. Davis agreed to accompany Detective Nanos to the police station. *Id*. After speaking with Detective Licon, Detective Nanos twice read Davis his *Miranda* rights, even though he testified that Davis was not handcuffed and not under arrest at that time. 4 R.R. 25. Once at the station, Detective Nanos testified that Davis signed an admonishment form and was allowed to go outside and smoke a cigarette. 4 R.R. 32. Deputy Mark Graham accompanied Detective Nanos to Davis's house and claims that he, too, read Davis his *Miranda* rights while at his home. 4 R.R. 57.

Detectives Albert Licon and Michael Torres initiated questioning of Davis at the station. 4 R.R. 89. Licon testified that he, too, Mirandized Davis, though he was still not under arrest. *Id*. At some point, Detective Vega came in to take over questioning, and according to Detective Licon, Davis appeared to be afraid of Vega. 4 R.R. 95. Davis told Detective Vega that he wanted to go home to check on his sick mother's condition. 4 R.R. 96. Instead of allowing him to go, Detective Licon called Davis's mother and

allowed them to speak on the telephone. 4 R.R. 98. After speaking to his mother, Detective Vega continued her interrogation and Davis confessed. 4 R.R. 99. None of this was audio or video recorded. Davis then signed a typed statement that Detective Vega had prepared. 4 R.R. 100–06.

Davis's uncle, Andrew Fuller, testified that he was present when the police took Davis from his home to the police station, and that he heard Davis ask for an attorney before getting into the police car. 4 R.R. 131–32. The officers did not respond to Davis's request. *Id.*

Davis testified at the suppression hearing that when the police confronted him at his house and asked him to accompany them to the police station, he requested an attorney. 4 R.R. 153. He testified that the police ignored him. *Id.* At the station, he again asked for an attorney and was again ignored. 4 R.R. 155. After Detective Licon began interrogating him, Davis again asked for an attorney and was told, "you don't need a lawyer unless you're guilty." 4 R.R. 157. Detective Vega then took over interrogation and was extremely aggressive toward him. 4 R.R. 157–58. When he spoke to his mother on the phone, he told her that the police would not provide him an attorney. 4 R.R. 168. Davis's mother, Carol Davis, confirmed that Detective Licon informed her over the phone that Davis had asked for an attorney. 4 R.R. 143. According to Davis, he did not sign a confession, but signed an empty piece of paper, which turned out to be the second page of the written statement. 4 R.R. 171.

At the suppression hearing held prior to trial, the defense argued that Davis was in custody and under arrest at the time of the confession, and that he had invoked his right to counsel and attempted to terminate the interview by asking to go home to check on his mother. The State violated his Fifth and Fourteenth Amendment due process rights by ignoring his invocations and continuing its interrogations. The trial court denied the motion. 4 R.R. 189.

A defendant's statement, especially a statement implicating himself in the commission of capital murder, is unlike any other evidence that can be admitted against a defendant. *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991). Confessions have a profound impact on the jury, so much so that the court may justifiably doubt its ability to put them out of mind even if told to do so. *Id.* at 296.

An interrogation must cease as soon as a person in custody indicates that he wishes to remain silent or requests the assistance of an attorney. *Mirada v. Arizona*, 384 U.S. 436, 473–74 (1966). Once the defendant invokes his right to remain silent, "his subsequent statements would be inadmissible unless the police 'scrupulously honored' his right to cut off questioning." *Soffar v. Cockrell*, 300 F.3d 588, 593 (5th Cir. 2002) (*quoting Michigan v. Mosley*, 423 U.S. 96, 104 (1975)). Similarly, "[a]n unambiguous statement 'that can reasonably be construed to be an expression of a desire for the assistance of an attorney,'" constitutes an invocation of the right to counsel, rendering any subsequent statements inadmissible. *Id.* at 595 (*quoting Davis v. United States*, 512 U.S. 452, 459 (1994)).

Davis instructed the detectives questioning him that he wanted to go home and that he wanted the assistance of an attorney. Both requests were ignored. Davis's testimony that he requested an attorney is corroborated by the testimony of his mother and his uncle. His testimony that he informed detectives that he wanted to stop his interview and go home is corroborated by the testimony of his interrogating officers. This establishes not only an invocation of his right to remain silent, but also the fact that he was in custody during his interrogation.

Davis's conviction should be reversed because it was secured on the basis of a confession that, under the Fifth Amendment to the U.S. Constitution, was unlawfully presented to the jury.

**VII. Davis has been convicted of capital murder in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution because his trial counsel rendered ineffective assistance during voir dire at his first trial.**

During voir dire selection at Davis's original trial, trial counsel challenged for cause jurors Jerry Castillo, 9 R.R. 101, and Yzela Sigala, 14 R.R. 98. The court denied the challenges for cause and counsel requested additional peremptory challenges. However, counsel was told that this request was untimely because both parties would exercise their peremptory challenges at the end of individual voir dire. On the day of trial, the court asked both sides to exercise their peremptory challenges, strikes were made, and the jury was impaneled. 25 R.R. 11. Neither side made objections.

Under Texas law, to preserve error related to the trial court's denial of a for-cause challenge, the defendant must specify on the record that he asserted a clear and specific challenge for cause, that he exercised a peremptory challenge on the veniremember, and that his peremptory challenges were exhausted and his request for additional strikes was denied. *Cannady v. State*, 11 S.W.3d 205, 208 (Tex. Crim. App. 2000). By failing to re-raise his request for additional peremptory challenges, trial counsel waived any error with regard to the court's refusal to remove for cause jurors Castillo and Sigala.

Trial counsel's failure to preserve this point of error for purposes of appeal constitutes ineffective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court held that in order to establish a Sixth Amendment violation of a defendant's right to effective assistance of counsel, the petitioner must demonstrate two things: that counsel's performance was deficient, and that the deficiency prejudice the defense. *Id*. at 678. To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." *Id*. at 688. The Court has declined to articulate specific guidelines for appropriate attorney conduct and instead has emphasized that "the proper measure of attorney performance remains simply reasonableness under prevailing professional

norms." *Id*. To establish prejudice resulting from a trial attorney's deficient performance, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

In this case, having sought additional peremptory challenges earlier in voir dire, either for the purpose of later correcting the trial court's erroneous denial of the defense's challenges for cause or to preserve the issue for appeal, there can be no articulable strategy for failing to re-request such additional challenges at the designated time. Trial counsel's deficient performance in failing to preserve Davis's challenge of jurors Castillo and Sigala for cause prejudiced his trial. Juror Castillo stated during voir dire that he expected the defense to put on a case, thus imposing on the defense a burden it did not have and demonstrating his inability to presume Davis's innocence. 9 R.R. 174. Juror Sigala stated that she could not consider a sentence of probation if she found a defendant guilty of a lesser-included murder charge. Both of these jurors served on Davis's first trial where he was found guilty even though both demonstrated an inability to follow the law. Trial counsel's failure to preserve this issue for appeal was ineffective, and Davis's conviction for capital murder must be reversed.

**VIII.   Davis has been sentenced to death in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution because his trial counsel rendered ineffective assistance during voir dire at his capital resentencing.**

Trial counsel ineffectively relinquished peremptory challenges against objectionable jurors by failing to require that each eligible juror be passed for peremptory challenge first by the prosecution.

Prior to Davis's penalty-phase retrial, defense counsel agreed in writing with the prosecuting attorney and the trial judge not to make the State exercise its peremptory

challenges first, as required by Texas Code of Criminal Procedure article 35.13. Instead, counsel consented to exercise Davis's strikes "independently," or without knowing beforehand which veniremembers would be struck by the prosecution. This method of blind strikes is permitted by Texas law for, and is the typical procedure in, criminal actions other than capital murder. Tex. Code. Crim. Proc. Arts. 35.25, 35.26. The procedure is different for death penalty cases to provide defendants with an extra level of procedural fairness, given the grave consequences which may follow from his conviction. Davis's counsel gave up that benefit without getting anything in return. Attorney Macias performed ineffectively by waiving, and advising Davis to approve the waiver of, this important tactical advantage. *See Strickland v. Washington*, 466 U.S. 668 (1984).

At the conclusion of the jury selection process, defense counsel identified seven objectionable veniremembers and requested additional peremptory challenges for use against them. 23 R.R.2d 4. Taking counsel at their word on this point, multiple jurors served who would not have served if the defense had peremptory challenges to exclude them. If counsel had not agreed to a jury selection procedure permitting blind strikes, the defense would have had at least one remaining peremptory challenge to exercise against an objectionable juror because one of its blind strikes was used against a prospective juror also struck by the prosecution. 3 C.R.2d 851–56.

Counsel's concession to the prosecution defeated the purpose of the statute, which was intended to confer on capital defendants the advantage of knowing which prospective jurors the prosecution would strike before deciding which to strike themselves. *See Hughes v. State*, 24 S.W.3d 833, 841 (Tex. Crim. App. 2000) ("Either of the statutory methods for exercising challenges for cause and peremptory strikes in Article 35.13 requires the State to act before the defendant and ensures that any strategic advantage benefits the defendant."); *Janecka v. State*, 739 S.W.2d 813 (Tex. Crim. App.

1987). Davis's defense counsel relinquished this advantage without any plausible strategic advantage.

Davis's lawyers, without any reasonable strategic basis or conceivable benefit to their client, waived the operation of a statute expressly designed to provide capital defendants with an advantage during jury selection in death penalty cases. As a direct consequence of that waiver, the jury which sentenced Davis to death included at least one juror who would have been struck as objectionable by defense counsel if they had had not waived Davis's statutory right, demonstrating prejudice under *Strickland*.

**IX. Davis was convicted of capital murder and sentenced to death in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution because the trial court erroneously failed to sustain his *Batson* challenges at his first and second trials.**

After the petit jury was selected at Davis's first trial, the defense objected to the prosecution's strikes of two African-American veniremembers, based on a claim that the prosecution struck them on account of their race. 25 R.R. 12. In answer to the defense's charge, the State explained its dismissal of Walter Lee Murrell. The State claimed his voir dire responses demonstrated that he first stated he was neutral on the death penalty, but later changed course and stated he was against the death penalty. 24 R.R. 14. The prosecutor acknowledged his statement that he could answer the special issues fairly, based on the evidence, but stated that Murrell was "wishy-washy" on the issue. *Id*. The prosecutor claimed a belief that he would hold the State to a higher burden of proof, a belief Murrell had denied. *Id*. The trial court ruled that the strike was not based on Murrell's race. 24 R.R. 15.

With regard to potential juror Ericka Renae Bracey, the prosecutor claimed she was aloof and hesitant in her answers. 24 R.R. 15. The prosecutor expressed the view that she could not follow the law, and noted that she was familiar with someone who spent time in prison for dropping a baby. 24 R.R. 15–16. The prosecutor further claimed that

Bracey did not show any emotion when she stated she had witnessed a rape. 24 R.R. 16. The trial court ruled the State did not strike Bracey on account of her race. 24 R.R. 17.

At Davis's second penalty trial, the defense again raised a *Batson* objection after the prosecution struck the only two African-American jurors on the panel of qualified jurors. 23 R.R.2d 8. Defense counsel argued that the prosecutor struck both veniremembers on account of their race. 23 R.R.2d 8–9. In response, the prosecutor explained that she struck juror Jason Cofield because he expressed his belief that, "it[']s never too late for people to change." 23 R.R.2d 10. The prosecutor further proffered that Cofield indicated he would need an enormous amount of evidence before deciding to assess the death penalty. *Id*. Defense counsel responded that several jurors had expressed the same opinion regarding a person's ability to rehabilitate and change for the better, and that many of those jurors had not been struck by the State. 2 R.R.2d 11–12. Furthermore, several jurors not struck by the State also indicated that the stakes were high and they would require the State to present substantial evidence before they could assess the death penalty. 23 R.R.2d 11.

"[R]acial discrimination by the State in jury selection offends the Equal Protection Clause." *Georgia v. McCollum*, 505 U.S. 42, 44 (1992). Evaluating whether a challenge was race-based involves a three-part inquiry. First, the defendant must demonstrate a *prima facie* case that the prosecutor dismissed the juror on the basis of race. Second, the State then has the burden of articulating a race-neutral explanation for its dismissal. Finally, the trial court must determine whether the defense met its burden of proving race-based discrimination. *Batson v. Kentucky*, 476 U.S. 79, 96–98 (1986). "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack [person] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005).

The trial court erred in violation of Davis's constitutional rights by denying his *Batson* challenges with respect to potential jurors Murrell and Bracey at his first trial because the State's explanation for dismissing them was pretextual. Both jurors stated they would follow the law and answer the questions posed to them fairly and honestly. Other non-African-American jurors who gave similar responses during voir dire questioning were allowed to serve on Davis's jury panel.

At Davis's penalty resentencing, the court erred in violation of Davis's constitutional rights by denying his *Batson* challenge with respect to juror Cofield. The defense rebutted the State's pretextual reasons for dismissing Cofield by pointing out that jurors with the same characteristics, other than race, were not dismissed. Juror Irma Medina sat as a juror and she made a statement that she needed to be really convinced before she could find in favor of the State. 4 R.R.2d 157. In addition, juror Victor Reveles responded in his written voir dire that "[e]veryone deserves a chance." Juror Richard Salcido mentioned that he has had students enter the penal system and come out with a better outlook on life. Juror Veronica Collier wrote that "[p]eople have been released and gone on to live a very successful life." Juror John Almanzar indicated that some people come out of prison changed. Juror Jessica Portillo stated "Everyone deserves a second chance; you don't know what someone was going through that got them where they are." Several other seated jurors expressed their beliefs that people can change. It is apparent that the State's professed reasons for striking Cofield were contrived in order to conceal its intent to exclude Cofield on the basis of his race.

The State's racially-motivated dismissal of two African-American jurors from Davis's first trial, and one African-American juror from his second trial, violated Davis's equal protection rights, rendering his conviction and sentence unconstitutional and requiring reversal.

**X.  Davis was sentenced to death in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution because the trial court erroneously refused Davis's challenges for cause with respect to three disqualified jurors at his second trial.**

At Davis's penalty-phase retrial, the court erroneously denied challenges for cause against three venire members who were biased.

Juror Sharon Ann Neumann had testified during voir dire that she was uncomfortable with Satanism. 5 R.R.2d 187. She described the religion as evil and contrary to everything she believed. 5 R.R.2d 188–89. She stated that a true Satanist is evil because they worship evil and at some point that evil would come out. 5 R.R.2d 190.

Juror Alejandro Melero testified during voir dire that he was leaning toward death over life as a sentence for Davis. 17 R.R.2d 305. He expected Davis to prove that the death penalty was not appropriate. 17 R.R.2d 309. In his opinion, death would be appropriate unless Davis showed otherwise. Id. His beliefs were going to affect how he decided the case. 17 R.R.2d 311.

Juror Luis Romo had a prior bad experience involving devil worship, which he initially refused to disclose. 20 R.R.2d 155, 158. After being recalled, he stated he had a bad experience with an uncle possessed by the devil. He had witnessed his uncle speaking in tongues and the impression of his uncle's face when this occurred was indelibly stamped on his memory. He stated he did not believe Satanism was a religion or that people should be allowed to practice it. 20 R.R.2d 126–28, 159. He believed Satanism was evil and he clearly indicated it would affect him if he sat as a juror and Davis was shown to be a Satanist. 20 R.R.2d 129. He further admitted that if the issue arose at trial, he would be forced to relive the horrible experience he had with his uncle. 20 R.R.2d 121–22. He admitted the incident would sway how he would view Satanism. 20 R.R.2d 127. He clearly stated his bias would come into play in deciding how to judge the evidence. 20 R.R.2d 131.

Davis exercised peremptory strikes against each of these jurors, and requested additional peremptory strikes, which were denied. He then identified the objectionable jurors that sat on his jury. 23 R.R.2d 4–6.

The Fifth, Sixth, and Fourteenth Amendments guarantee the right of criminal defendants to a fair trial before an impartial and unbiased jury and to a reliable jury verdict. *See, e.g.*, *Irvin v. Dowd*, 366 U.S. 717 (1961) (federal right to jury trial guarantees fair trial by impartial, indifferent jurors); *Smith v. Phillips*, 455 U.S. 216, 217 (1982) (due process demands that every criminal defendant be afforded "a jury capable and willing to decide the case solely on the evidence before it."). "The Sixth Amendment requires that in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. The Amendment prescribes no specific tests. The bias of a prospective juror may be actual or implied; that is, it may be bias conclusively presumed as [a] matter of law." *United States v. Wood*, 299 U.S. 123, 134 (1936) (internal quotations omitted).

Each of the jurors described above suffered an unlawful bias against Davis. Both Romo and Neumann defined Satanism as an evil religion stated that evidence of the defendant's belief or practice of Satanism would impact their decision-making. They both had a clear and definite bias against Satanists. Likewise, Melero was biased as a matter of law because he stated his expectation that Davis had to rebut the presumption of the death penalty. Davis's due process rights to a fair trial and an impartial jury verdict were violated by the court's refusal to strike these three jurors for cause at his second penalty trial. His death sentence must be reversed.

## Conclusion

Irving Davis's trial and sentencing were poisoned by unfairness and constitutional error. He respectfully asks the Court to issue a writ of habeas corpus, vacate his

conviction and sentence, order an evidentiary hearing, and such other relief as law and justice require.

Respectfully submitted,

*/s/ Joe A. Spencer, Jr.*
Joe A. Spencer, Jr.
Attorney at Law
1009 Montana
El Paso, TX 79002
(915) 544-3132


*/s/ Richard D. Esper*
Richard D. Esper
Esper Law Office
801 N. El Paso St., Second Floor
El Paso, TX 79902
(915) 532-5562


*/s/ Matthew Stiegler*
Matthew Stiegler
7145 Germantown Avenue, Suite 2
Philadelphia, PA 19119
(215) 242-1450
Matthew@StieglerLaw.com

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing consolidated amended petition was served through ECF on each counsel of record on this 2nd day of October, 2018.

*/s/ Matthew Stiegler*

Matthew Stiegler