**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **IRVING ALVIN DAVIS,** | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | **Cause No. EP-14-CV-121-KC** |
| | § | **CAPITAL CASE** |
| **BOBBY LUMPKIN,** | § | |
| **Director, Texas Department of Criminal** | § | |
| **Justice, Correctional Institutions Division,** | § | |
| **Respondent.** | § | |

## MEMORANDUM OPINION AND ORDER

Texas death row inmate Irving Alvin Davis, through his counsel, petitions for a writ of habeas corpus under 28 U.S.C. §§ 2241 and 2254. Pet'r's Am. Pet., ECF No. 165.[1] His opposed petition is denied for the following reasons.

## PROCEDURAL HISTORY

In 2002, a state court jury in El Paso County, Texas, found Davis intentionally murdered 15-year-old Melissa Medina in the course of committing an aggravated sexual assault, in violation of Texas Penal Code § 19.03.[2] *State v. Davis*, No. 20010D06419, 2002 WL 34676806 (Tex. Dist. July 1, 2002). The jury then answered the special issues submitted to it under Texas Code of Criminal Procedure Article 37.071 §§ 2(b)(1) and 2(e)(1) and determined Davis was a continuing threat to society and there were insufficient mitigating circumstances to warrant a sentence of life in prison without parole.[3] *Id.* The trial court accordingly set Davis's punishment

---

[1] "ECF No." refers to the Electronic Case Filing (ECF) number for documents docketed in this case. Where a discrepancy exists between page numbers on filed documents and page numbers assigned by the ECF system, the Court will use the latter page numbers.

[2] *See* Tex. Penal Code Ann. § 19.03(a) (West) ("A person commits an offense [of capital murder when] the person intentionally commits the murder in the course of committing or attempting to commit . . . aggravated sexual assault . . .").

[3] *See* Tex. Code Crim. Proc. Ann. art. 37.071 (West), which provides:

at death. *Id*. The Texas Court of Criminal Appeals reversed "on the issue of punishment." *Davis v. State*, No. AP-74,393, 2007 WL 1704071, at *1 (Tex. Crim. App. June 13, 2007). Davis received a new punishment trial in 2008, but was again sentenced to death. *Davis v. State*, 329 S.W.3d 798, 802 (Tex. Crim. App. 2010), *cert. denied*, 565 U.S. 830 (2011). The Court of Criminal Appeals affirmed the judgment of the trial court. *Id*. at 825.

Davis "filed an application for writ of habeas corpus following his first conviction and sentence, and he filed a second application following the retrial on [his] punishment." *Ex parte Davis*, No. WR-61,445-01 & -02, 2014 WL 969802 (Tex. Crim. App. Mar. 12, 2014). The trial court issued findings of fact and conclusions of law regarding both applications. *Id*. The Court of Criminal Appeals adopted the trial court's findings and conclusions and denied Davis habeas relief. *Id*.

Davis filed multiple federal habeas petitions in this Court. Pet'r's Pet., ECF No. 12 (filed Jan. 2, 2015); Pet'r's Am. Pet., ECF No. 14 (filed Jan. 6, 2015); Pet'r's 2d Am. Pet., ECF No. 15 (filed Jan. 6, 2015); Pet'r's Am. Pet., ECF No. 18 (filed Mar. 11, 2015); Pet'r's 2d Am. Pet., ECF No. 112 (filed Nov. 6, 2017); Pet'r's Consolidated Am. Pet., ECF No. 124 (filed Oct. 2, 2018). The

---

(b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

(1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

. . . .

(e)(1) The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b), it shall answer the following issue:

Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

Director likewise submitted several answers. Resp't's Answer, ECF Nos. 26 (filed Jun. 16, 2015); Resp't's Answer, ECF No. 133 (filed Feb. 21, 2019). On June 13, 2019, Davis filed a motion to stay and abate so that he could exhaust certain claims in state court. Pet'r's Mot., ECF No. 137 (filed Jun. 13, 2019). This Court granted the motion. Order, ECF No. 140 (filed July 17, 2019).

Davis filed a third state habeas application raising four previously unexhausted claims. *Ex parte Davis*, No. WR-61,445-03, 2020 WL 1645017, at *1 (Tex. Crim. App. Apr. 1, 2020). His application was dismissed by the Court of Criminal Appeals as an abuse of the writ—without considering the merits of Davis's claims—because he failed to satisfy the requirements of Article 11.071, § 5(a). *Id*. at *2. This Court subsequently lifted the stay and reopened the case. Order, ECF No. 150 (filed May 12, 2021).

Davis now challenges his original 2002 conviction and his 2008 punishment in this Court pursuant to 28 U.S.C. §§ 2241 and 2254. Pet'r's Am. Pet., ECF No. 165 (filed Dec. 6, 2021). He asserts the following claims:

1. At his first trial, Davis's Fifth, Sixth, Eighth, and Fourteenth Amendment rights to a fair trial before an impartial and unbiased jury were violated because a juror, Severiano Santini, did not disclose that he stood accused of a crime, that these accusations were pending before the same office prosecuting Davis, and that he decided to find Davis guilty to curry favor in his own case. *Id*. at 18–30.

2. At his first trial, the State failed to disclose its investigation and eventual prosecution of Juror Santini for indecency with a minor, violating Davis's right to due process and a fair trial. *Id*. at 30–38.

3. At his second trial, Davis's counsel failed to investigate and present readily available mitigating evidence of serious abuse and a dysfunctional family life. *Id*. at 39–86.

4. At both trials, Davis's trial counsel were ineffective for failing to challenge erroneous testimony from the pathologist regarding her conclusion that Davis sexually assaulted Medina. *Id*. at 86–98.

3

5.  At his second trial, Davis's constitutional rights were violated because evidence of his affiliation with Satanism was improperly admitted. *Id*. at 98–111.

6.  At his first trial, Davis's Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated because the trial court erroneously denied his motion to suppress and admitted his confession. *Id*. at 111–15.

7.  At his first trial, Davis's trial counsel rendered ineffective assistance during voir dire when they waived any error about the trial court's refusal to remove to jurors for cause. *Id*. at 115–17.

8.  At his second trial, Davis's trial counsel rendered ineffective assistance by agreeing to a jury selection procedure which permitted blind strikes during voir dire. *Id*. at 117–19.

9.  At both his trials, Davis's constitutional rights were violated because the trial court erroneously rejected his challenges under *Batson v. Kentucky*, 476 U.S. 79 (1986). *Id*. at 119–23.

10. At his second trial, Davis's constitutional rights were violated because the trial court erroneously denied his challenges for cause to three biased veniremembers. *Id*. at 123–26.

In his reply, Davis that he inadvertently included his tenth claim—which he had withdrawn on May 10, 2019—in his latest version of his petition. Pet'r's Reply, ECF No. 175 at 72 (citing Resp't's Ans., ECF No. 170 at 147; Pet'r's Reply, ECF No. 136 at 45).

Lumpkin answers "[s]ome of these claims are procedurally barred from federal habeas review." Resp't's Answer, ECF No. 170 at 2 (filed June 15, 2022). "Moreover, all of these claims lack merit." *Id*.

Davis replies for the reasons he gives in his reply "and in his amended petition, [he] respectfully asks the Court to grant him habeas relief, order an evidentiary hearing, and/or issue such other relief as law and justice require." Pet'r's Reply, ECF No. 175 at 72

**FACTUAL HISTORY**

4

## A.  SUMMARY

On June 3, 2001, 18-year-old Davis met with some acquaintances—including Melissa Medina—at a house in Anthony, Texas. *Davis*, 2007 WL 1704071, at *1. He expressed interest in Medina, but was warned to back off. *Id*. He followed Medina when she left to walk home from the party. *Id.*

The following morning, Medina's nude body was discovered in the playground of an elementary school by a maintenance worker. *Id*. "Her face was black and swollen, and her fingertips had been cut off." *Id*.

When confronted by police officers later that day, Davis claimed that he had engaged in consensual sex with Medina while on the school grounds. *Id*. He added that when she asked him to stop and threatened to "cry rape," he "lost it" and strangled her. *Id*. "He also said he cut off Medina's fingertips because she had scratched him and his DNA was under her fingernails." *Id*.

## B.  INDICTMENT

A grand jury indicted Davis for intentionally causing the death of Medina in the course of committing and attempting to commit the offense of aggravated sexual assault by (1) strangling her with a ligature, (2) strangling her with his hands, (3) striking her in the head with an unknown object, and (4) striking her in the chest with an unknown object. Clerk's R. vol. 1, ECF No. 167-2 at 6–7. It also alleged Davis took immediate flight and used and exhibited deadly weapons including a ligature, a hand, and an unknown object. Clerk's R. vol. 1, ECF No. 167-2 at 6–7.

## C.  PETITIONER'S MOTION TO SUPPRESS

Davis moved to suppress his oral or written statements to the police. Rep. R. (2002) vol. 4 at 14. He asserted he was already a suspect and under arrest at the time of his interviews. Rep. R.

(2002) vol. 4 at 183. He claimed he was never "free to leave from the minute they took him into custody." Rep. R. vol. 4 at 184. He also maintained he asked for an attorney—as he had on three prior occasions when he was in trouble with the law in North Carolina. Rep. R. vol. 4 at 183–184.

At the hearing on the motion, Detective Ron Nanos testified he went to Davis's house with Detective Mark Graham on June 5, 2001. *Davis*, 2007 WL 1704071, at *4. Detective Nanos told Davis he was working on a case and had some questions for him. *Id*. He said Davis agreed to accompany him to the police station. *Id*. Before they left, Detective Nanos read Davis his *Miranda* rights. *Id*. He did not handcuff Davis on the way to the station, and when they arrived, he once again advised Davis of his *Miranda* rights. *Id*. He also obtained Davis's written acknowledgment of those rights. *Id*. While waiting for the other detectives assigned to the case to arrive, he took Davis outside to smoke a cigarette. *Id*.

Detective Albert Licon testified when he arrived at the station he met with Davis, who was not handcuffed. *Id.* He showed Davis the form he had previously signed acknowledging his *Miranda* rights and asked Davis if he understood his rights. *Id.* He obtained Davis's agreement to waive those rights and speak with him. *Id.* He then began to discuss Davis's whereabouts the night before and his interaction with Medina. *Id*.

Davis initially told Detective Licon he did not walk Medina all the way home because she got into a gray car. *Id.* Davis claimed he received the scratches Detective Licon observed on his neck in a fight with his brother. *Id.* A few minutes later, Davis asked for a cigarette and went outside to the smoking area and was left unattended. *Id.* According to Detective Licon, Davis was free to leave at that point, had he wished to do so. *Id.*

When the interview resumed, Detective Sonia Vega joined Detectives Licon and Nanos in the interview room and started asking Davis questions. *Id.* She said Davis became very nervous and asked to go home for an hour to see his mother because he was concerned about her health. *Id.*

Detective Licon asked Davis, "Well, what are you saying at this point? Do you want to terminate the interview? Is it that you want it to cease, to stop?" *Id*. Davis answered, "No," that he just wanted to get this over with. *Id.* Detective Licon then called Davis's mother on the telephone and allowed Davis to speak with her. *Id.* After Davis finished speaking with his mother, he agreed to continue the interview and confessed to killing Medina. *Id.*

Detective Nanos stopped Davis to advise him of his *Miranda* rights once again. *Id*. He obtained Davis's agreement that he understood his rights, waived them, and would give a written statement. *Id.*

Davis testified at the hearing on the motion to suppress that he "asked probably about 10 times" for a lawyer. Rep. R. vol. 4 at 157. He further claimed he asked to go home, but did not believe he was free to leave. Rep. R. vol. 4 at 157.

The trial court found Davis was not in custody at the time he made the oral and written statements. *Davis*, 2007 WL 1704071, at *5. It further found Davis was not coerced, threatened, or made promises in exchange for his statement. *Id*. It also found Davis was coherent and understood what was happening while giving his statement. *Id.* It concluded Davis had been advised of his rights and had intelligently and voluntarily waived them. *Id.*

### D.  GUILT PHASE (2002)

#### 1.  The State's Evidence

On the night of June 3, 2001, Davis went to the home of Amy and Benjamin Romero in Anthony, Texas, to drink alcohol and socialize with a group of the Romero's friends—Melissa Medina, Martin Oscar, Priscilla Verdugo, Lisa Amaro, and Carlos Ramirez. Rep. R. (2002) vol. 25 at 131–40, 150. During the evening, Davis told Amy Romero that Medina "had a nice butt." Rep. R. (2002) vol. 25 at 133. Davis also indicated to Benjamin Romero that he wanted to "hit up on Melissa." Rep. R. (2002) vol. 26 at 40, 52.

Medina had a boyfriend at the time and generally demonstrated indifference towards Davis. Rep. R. (2002) vol. 25 at 150; Rep. R. (2002) vol. 26 at 40, 52; Rep. R. (2002) vol. 27 at 20. On one occasion, she referred to Davis with a racial slur. Rep. R. (2002) vol. 27 at 215.

At about 12:20 a.m. on June 4, 2001, Medina left the Romero house—accompanied by the others from the party—to walk home. Rep. R. (2002) vol. 25 at 134–35. When Medina was about halfway home and near Anthony Elementary School, she announced she wanted to walk the rest of the way alone. Rep. R. (2002) vol. 25 at 136.

After Medina walked away, Davis announced he would take Medina all the way to her house and walked quickly to catch up with her. Rep. R. (2002) vol. 25 at 137; Rep. R. vol. 27 at 127. He ignored Amy Romero's request to leave Medina alone. Rep. R. (2002) vol. 25 at 137.

Mary Lynn Skinner lived across the street from Anthony Elementary School. Rep. R. (2002) vol. 25 at 163. She reported that at approximately 1:50 a.m., her dogs became extremely agitated and began barking. Rep. R. (2002) vol. 25 at 167. She went outside and heard low growls followed by thumping noises. Rep. R. (2002) vol. 25 at 168–70.

Davis returned to the Romero's house where Benjamin Romero observed fresh scratches on Davis's neck. Rep. R. (2002) vol. 26 at 47, 49. Davis explained "his mother got into it while he

8

was trying to sneak out of the house." Rep. R. (2002) vol. 26 at 49. Davis left about five minutes later and headed toward the elementary school, which was in the opposite direction from his house. Rep. R. (2002) vol. 27 at 205.

Alejandro Betancourt, an Anthony Elementary School maintenance department employee, arrived at his workplace the following morning. Rep. R. (2002) vol. 25 at 44. Bentancourt and his partner, Eulalio Rivera, were putting a ladder in the school's shop when they observed a body on the playground. Rep. R. (2002) vol. 25 at 45. At first Betancourt did not recognize the girl because "her whole face was black, it was swollen. She had something . . . on her neck. And her fingers from her hands were chopped" off. Rep. R. (2002) vol. 25 at 45–46. He then realized it was Medina—a girl he recognized as a former student at the school. Rep. R. (2002) vol. 25 at 48. Betancourt notified the school's superintendent, and the police came. Rep. R. (2002) vol. 25 at 46–47.

Deputy Sheriff Mark Graham reported to Anthony Elementary School, saw Medina's body in the schoolyard, and secured the murder scene. Rep. R. (2002) vol. 26 at 188–89, 204.

Lisa Amaro—who had been at the Romero's house the previous evening with Davis—learned Medina was missing and called Davis to find out if he had walked Medina home. Rep. R. (2002) vol. 27 at 44–45. Davis replied that he had. Rep. R. (2002) vol. 27 at 45. After he changed his story several times, Amaro hung up the phone. Rep. R. (2002) vol. 27 at 45–47. Amaro walked to the school and saw Medina's body. Rep. R. (2002) vol. 27 at 48. She then approached Detective Ron Nanos, who was present at the school, and pointed out where Davis lived. Rep. R. (2002) vol. 27 at 50.

David Broadnax, a crime-scene technician with the El Paso County Sheriff's Office, also went to Anthony Elementary School and took photographs of the crime scene which were introduced into evidence. Rep. R. (2002) vol. 25 at 57–62. He observed Medina's fingertips had been cut off and a blouse was wrapped around her neck. Rep. R. (2002) vol. 25 at 91.

Deputy Sheriff Graham accompanied Detective Nanos to Davis's house after they learned Davis was the last person seen with Medina. Rep. R. (2002) vol. 26 at 190, 202–03, 264–65. Deputy Graham waited outside while Detective Nanos went in and came out with Davis. Rep. R. (2002) vol. 26 at 193–94. Deputy Graham observed that Davis was not handcuffed and had agreed to go to a substation. Rep. R. (2002) vol. 26 at 194–95. Deputy Graham read Davis the *Miranda* warnings before they got into a car. Rep. R. (2002) vol. 26 at 195, 208. He read Davis the *Miranda* warnings again when they arrived at the substation and had Davis initial and sign a printed copy of the warnings. Rep. R. (2002) vol. 26 at 198–99, 208, 211.

Davis was initially interviewed by Detective Licon at the substation. Rep. R. (2002) vol. 26 at 263–64. Davis was not handcuffed and was free to leave. Rep. R. (2002) vol. 26 at 264–65. Davis was read his *Miranda* rights again and said he wanted to talk. Rep. R. (2002) vol. 26 at 265. Davis claimed he was walking a female home after a party, but she jumped into a grey car. Rep. R. (2002) vol. 26 at 266. Davis explained the scratch marks on his neck were the consequence of a fight with his brother a few days earlier. Rep. R. (2002) vol. 26 at 267. Davis told Detective Licon to call his mother to verify his story, but when Detective Licon called, there was no answer at his house. Rep. R. (2002) vol. 26 at 268. Davis then went outside the substation by himself to smoke a cigarette. Rep. R. (2002) vol. 26 at 268–69.

Davis was called back into the substation and confronted by Detective Sonia Vega about the scratches on his neck because they looked fresh to her. Rep. R. (2002) vol. 26 at 267. Davis said he wanted to go home to see his mother because she was sick, but he claimed he would return to the substation in an hour. Rep. R. (2002) vol. 26 at 271, 289. Davis was asked, "Are you saying that you want this interview to stop? Do you want it to cease?" Rep. R. (2002) vol. 26 at 272. Davis answered, "No, I want to continue. I want to get this over with." Rep. R. (2002) vol. 26 at 272.

Detective Licon called Davis's mother again and confirmed Davis had fought with his brother. Rep. R. (2002) vol. 26 at 272. Detective Licon told her Davis wanted to talk to her because he was concerned about her health, but she said she was fine. Rep. R. (2002) vol. 26 at 273. Detective Licon then allowed Davis to speak briefly with his mother. Rep. R. (2002) vol. 26 at 273.

After ending the conversation with his mother, Davis admitted he had strangled Medina. Rep. R. (2002) vol. 26 at 273. Davis also agreed to make a written statement. Rep. R. (2002) vol. 26 at 273. Davis took about two hours to complete it. Rep. R. (2002) vol. 26 at 275–76. Davis was not threatened or promised anything in exchange for this statement. Rep. R. (2002) vol. 26 at 274. Davis never asked to speak with an attorney. Rep. R. (2002) vol. 26 at 274. Davis's written statement was admitted into evidence as State's Exhibit 232 and read aloud for the jury. Rep. R. (2002) vol. 26 at 280–83.

In his written statement, Davis described Medina as a "willing participant" in consensual sex. State's Ex. 232. But during intercourse, he claimed Medina suddenly asked him to stop and threatened to accuse him of rape if he told anyone what had happened. State's Ex. 232. Davis reported Medina said, "she was a virgin and this was a one-time deal." State's Ex. 232. Davis explained he "lost it" and began choking Medina with his hands. State's Ex. 232. He continued to

strangle her with his belt. State's Ex. 232. He added he "blacked out" and just walked around. State's Ex. 232. He later returned with some garden shears and cut off Medina's fingertips because she had scratched him. State's Ex. 232.

Dr. Kenneth Berumen completed a "head-to-toe" physical examination of Davis on June 4, 2001. Rep. R. (2002) vol. 26 at 111. He observed Davis had a "significant amount of injuries on his body." Rep. R. (2002) vol. 26 at 112. He explained Davis had "scratch-like marks to the right side of his neck, that were superficial in nature." Rep. R. (2002) vol. 26 at 112. He added Davis had deep scratches under his right arm, which extended to his back, and abrasions on his right forearm. Rep. R. (2002) vol. 26 at 112, 114. He also noted Davis had "a small lesion on the shaft of his penis." Rep. R. (2002) vol. 26 at 116.

Dr. Corrine Stern, the Chief Medical Examiner for El Paso County, performed an autopsy on Medina. Rep. R. (2002) vol. 27 at 134, 136. Dr. Stern observed Medina had a blunt-force injury to the head which caused bleeding under her scalp and a subarachnoid hemorrhage, meaning she bled underneath the membrane covering the brain. Rep. R. (2002) vol. 27 at 145, 148. She opined the subarachnoid hemorrhage alone was sufficient to cause Medina's death. Rep. R. (2002) vol. 27 at 150. She found a brown nylon shirt tired around Medina's neck which left a ligature furrow in her skin. Rep. R. vol. 27 at 151. Dr. Stern testified strangulation with the shirt could have been a second cause of Medina's death. Rep. R. (2002) vol. 27 at 151. She noted Medina had numerous abrasions on her torso and her right pulmonary artery was torn, which caused the pericardial sac around her heart to fill with blood. Rep. R. (2002) vol. 27 at 155–56. She believed the tear to the artery was sufficient to have been a third cause Medina's death. Rep. R. (2002) vol. 27 at 158, 160. She noted Medina had scrapes called "mucosal abrasions" inside her vagina which were consistent

with penile penetration near the time of her death. Rep. R. (2002) vol. 27 at 161–63, 176–77. Dr. Stern further noted there were no sperm cells in Medina's vaginal vault. Rep. R. (2002) vol. 27 at 173–74. But she opined it would not be unusual for semen not to be found in the victim of a sexual assault. Rep. R. (2002) vol. 27 at 171. She concluded Medina was sexually assaulted, Medina fought her attacker, and Medina's brain injuries, torn pulmonary artery, and strangulation could have independently or in combination caused her death. Rep. R. (2002) vol. 27 at 163–65, 172, 181.

On cross-examination, Dr. Stern's opinion that Medina was sexually assaulted was immediately challenged. Rep. R. (2002) vol. 27 at 172–73. Dr. Stern readily acknowledged that the presence of vaginal injuries alone did not prove lack of consent. Rep. R. (2002) vol. 27 at 172. But she reiterated her opinion that Medina had been sexually assaulted was based on *all* of the injuries Medina had suffered:

> Q. Dr. Stern, you said that this woman was sexually assaulted?
>
> A. Yes, sir.
>
> Q. Why do you say that she was sexually assaulted?
>
> A. Given the injuries to the vaginal vault and her other injuries.
>
> Q. She had rough sex, but I mean, how do you know it wasn't consensual?
>
> A. I'm not a hundred percent convinced it wasn't consensual, but I have to look at the whole picture and I have to look at all her injuries.
>
> Q. Okay. So you're not saying beyond a reasonable doubt that this woman was sexually assaulted, are you? You're not telling this Jury she was sexually assaulted, are you?
>
> A. Yes, I am. In my opinion this individual was sexually assaulted.

> Q. Now, what's the difference between -- how do you know that it wasn't consensual?
>
> A. I'm not a hundred percent sure, but in my opinion she was sexually assaulted.
>
> Q. Well, what, in your opinion, is the difference between sexually assaulted and rough sex?
>
> A. Well, I guess rough sex could be either consensual or not consensual, but given the nature of her injuries, in my opinion, this was not consensual.

Rep. R. (2002) vol. 27 at 172–73. Dr. Stern further testified on cross-examination that she believed Medina's vaginal injuries had been inflicted around the time of her death, but because she could not pinpoint the precise time of death, she likewise could not pinpoint a precise time at which Medina's vaginal injuries had been inflicted. Rep. R. (2002) vol. 27 at 177–78.

Orlando Manuel Sapien testified that Medina had been his girlfriend "for about a year" before her death. Rep. R. (2002) vol. 27 at 226. On cross examination, he claimed they were not "sexually active." Rep. R. (2002) vol. 27 at 231.

The state rested. Rep. R. (2002) vol. 28 at 5.

## 2. Motion for Directed Verdict

Davis moved for a directed verdict. Rep. R. (2002) vol. 28 at 6–8. Davis asserted, among other things, that "the only evidence" of an aggravated sexual assault was Davis's confession—and Davis claimed he had consensual sex with Medina. Rep. R. (2002) vol. 28 at 7. Hence, he argued, "if you believe the confession, then you believe that there was consensual sex and not an aggravated sexual assault." Rep. R. (2002) vol. 28 at 7. Davis's motion was denied by the trial court. Rep. R. (2002) vol. 28 at 8.

## 3. The Defense's Evidence

14

Davis's grandmother, Bobbie Fuller, testified she knew Davis came home at 1:55 a.m. on June 4, 2001, because she looked at her clock. Rep. R. (2002) vol. 28 at 10. Fuller claimed Detective Nanos came to the house looking for Davis later that morning. Rep. R. (2002) vol. 28 at 12. She said Detective Nanos told her Davis was wanted for questioning and was not under arrest. Rep. R. (2002) vol. 28 at 17, 31. She maintained Davis was scratched during a fight with his older brother, Carl Fuller, on Friday, June 1, 2001. Rep. R. (2002) vol. 28 at 41–42.

Davis's mother, Carol Davis, also reported Davis fought with his brother, Carl Fuller, on Friday, June 1, 2001. Rep. R. (2002) vol. 28 at 50, 52. She said Detective Nanos arrived on the morning of June 4, 2001, and told her he "needed to take [Davis] in for questioning." Rep. R. (2002) vol. 28 at 60, 67. She overheard a uniformed sheriff's deputy read Davis the *Miranda* warnings before Davis got into the car. Rep. R. (2002) vol. 28 at 61. She recalled speaking to Davis on the telephone later that day and learned that Davis was at a police substation and "doing okay." Rep. R. (2002) vol. 28 at 68.

Davis's brother, Carl Fuller, claimed he got into a fight with Davis on Friday, June 1, 2001, and scratched Davis on the neck. Rep. R. (2002) vol. 28 at 76–77.

Andrew Fuller testified he overheard a deputy read the *Miranda* rights to Davis as he took him to a patrol car. Rep. R. (2002) vol. 28 at 105. He reported Davis asked the deputy, "Do I need a lawyer?" Rep. R. (2002) vol. 28 at 135, 140. He overheard the deputy tell Davis he "was just being held for questioning." Rep. R. (2002) vol. 28 at 140. He clarified on cross examination he did not hear Davis say, "I want an attorney." Rep. R. vol. 28 at 140–141.

Luis Rios, a neighbor of Davis, recalled seeing some scratches on Davis on June 1, 2001. Rep. R. (2002) vol. 28 at 119.

The defense closed. Rep. R. (2002) vol. 28 at 141.

### 4.  The Verdict

The jury found Davis "guilty of capital murder as alleged in the indictment" and found Davis used or exhibited a deadly weapon—a ligature, hand, and unknown object—in committing the offense. Rep. R. vol. 29 at 5; *Davis*, 2002 WL 34676806. After hearing the evidence presented during the punishment phase and "[p]ursuant to the jury's answers to the special issues, the trial judge sentenced [Davis] to death." *Davis*, 2007 WL 1704071, at *1.

### E.  FIRST DIRECT APPEAL

Davis raised eleven points of error in his direct appeal, but only four are relevant to his federal habeas petition. *Davis*, 2007 WL 1704071, at *1.

### 1.  Motion to Suppress

In his first point of error, Davis argued the trial court should have granted his motion to suppress his oral and written confessions. *Davis*, 2007 WL 1704071, at *3. Specifically, he claimed the trial court erred in admitting his confession at trial because the police officers should have terminated his interview when he told them he wanted to go home. *Id*. He relied on *Miranda* and its progeny to argue officers must " 'scrupulously honor' the invocation of *Miranda* rights." *Id*.

The Court of Criminal Appeals overruled the objection. It explained "[a] person is in 'custody' for *Miranda* purposes 'if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest.' " *Id*. at *3 (citing *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996)). It concluded, after reviewing the record, that Davis "was not in custody at the time his statements were made." *Id*. at

*5. It explained "[t]he police did nothing to lead a reasonable person to believe that he was restrained to the degree associated with a formal arrest." *Id.* And because Davis "was not in custody, law enforcement officials had no obligation under *Miranda* to scrupulously honor a request to terminate questioning." *Id.* (citing *Dowthitt*, 931 S.W.2d at 257).

### 2.   Sufficiency of the Evidence

In his fifth point of error, Davis asserted the evidence was legally insufficient to support the jury's verdict on guilt. *Davis*, 2007 WL 1704071, at *1. Specifically, he claimed the evidence was inadequate to show he murdered Medina "while committing or attempting to commit aggravated sexual assault." *Id.*

The Court of Criminal Appeals overruled the objection. *Id.* at *2. It reasoned the jury could have reasonably inferred Medina was sexually assaulted "[f]rom the evidence of Medina's injuries and the medical examiner's testimony about them." *Id.* Accordingly, "[v]iewing the evidence in the light most favorable to the verdict, [it held] the jury could have found beyond a reasonable doubt that [Davis] murdered Medina during the course of committing or attempting to commit aggravated sexual assault." *Id.*

### 3.   Jury Selection

In his eleventh point of error, Davis argued the trial court blundered during jury selection in two ways. *Davis*, 2007 WL 1704071, at *2. First, he asserted the trial court erred in denying his challenges for cause of prospective jurors Jerry Castillo and Yzela Sigala. *Id.* Second, he claimed the trial court erred in overruling his objections to the State's use of peremptory challenges on prospective African American jurors Walter Lee Murrell and Ericka Renae Bracey because it did not comply with the requirements of *Batson v. Kentucky*, 476 U.S. 79 (1986). *Id.* at *3.

The Court of Criminal Appeals overruled the objections. *Id.* at *2–3. It explained that in order for Davis to show harm from the trial court denying his challenges for cause, the record must show he:

> (1) exhausted his peremptory challenges, (2) made a request for more peremptory challenges that was denied, (3) exercised a peremptory challenge against the complained-of juror (if he had a peremptory strike available to do so), and (4) identified an objectionable juror who served on the jury.

*Id.* at *2. It observed the record showed Davis "did not use a peremptory strike on either Castillo or Sigala, and he had available strikes with which to do so." *Id.* Moreover, "he did not request additional strikes after he exercised his peremptory challenges." *Id.* (emphasis omitted). Consequently, it concluded that Davis "was not harmed by the trial court's failure to grant his challenges for cause." *Id.*

As to the *Batson* challenges, the Court of Criminal Appeals explained:

> Under *Batson*, a defendant must establish a *prima facie* showing of racial discrimination in the State's exercise of its peremptory strikes. The burden then shifts to the State to articulate race-neutral explanations for its questioned strikes. Once the prosecutor has articulated race-neutral explanations, the burden shifts to the defendant to show that the explanations are really a pretext for racial discrimination. The trial court must then determine whether the defendant has carried his burden of proving racial discrimination.

*Id.* at *3. It noted "the prosecutor offered race-neutral explanations for using the strikes" in Davis's case. *Id.* Yet, Davis "made no attempt to rebut the prosecutor's race-neutral explanations, and the trial court overruled [Davis's] *Batson* challenges." *Id.* Consequently, it concluded "[t]he trial court did not abuse its discretion in finding that [Davis] failed to carry his burden of showing purposeful racial discrimination." *Id.*

### 4.  Excluding Lay Testimony on Future Dangerousness

In his tenth point of error, Davis argued the trial court abused its discretion by excluding the testimony of his lay witnesses regarding their opinions on whether Davis would be a future danger. *Davis*, 2007 WL 1704071, at *9. The State conceded the error. *Id.*

The Court of Criminal Appeals observed "[t]he opinions of nine lay witnesses who actually knew the appellant were erroneously withheld, while the contrary opinion of an expert as to a hypothetical person was admitted." *Id.* It concluded "[t]his shows a degree of harm that is intolerable in a death-penalty case." *Id.* It accordingly reversed the judgment of death and remanded the case to the trial court for a new trial on punishment. *Id.*

### F.  FIRST STATE HABEAS CORPUS APPLICATION (WR-61,445-01)

Davis raised eight grounds for relief in his first state writ application filed in 2004 after his trial and first sentencing. State Habeas R. (WR-61,445-01) at 8–43. First, he claimed his trial counsel provided ineffective assistance when they "failed to obtain expert assistance for purposes of presenting a serotonin defense" in mitigation. State Habeas R. (WR-61,445-01) at 10. Second, he asserted his counsel provided ineffective assistance when they "failed to ask for a directed verdict based on a factual insufficiency of evidence regarding the underlying felony of Aggravated Sexual Assault." State Habeas R. (WR-61,445-01) at 13. Third, he maintained his appellate counsel provided ineffective assistance when he failed to adequately brief the "legal sufficiency of evidence regarding underlining [sic] felony of Aggravated Sexual Assault." State Habeas R. (WR-61,445-01) at 14–15. Fourth, he averred his trial counsel provided ineffective assistance at the punishment phase because they failed "to obtain expert assistance to assist in the presentation of [Davis's] troubled psychiatric condition." State Habeas R. (WR-61,445-01) at 16. Fifth, he claimed his trial counsel provided ineffective assistance when they "failed to adequately present

mitigating circumstances." State Habeas R. (WR-61,445-01) at 17. Sixth, he asserted his trial counsel provided ineffective assistance when they "failed to adequately investigate mitigating circumstances for presentation during the sentencing phase of his trial." State Habeas R. (WR-61,445-01) at 18. Seventh, he claimed his counsel provided ineffective assistance when they failed to ask the court "to instruct the jury that they must find beyond a reasonable doubt that there were no mitigating circumstances sufficient to warrant . . . a sentence of life imprisonment." State Habeas R. (WR-61,445-01) at 19–20. Finally, he maintained his trial counsel were ineffective when "they did not preserve error when . . . challenging jurors for cause." State Habeas R. (WR-61,445-01) at 21.

The trial court—after considering Davis's application, the State's answer, and official court document records in this case—entered findings of fact and conclusions of law on Davis's habeas petition. State Habeas R. (WR-61,445-01) at 175–91. It concluded that Davis failed to overcome the presumption that his trial counsel exercised reasonable trial strategy when they did not seek the appointment of a serotonin expert. State Habeas R. (WR-61,445-01) at 182. It noted that Davis's trial counsel was not required to preserve a factual-sufficiency challenge for a direct appeal. State Habeas R. (WR-61,445-01) at 183 (citing *Rankin v. State*, 46 S.W. 3d 899, 901 (Tex. Crim. App. 2001)). And it found that the record did not support Davis's claim that his appellate counsel's briefing on the legal sufficiency of the evidence was inadequate. State Habeas R. (WR-61,445-01) at 185. Indeed, the trial court opined the evidence was "legally sufficient to support the jury's finding that Davis murdered the victim while in the course of committing or attempting to commit aggravated sexual assault." State Habeas R. (WR-61,445-01) at 185. The trial court then addressed Davis's claims concerning his sentencing. It noted that Davis failed to

identify any "additional mitigating testimony that his punishment witnesses could have provided," so his "claim that his trial counsel was ineffective for not presenting more thoroughly developed mitigation testimony" remained unproven. State Habeas R. (WR-61,445-01) at 186. It observed that "[b]ecause Davis offered only unsupported speculation that his trial counsel could have presented some unknown psychiatric evidence in mitigation of punishment," he could not meet his burden of providing his trial counsel was ineffective. State Habeas R. (WR-61,445-01) at 186. It also reported that "[t]he Court of Criminal Appeals has specifically rejected the argument that due process requires the trial court to instruct the jury that it must find beyond a reasonable doubt that there were no mitigating circumstances before imposing the death penalty." State Habeas R. (WR-61,445-01) at 189 (citing *Raby v. State*, 970 S.W.2d 1, 8 (Tex. Crim. App. 1998); *Lawton v. State*, 913 S.W.2d 542, 555–56 (Tex. Crim. App. 1995). Accordingly, the trial court recommended that the Court of Criminal Appeals deny Davis's request for habeas relief. State Habeas R. (WR-61,445-01) at 198.

The Court of Criminal Appeals noted, "[a]s to all of these allegations, the trial judge entered findings of fact and conclusions of law and recommended that relief be denied." *Ex parte Davis*, No. WR-61,445-01, 2014 WL 969802, at *1 (Tex. Crim. App. Mar. 12, 2014). It also found "the allegations in the first writ application concerning the punishment phase became moot when the first sentence was vacated on direct appeal." *Id*. It then adopted the trial court's findings and conclusions and denied Davis relief. *Id*.

### G.  SECOND PUNISHMENT PHASE (2008)

#### 1.  The State's Evidence

At Davis's punishment retrial, the State re-introduced the evidence pertaining to Davis's guilt for murdering Medina—including his confession.

Dr. Stern, the Chief Medical Examiner for El Paso, described the injuries inflicted on Medina. Rep. R. (2008) vol. 24 at 63–105. She explained that Medina had suffered multiple abrasions to her face; blunt-force trauma to her head, which resulted in severe internal head injuries, including a subarachnoid hemorrhage in her brain; multiple abrasions to her torso, including a large abrasion that was consistent with being struck with a pipe-shaped object; a particularly severe blow to the chest that bruised her heart and ruptured her pulmonary artery and filled her pericardial sac with blood; and strangulation. Rep. R. (2008) vol. 24 at 64–65, 69, 71–79, 85, 94–103; States Exs. (2008) 71, 278. She further explained that she performed a speculum examination of Medina's "vagina, and in the mid-upper vaginal vault, or the opening of the vagina, she had multiple abrasions of the mucosa with surrounding erythema. Erythema is just a fancy word for redness." Rep. R. (2008) vol. 24 at 90. She opined that Medina's vaginal injuries were consistent with penile penetration and that Medina had been sexually assaulted prior to her death. Rep. R. (2008) vol. 24 at 92.

Defense counsel challenged Dr. Stern's opinion that Medina was sexually assaulted and elicited testimony from her that, while she believed Medina's serious and painful vaginal injuries were not likely the result of consensual sex, she could not be certain those injuries had not been caused by consensual sex:

> Q. Dr. Stern, do you know what caused the abrasions on [Medina's] vaginal vault?
>
> A. I don't know exactly. I just know what they're consistent with.
>
> Q. Right. And they're consistent with a penis?

A. They can be, yes.

Q. Okay. Now, what is the difference between healthy, vigorous, consensual sex and what you found in [Medina's] vaginal vault?

A. Healthy consensual sex shouldn't leave injuries.

Rep. R. (2008) vol. 24 at 106. But Dr. Stern testified on re-cross she could not be sure the sex was not consensual:

Q. Dr. Stern, your opinion has been expressed numerous times in the past seven years that as far as you were concerned, this was a sexual assault. Isn't that correct?

A. That's correct.

Q. Okay. And that opinion is based on your investigation of the police investigation and the scientific evidence?

A. That's correct.

Q. But as far as the scientific evidence is concerned, you cannot tell us if this was consensual sex or not, can you?

A. Not with a hundred percent certainty.

Q. And you cannot tell us if this was -- this consensual sex took place two hours before these other injuries or two minutes before the other injuries?

A. That's correct.

Rep. R. (2008) vol. 24 at 128.

The State then presented five witnesses who testified about Davis's propensity to violence.

Carlos Ramirez—who was present at the Romero's party on the evening of June 3, 2001—testified that Davis had "clotheslined" him by abruptly putting his arm around his chest to stop him. Rep. R. (2008) vol. 24 at 198–99. And later—after Ramirez told Davis he did not

appreciate unwanted roughhousing—Davis held his head down while he was tying his shoes. Rep. R. (2008) vol. 24 at 200, 208–09.

Megan Ryan—a former schoolmate from Jacksonville, North Carolina—said that on January 24, 1996, she saw Davis chase his twin brother, Oscar, around the house with a big kitchen knife and pin him on the ground with that knife. Rep. R. (2008) vol. 26 at 61–63.

Michelle Marinelli—another person who knew Davis in North Carolina—said he saw Davis throw a bar stool in anger at a dance club and later called her a "bitch." Rep. R. (2008) vol. 26 at 67–70.

Mary Cramer Segovia—a prior acquaintance from North Carolina—said she once observed a knife on the floor—which Davis picked up and claimed as his—while she was dancing with friends at a nightclub. Rep. R. (2008) vol. 26 at 224–25, 228, 239.

Patricia Ann Trott—a former neighbor from North Carolina—testified she saw a law-enforcement officer speaking with Davis at his house and afterwards, when Davis was talking to a friend on his porch, Davis pointedly looked at Trott and said, "But I'll take care of her." Rep. R. (2008) vol. 26 at 242–44, 247. On another occasion, when Trott was driving up the street, Davis, who appeared angry, began to cross the street very slowly in front of her, as if deliberately trying to stop her from passing, and leaned down and said something to her as she passed. Rep. R. (2008) vol. 26 at 244–45, 249–50, 252.

The State next presented evidence that Davis was on probation for theft in North Carolina when he sexually assaulted and killed Medina. Rep. R. (2008) vol. 26 at 216–17, 219; Rep. R. vol. 28 at 226; State's Exs. 234–36. It established that Officer Nelson Negron, a former school-resource officer at Jacksonville High School, arrested Davis for criminal trespass in 1997

because Davis—who had previously been suspended from school—was not permitted to be on school grounds. Rep. R. (2008) vol. 26 at 261–62, 266–68. It showed that Officer Negron assisted when his partner, Officer Clifton McQueen, arrested Davis for possession of marijuana in 1998. Rep. R. (2008) vol. 26 at 259–61, 264. It presented evidence establishing that Officer McQueen, also a former school-resource officer, was present when Davis was suspended from school later that year. Rep. R. (2008) vol. 26 at 270, 272–79.

The State then offered evidence—including books, writings, and drawings—found in Davis's death-row prison cell which suggested Davis was involved with Satanism. Rep. R. (2008) vol. 27 at 36–48; State's Exs. 285–91, 297–300. It also submitted violent drawings by Davis of women with slashed throats, bound and gagged, and covered in blood. Rep. R. (2008) vol. 27 at 42–44, 47–48, 60–61; State's Exs. 276, 294–96, 301.

Dr. Edward Gripon—the State's expert witness in the field of forensic psychiatry—testified he reviewed "collateral information" on Davis—including his offense report, prior testimony at his suppression hearing, school record, artwork, and telephone conversations. Rep. R. (2008) vol. 27 at 83–87. Dr. Gripon then listened as the prosecutor outlined a hypothetical question which summarized the evidence against Davis in this case. Rep. R. (2008) vol. 27 at 121–37. Dr. Gripon opined on the issue of future-dangerousness that the hypothetical person described by the prosecutor "would be likely to continue to pose a continued threat." Rep. R. (2008) vol. 27 at 137. Dr. Gripon explained he mostly based his opinion on Davis's history of antisocial behavior and escalating violence:

> But the majority of it being focused on the -- starting with behaviors that were against the law.  . . . There is a history of violence. There's an escalation of that behavior. There's some antisocial tendency in that the person does not conform their behavior to an acceptable or society standard at some point. And there seems

> to be some degree of preoccupation with violence, death, that sort of thing, and probably -- possibly some problem with the way he looks at certain people.

Rep. R. (2008) vol. 27 at 137.

Donald Vaughn Haley—the Director of Criminal Justice at Tidewater Community College in Virginia Beach, Virginia—testified he had studied Satanism for nineteen years and had consulted with law enforcement agencies—including the Federal Bureau of Investigations on one occasion—about the subject. Rep. R. (2008) vol. 27 at 194–97, 214, 219–20. Although he had never testified in court as an expert on Satanism, he was allowed by the trial court—over the objection of Davis's counsel—"to testify as an expert in the area of satanism" in this case. Rep. R. (2008) vol. 27 at 199. He read a passage from *The Satanic Bible* by Anton LaVey—the founder of the Church of Satan—which suggested human sacrifice could be used "to dispose of a totally obnoxious and deserving individual," meaning "[a]nyone who had unjustly wronged you or has gone out of his way to hurt you." Rep. R. (2008) vol. 27 at 200–01. He said *The Satanic Bible* commands that when a person, by his "reprehensible" behavior, "cries out to be destroyed, it is truly your moral obligation to indulge [ ] their wish." Rep. R. (2008) vol. 27 at 202. He claimed Rule Eleven of LaVey's Eleven Satanic Rules of the Earth—"When walking in open territory, bother no one. If someone bothers you, ask him to stop. If he does not stop, destroy him"—shows that if a person "annoys you, [you may] treat him cruelly." Rep. R. (2008) vol. 27 at 204. And if the person does not stop his annoying behavior, you may "destroy" him. Rep. R. (2008) vol. 27 at 204. On cross-examination, Haley asserted the brutal way Davis murdered Medina was consistent with the term "destroy," and that "destroy" meant "to die." Rep. R. (2008) vol. 27 at 210–11.

> Q. They die? Okay. And so what you're doing is you're reading these things literally, right?

A. Yes, sir.

Q. How are you supposed to destroy a person? Would you explain it to the Ladies and Gentlemen of the Jury?

A. Well, you could turn around, hit them in the heart so much that it ruptures. You could bash their head against a pole till they bleed out. You can cut their fingertips out. I think that would be an adequate description of being destroyed.

Rep. R. (2008) vol. 27 at 210–11.

Davis's counsel deftly cross-examined Haley. Rep. R. (2008) vol. 27 at 205–25. They obtained Haley's admission that he was reading Rule Eleven of LaVey's Eleven Satanic Rules of the Earth "literally." Rep. R. (2008) vol. 27 at 210. They established that Haley had never published in the area of Satanism, had interviewed only three Satanists, and was, at best, minimally qualified to give opinions on Satanism or the Church of Satan. Rep. R. (2008) vol. 27 at 211–25

### 2.  The Defense's Evidence

The defense called a witness to counter Haley's testimony on Satanism.

John Gordon Melton—the director for the Institute for the Study of American Religion in Santa Barbara, California, an expert in religious studies, and a religious historian with training on cults and new religions—was qualified as an expert on American religions including Satanism. Rep. R. (2008) vol. 27 at 227–29. He testified about the origin of the Church of Satan in the United States with its founder—a former circus performer named Anton LaVey—and its nature and rituals. Rep. R. (2008) vol. 27 at 230–43.

Q. So a lot of satanism is just ritual.

A. Well, certainly in LaVey's satanism he's drawing upon psychological studies that suggest that rituals have many purposes far beyond their stated purpose. And so he was drawing on that kind of psychological tradition to say rituals are important.

. . . .

Q.   . . . And what is meant by human sacrifice?

A. In the satanic system LaVey was opposing the idea of turning the other cheek. If someone is doing you harm, as is [sic] opposing you, putting you down, then you react to that. And in choosing a proper human sacrifice, which is the title of this chapter [of *The Satanic Bible*], you select someone who was trying to hurt you, either is hurting you, or is trying to hurt you as a proper object or sacrifice.

Q. And how do you -- how do you destroy this person?

A. You curse them. You go through a ritual, and you symbolically curse them.

Q. Symbolically curse them. Explain that to me. How do I symbolically curse one of my enemies?

A. In the back part of the book . . . you have some basic outlines for rituals. And one of the rituals is called a ritual of destruction. So you go through the ritual preparation. Rituals are -- magical rituals are designed to focus your will, your intention. So you go through magical ritual, and you pronounce a curse on the person who you want to destroy. And you put all your emotional energy into it and then after it's over, you've done it. And you drop that and go on to something else, so it's kind of a cathartic response to the person. You don't actually touch him, or you don't actually respond to him. If you did -- you know, LaVey was at this for 30 years. If he was doing anything other than symbolically dealing with people who didn't like him, he would have ended his life in jail, and his members likewise. So it's laid out fairly simply through here that you destroy someone by pronouncing a curse on him.

Rep. R. (2008) vol. 27 at 236–37. He explained LaVey formed the Church of Satan to counter Christianity and Catholicism, which he deemed hypocritical. Rep. R. (2008) vol. 27 at 235–36. He further claimed followers of Satanism should not take the passages in *The Satanic Bible* literally, and opined LaVey's Eleven Satanic Rules of the Earth and Nine Satanic Statements were non-violent in nature. Rep. R. (2008) vol. 27 at 253, 269–72. But he conceded an individual

reading *The Satanic Bible* could take the words literally. Rep. R. (2008) vol. 27 at 253–54. He also

conceded people had been killed "[i]n the name of satanism." Rep. R. (2008) vol. 27 at 251.

The defense provided character testimony from twelve lay witnesses—including

childhood and adult friends, a schoolteacher, and family members. Rep. R. (2008) vol. 27 at 323–

92. These witnesses opined Davis was peaceful, non-violent, not aggressive, and would not pose a

future danger to society. Rep. R. (2008) vol. 27 at 323–93.

Dr. James William Schutte—a licensed psychologist—testified that clinical method risk

assessments—such as the one provided by Dr. Gripon—were highly inaccurate. Rep. R. (2008)

vol. 28 at 32–34, 47–48. He explained:

> There are two methods of conducting [a] risk assessment. One is called the clinical method. What that involves is simply having a doctor . . . respond to a hypothetical and give their personal subjective opinion to whether or not that person is likely to be dangerous. And from scientific research, we've known for over 25 years that that type of method is highly inaccurate most of the time.
>
> The other method is what we call the actuarial method. That's where we, through scientific research, have identified which factors or which characteristics of a defendant make them more or less likely to be violent. And then we plug . . . those characteristics into a formula and that gives us an estimate of how likely that person is to be violent in the future.   . . .
>
> There's a study published in December 2007, *The Journal of Law and Human Behavior*, . . . which . . . found . . . this actuarial method of predicting violence was accurate.
>
>           . . . .
>
> There's also been a study that was published in 2005 examining individuals who have been given the death penalty. And which a professional had come into the court and said that this person was probably going to be violent again in the future. Ninety-five percent of the time those predictions of future violence were wrong.

Rep. R. (2008) vol. 28 at 32–36. Dr. Schutte explained that when using the actuarial method, every

inmate starts with a base rate of a 16.4 percent likelihood of committing future violence in prison

and then numerous factors are used to add or subtract from that base rate. Rep. R. (2008) vol. 28 at

37–43. Dr. Schutte then went through the factors:

> We know that the typical murder inmate has a likelihood of violence of 16.4
> percent. If we follow your hypothetical, the person did not commit a robbery or
> burglary at the time of the murder, so that doesn't get added in. There were not
> multiple victims, so that doesn't get added in. There were no prior convictions for
> attempted murder or assault, so we don't add that number. No gang membership, so
> we don't add that number. No prior prison term, so we don't add that number.
> Person is not less than 21, so we don't add that number. And of course, they're not
> old enough at this point to fall into those other categories, so what we are left with is
> an estimate of future violence of 16.4 percent.

Rep. R. (2008) vol. 28 at 43. Dr. Schutte opined that "there is *not* a probability" a hypothetical

individual like Davis—who had attained the age of twenty-five and did not have any factors added

to his base rate—"would commit acts of violence in prison." Rep. R. (2008) vol. 28 at 46

(emphasis added). Dr. Schulte also reported that in a "study of 136 capital murderers in Texas

prisons [in the early 2000s], none of that group of 136 committed a murder while in prison." Rep.

R. (2008) vol. 28 at 78

Davis's mother—Carol Davis—testified that Davis's father, Oscar Davis III, was in the

military and "[h]e was gone a lot." Rep. R. (2008) vol. 28 at 82.

> We were stationed at Cherry Point, North Carolina, for about three years. And then
> he went overseas to Korea for a year. We left North Carolina. We went to . . .
> Virginia, Virginia Beach, and we were there . . . for maybe six, seven years. And
> then after that we went to 29 Palms, California, for three years. And in between
> each one there was duty that he had to go overseas for a year. So we were like
> basically left one year with me and the children by ourselves.

Rep. R. (2008) vol. 28 at 82–83. She added that she had "not been with him" since she obtained a

restraining order in May of 1995. Rep. R. (2008) vol. 28 at 82, 88. She claimed that she did not

have a "good relationship" with her husband, and there was always extra hostility when he

returned home from a deployment. Rep. R. (2008) vol. 28 at 82. She described her husband as a

drinker who physically and verbally abused her—and treated his children like they were in the military. Rep. R. (2008) vol. 28 at 87.

> If the children would get in trouble, or they didn't do anything to his specifics, being a military person, they would have to stand in front of him and they would have to listen to him lecture them about what was right and what was wrong. And I had enough. I couldn't put them through that anymore. When he retired I told him that it wasn't going to work anymore so he left. And I filed for a restraining order to keep him away from myself and my children.

Rep. R. (2008) vol. 28 at 88. She believed that not having a father present affected the boys and she claimed the children still loved their father and talked to him when they wanted. Rep. R. (2008) vol. 28 at 88–89. She explained that Davis dropped out of high school just before he turned eighteen, and the family moved to Anthony, Texas, because he got into legal trouble and was being harassed by some other kids. Rep. R. (2008) vol. 28 at 90–92. She believed that Davis had potential and good qualities, and she did not believe he was a future danger. Rep. R. (2008) vol. 28 at 96–98.

Davis was the last to testify. He explained he grew up a Baptist but switched to Buddhism in 1999. Rep. R. (2008) vol. 28 at 107, 169. He claimed two events led him to Satanism: the first was his anger over the way Buddhists were treated by the Chinese in Tibet and the second was his desire to look into the myth of the war in heaven. Rep. R. (2008) vol. 28 at 171–72. He maintained he did not believe in Satan as a deity:

> I see Satan as the spirit of rebellion, because without rebellion we wouldn't have done anything. If you -- the original satanists were the Illuminati, Bernini, Galileo, people that went against the Church to tell people -- man, the truth about what's going on, to say that earth wasn't the center of our universe, of our galaxy, but the sun was, because the Church said the earth was created by God, and we're descendants of the universe, everything revolves around us. And the scientists said, no, that's not true. So they were attempting to explain through science, through logic, the way our world worked. And that's what the original satanists were at the

> beginning. It comes from the Islamic shaitan, which means adversary, so Satan is
> the spirit of rebellion.

Rep. R. (2008) vol. 28 at 122. He claimed Satanism did not advocate violence. Rep. R. (2008) vol.

28 at 117–18. He explained *The Satanic Bible* lays out various spells: compassion spells,

destruction spells, and lust spells. Rep. R. (2008) vol. 28 at 202. He maintained he used his "spells

for compassion." Rep. R. (2008) vol. 28 at 202. He said Rule Eleven of the Satanic Rules of the

Earth provided "[w]hen walking into open territory, bother no one. If someone bothers you, ask

him to stop. If he does not stop, destroy him." Rep. R. (2008) vol. 28 at 204. He said "destroy" in

this context did not mean you actually hurt another, but you could defend yourself "through your

words." Rep. R. (2008) vol. 28 at 205. He also discussed his artwork, poetry, and life philosophy at

length. Rep. R. (2008) vol. 28 at 102–210.

Davis testified about his childhood, home life, and his father's abuse. Rep. R. (2008) vol.

28 at 210–27. He described how his father gave Davis and his twin brother, Oscar Davis,

"whoopings." Rep. R. (2008) vol. 28 at 212. He said they would "have to strip down and he'd hit

us on our bare bottoms with a belt. Other times he would just be cruel." Rep. R. (2008) vol. 28 at

212. He claimed they were always punished together, especially when their father was drunk,

because he could not tell them apart. Rep. R. (2008) vol. 28 at 213. He alleged his father also

kicked his older brother—Carl Fuller—out of the house when he was sixteen years old because

Carl Fuller threatened his father after he hit his mother. Rep. R. (2008) vol. 28 at 213–14. He

claimed his father would hit his mother "only when he was drunk." Rep. R. (2008) vol. 28 at 214.

He said his father first started drinking periodically and then "more and more." Rep. R. (2008) vol.

28 at 215. He maintained his father hit him "like a grown man." Rep. R. (2008) vol. 28 at 219.

Davis explained he dropped out of high school during his junior year at the age of seventeen because he "was weak." Rep. R. (2008) vol. 28 at 224.

> I couldn't get past everything that I had went through, and so it would consume me. At the time I was pretty much a junkie. I was doing drugs in school, doing drugs out of school. I'd party all day, party all night, and I just said, you know, I couldn't do it anymore. I just gave up on myself. I gave up on everything.

Rep. R. (2008) vol. 28 at 224.

Davis admitted he was placed on probation after his arrest for possession of marijuana and stolen items. Rep. R. (2008) vol. 28 at 225–26. He claimed his mother made a deal for him to leave North Carolina and come to Anthony, Texas. Rep. R. (2008) vol. 28 at 226. He said Anthony was "all right" because he was part of the only Black family in town, and he was a novelty. Rep. R. (2008) vol. 28 at 226.

Davis then described how he murdered Medina. Rep. R. (2008) vol. 28 at 227–38. He explained that after a party where everyone was drinking beer and smoking marijuana, the crowd broke up and he decided to walk Medina home because he was interested in her. Rep. R. (2008) at 227–32. At one point, he said he climbed over a fence and then helped Medina down. Rep. R. (2008) vol. 28 at 231. He professed they were "kind of out of it." Rep. R. (2008) vol. 28 at 231. He said he tried to "get with her" for "just sex," but Medina said she had a boyfriend. Rep. R. (2008) vol. 28 at 231–32. Despite this, he alleged they started to kiss, he helped her undress, he pulled his pants down, and they had sex. Rep. R. (2008) vol. 28 at 232. During the sex, he claimed Medina "froze up" and told him they could not continue. Rep. R. (2008) vol. 28 at 232. Davis said he asked what the problem was, and Medina said she did not want anyone to find out and that if anyone did, "I'm just going to say you raped me." Rep. R. (2008) vol. 28 at 233. Davis said he started thinking he would go to jail if she accused him because no one would believe him and he "just snapped."

Rep. R. (2008) vol. 28 at 233–34. He remembered putting his hands around Medina's neck and strangling her while she fought back. Rep. R. (2008) vol. 28 at 234. Even though Medina said, "it's fine, it's fine," he "wasn't trying to hear it anymore." Rep. R. vol. 28 at 234. Davis maintained he walked around Anthony in a haze after he choked Medina and was "freaking out." Rep. R. (2008) vol. 28 at 235. Then, he went back to the crime scene thinking Medina would be alive and gone, but she was still there and not moving. Rep. R. (2008) vol. 28 at 235. He tried to clean up the crime scene and grab things to cover his tracks because he was guilty and did not want to go to jail. Rep. R. (2008) vol. 28 at 236. He explained he cut Medina's fingertips off with some garden shears that he possibly got out of someone's car. Rep. R. (2008) vol. 28 at 236. He declared, "[t]here was no rhyme or reason to the things I was doing. I just went on autopilot." Rep. R. (2008) vol. 28 at 237. He ended up throwing everything away—Medina's pants, Medina's fingertips, and the shears—and went home. Rep. R. (2008) vol. 28 at 237. He explained he got the idea of cutting off Melissa's fingertips from television because he understood DNA could get under fingernails. Rep. R. (2008) vol. 28 at 237.

The next morning, he said he saw Melissa's body on the news and knew that people were coming for him because he was the last person with her. Rep. R. (2008) vol. 28 at 239–40. When the police arrived, he agreed to go to the station. Rep. R. (2008) vol. 28 at 239–40. Davis admitted he initially lied to the detectives and said that another person picked up Medina, but then he told them everything. Rep. R. (2008) vol. 28 at 240–41. He claimed he needed to tell them the truth for closure. Rep. R. (2008) vol. 28 at 241.

At the end of his testimony, Davis said it "killed him" to know he was a part of the Medina family's horror; "it was eating [him] up" that no one talks about her anymore; "to remember her is

to remember everything I did"; and he stole from their family by taking their daughter. Rep. R. (2008) vol. 28 at 243. He then said:

> I would ask you all to please, please remember her. I mean, I'm a piece of crap. I understand that. I'm not asking -- I didn't come here looking for salvation. I came here looking for an execution. I'm not asking you all to spare my life. I'm asking you all to allow me to give up my life in spite of hers, based on the laws I live by. It's life for life. I took a life, mine should be taken in return."

Rep. R. (2008) vol. 28 at 243. Davis added he could do nothing to make this right except give up his right to live. Rep. R. (2008) vol. 28 at 244–45.

### 3. The Verdict

At the conclusion of the punishment hearing, the jury again answered the two special issues submitted under Texas Code of Criminal Procedure Article 37.071, §§ 2(b) and 2(e), and determined (1) Davis was a continuing threat to society and (2) there were insufficient mitigating circumstances to warrant a sentence of life in prison without parole. *Davis*, 329 S.W.3d at 802. The trial court, acting in accordance with the jury's answers to the special issues, sentenced Davis to death. *Id.*

## H.  SECOND DIRECT APPEAL

Davis raised "nine issues on direct appeal from the second punishment hearing," but only four are relevant to his federal habeas petition. *Id.*

### 1.  Evidence of Satanism

In point of error one, Davis argued the trial court erred when it allowed the State to present evidence that he "had become a Satanist while imprisoned on death row." *Id.* at 802–03. He specifically complained the trial court erred by admitting State's Exhibits 247, 248, and 285 through 301, permitting the testimony of State's expert witness Donald Haley, and requiring him

to display the tattoo of a pentagram on his chest to the jury. *Id.* at 803. He raised both constitutional and statutory claims, arguing that the trial court violated the First Amendment to the United States Constitution and Rules 401 and 403 of the Texas Rules of Evidence. *Id.*

The Court of Criminal Appeals overruled the objection. *Id.* at 806. It explained "[t]he First Amendment to the Constitution guarantees the freedoms of religion and association." *Id.* at 805 (first citing *Casarez v. State*, 913 S.W.2d 468, 476–78 (Tex. Crim. App. 1994); then citing *Mason v. State*, 905 S.W.2d 570, 576 (Tex. Crim. App. 1995)). "It protects an individual's right to join groups and to associate with others holding similar beliefs." *Id.* (citing *Mason*, 905 S.W. 2d at 576). But it does not, "erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing merely because those beliefs and associations are protected by the First Amendment." *Id.* (citing *Mason*, 905 S.W.2d at 576). Evidence of religious beliefs "may be admissible if it is shown to be relevant to the issues involved in the case." *Id.* (citing *Mason*, 905 S.W.2d at 576–77). In a capital murder trial, "[f]uture dangerousness is an issue that is relevant to the sentencing stage." *Id.* (citing *Mason*, 905 S.W.2d at 577).

The Court of Criminal Appeals further explained, "[i]n order to prove the relevance of a defendant's membership in an organization or group, the state must show: (1) proof of the group's violent and illegal activities, and (2) the defendant's membership in the organization." *Id.* (citing *Mason*, 905 S.W.2d at 577). It noted that the State introduced prison records showing Davis "had identified himself as a Satanist since 2005." *Id.* It observed that Haley testified some members of the Satanic religion advocated violence. *Id.* It further noted that "[a]lthough Melton disagreed with Haley's definition of the term 'destroy' and his description of Satanic philosophy, Melton acknowledged that in some instances people had been killed in the name of Satanism." *Id.* It

36

concluded "[i]t was within the zone of reasonable disagreement for the trial court to decide that the evidence of Satanism was relevant to the issue of future dangerousness and outside the protection of the First Amendment." *Id.* at 805–06.

> The Court of Criminal Appeals then observed:

> In the instant case, [Davis] brutally raped, beat, and strangled a fifteen-year-old girl and then cut off her fingertips to remove potential DNA evidence. The state presented evidence that, in the past, [Davis] had displayed aggressive behavior, had been in trouble at school, and had been placed on probation for a theft offense in North Carolina. Defense counsel argued, "Maybe he wasn't a good person back then, but he's a good person now," pointing out that "he's been trying to do the right things" since he was incarcerated and that he had no documented incidents of violence in prison. The evidence that [Davis] became a Satanist while in prison helped to rebut that defense argument.

*Id.* at 806. It concluded "the trial court did not abuse its discretion in admitting this evidence." *Id.*

## 2.   Challenges for Cause

In point of error two, Davis asserted the trial court improperly denied his challenges for cause against venire members Sharon Ann Neumann, Alejandro Melero, and Luis Romo. *Id.* at 806–07. Davis alleged they were challengeable for cause under Texas Code of Criminal Procedure Article 35.16 because they were biased against him "or against some part of the law applicable to the case upon which he was entitled to rely." *Id.* at 807 (citing Tex. Code Crim. Proc. Ann. art. 35.16(a)(9) and (c)(2) (West)). Davis claimed Neumann was biased against him because she "was uncomfortable with Satanism" and she "described the religion as evil and contrary to everything [she] believe[d]." *Id.* Davis averred Melero was biased because he "was leaning towards death over life" and he expected Davis "to prove that the death penalty was not appropriate." *Id.* at 808. He asserted Romo was biased against him because he "had a bad experience with an uncle

possessed by the devil" and "[h]e admitted the incident would sway how he would view evidence of Satanism." *Id*. at 810.

The Court of Criminal Appeals overruled the objection. *Id*. at 813. It first explained it must look at the entire record to determine if the evidence was sufficient to support a trial court's decision to deny a challenge for cause. *Id*. at 807 (citing *Feldman v. State*, 71 S.W.3d 738, 744 (Tex. Crim. App. 2002)). It then explained "[b]efore venire members may be excused for cause, the law must be explained to them, and they must be asked whether they can follow that law, regardless of their personal views." *Id*. (citing *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009)). It added "[t]he proponent of a challenge for cause has the burden of establishing . . . the venire member understood the requirements of the law and could not overcome his or her prejudice well enough to follow the law." *Id*. (citing *Gardner*, 306 S.W.3d at 295). It also said it reviewed "a trial court's ruling on a challenge for cause with considerable deference because the trial judge is in the best position to evaluate a venire member's demeanor and responses." *Id*. (citing *Gardner*, 306 S.W.3d at 295–96).

The Court of Criminal Appeals found "Neumann ultimately stated that she could follow the law, regardless of her personal views." *Id.* at 808. It further found "Melero agreed that he could set aside his personal opinions and follow the law requiring the state to prove the future-dangerousness special issue beyond a reasonable doubt." *Id*. at 810. It also found Romo "ultimately stated to the trial court that he could set aside his bias and follow the law." *Id*. at 813. Hence, it found Davis failed to meet his burden of showing Neumann, Melero, and Romo could not overcome their prejudices well enough to follow the law. It accordingly concluded the trial court did not abuse its discretion when it denied Davis's challenges for cause. *Id.* at 813.

38

### 3.  Expert Testimony

In point of error three, Davis maintained the trial court erred in allowing Donald Haley, the state's expert on Satanism, to testify about the Satanic religion and the beliefs and practices of its adherents. *Id*. He argued "the state failed to demonstrate that Haley was qualified or that his expert testimony was reliable." *Id*.

The Court of Criminal Appeals overruled the objection. *Id*. at 815. It explained a trial court must be satisfied three conditions are met before admitting expert testimony under Texas Rule of Evidence 702: "(1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the factfinder in deciding the case." *Id.* at 813 (citing *Alvarado v. State*, 912 S.W.2d 199, 215–16 (Tex. Crim. App. 1995)). It concluded, "[g]iven Haley's years of researching, studying, teaching, and advising about the subject of Satanism, . . . the trial court did not abuse its discretion in permitting Haley to testify over [Davis's] qualification objections." *Id.* at 814. It found "Haley was considered an expert on the subject of Satanism by Tidewater Community College and the Virginia Gang Association, had conferred with other experts on the subject in various cases, and had spent years teaching the subject to college students and law-enforcement personnel." *Id*. at 815. It concluded "[t]he trial court did not abuse its discretion in admitting Haley's expert testimony over [Davis's] reliability objections." *Id*.

### 4.  *Batson* Challenge

In point of error four, Davis argued "the trial court erred in overruling his *Batson* objection to the State's peremptory strike against prospective [African American] juror Jason Cofield." *Id.*

39

He claimed, "the State's professed reasons for striking juror Cofield were contrived in order to conceal racially discriminatory intent" and the trial court's ruling was clearly erroneous. *Id.*

The State noted a juror could answer the special issues submitted under Texas Code of Criminal Procedure Article 37.071 in the affirmative "based upon the evidence of the crime alone." *Id.* at 816. Yet when Cofield was asked about the burden of proof, "[h]e said he needed an enormous amount of evidence" and suggested the fact of the murder alone was not enough. *Id.* at 815. He also stated "[i]t's never too late" for someone to change his life for the better and "[a]nybody can make a change." *Id.* at 817. "At the conclusion of his *voir dire* questioning, Cofield agreed that he could not affirmatively answer the future-dangerousness question based on the facts of the case alone." *Id.*

The Court of Criminal Appeals overruled the objection. *Id.* at 818. It found the State's explanations for striking Cofield were facially race neutral, and Davis had not demonstrated evidence of pretext. *Id.* Thus, it concluded the trial court did not abuse its discretion in denying Davis's *Batson* challenge to Cofield. *Id.*

## I.   SECOND STATE HABEAS CORPUS APPLICATION (WR-61,445-02)

Davis raised eight grounds for relief in his second state writ application filed after his resentencing. State Habeas R. (WR-61,445-02) at 45–46. First, he claimed he was sentenced to death in violation of the First and Fourteenth Amendments because evidence of his religious association with Satanism was erroneously received into evidence. State Habeas R. (WR-61,445-02) at 45. Second, he asserted his trial counsel provided ineffective assistance when they failed to investigate and present "readily available evidence of his seriously abusive and dysfunctional family life in mitigation." State Habeas R. (WR-61,445-02) at 45. Third, he

maintained his trial counsel were ineffective when they failed to obtain and present expert testimony describing the abuse he experienced while growing up, his mental health issues, and the psychological implications of the febrile seizures he suffered during his infancy. State Habeas R. (WR-61,445-02) at 45. Fourth, he claimed his trial counsel provided ineffective assistance when they relinquished peremptory challenges against objectionable jurors by failing to require the State to make peremptory challenges before him. State Habeas R. (WR-61,445-02) at 45. Fifth, he averred his trial counsel were ineffective when they failed to oppose the erroneous exclusion of Vicki Everett Torres from the jury for cause. State Habeas R. (WR-61,445-02) at 45. Sixth and seventh, he contended his appellate counsel provided ineffective assistance by failing to complain that Patsey Lindsey and Robert G. Beckoff were erroneously excluded from the jury for cause. State Habeas R. (WR-61,445-02) at 46. Finally, he asserted his trial counsel provided ineffective assistance by failing to adequately develop the factual basis for his claim that the State improperly exercised peremptory challenges against one or more qualified potential jurors on account of their race. State Habeas R. (WR-61,445-02) at 46.

The trial court entered findings of fact and conclusions of law on Davis's second habeas petition. State Habeas R. (WR-61,445-02), ECF No. 167-2 at 160–74; ECF No. 167-3 at 1–34. It observed that the Court of Criminal Appeals had already rejected Davis's complaint alleging "the admission of the evidence of his involvement with Satanism violated his constitutional right to freedom of religion/association"—and his claim was, therefore, "not cognizable in [a] post-conviction writ proceeding." State Habeas R. (WR-61,445-02), ECF No. 167-3 at 32 (citing *Ex parte Reynoso*, 257 S.W. 3d 715, 723 (Tex. Crim. App. 2008)). It concluded, in the alternative, that evidence of Davis's affiliation with Satanism was relevant and material to his character and

future dangerousness—and its admission did not violate his freedom of religion or association. State Habeas R. (WR-61,445-02), ECF No. 167-3 at 32 (citing *Davis*, 329 S.W. 3d at 805–06). It additionally concluded, in the alternative, that Davis failed to demonstrate he was harmed by the admission of the evidence because it was more likely than not that the outcome of his "punishment phase would have been the same without the complained-of evidence." State Habeas R. (WR-61,445-02), ECF No. 167-3 at 32 (citing *Ex parte Barber*, 879 S.W. 2d 889, 892 (Tex. Crim. App. 1994); *Ex parte Fierro*, 934 S.W.2d 370, 376–77 (Tex. Crim. App. 1996)).

The trial court determined that "the aggravating factors were severe" and "the omitted mitigation evidence, if believed, was not that strong." State Habeas R. (WR-61,445-02), ECF No. 167-3 at 32. It added that evidence of Davis's "abusive childhood was admitted before (and rejected by) the jury." State Habeas R. (WR-61,445-02), ECF No. 167-3 at 32. It further concluded that Davis failed to show the missing mitigation evidence, if presented to the jury, "would have tipped the scale in his favor." State Habeas R. (WR-61,445-02), ECF No. 167-3 at 32. As a result, it also concluded that Davis failed to meet his burden of showing his counsel provided ineffective assistance. State Habeas R. (WR-61,445-02), ECF No. 167-3 at 32 (citing *Strickland*, 466 U.S. at 687); *Ex parte Gonzalez*, 204 S.W.3d 391, 393–94 (Tex. Crim. App. 2006); *Ex parte Martinez*, 195 S,W.3d 713, 728 (Tex. Crim. App. 2006); *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999)).

The trial court further determined that Davis failed to meet his burden of proving his trial counsel rendered deficient performance by using the jury-selection process employed in his punishment retrial. State Habeas R. (WR-61,445-02), ECF No. 167-3 at 33 (citing *Strickland*, 466 U.S. at 687; *Hughes v. State*, 24 S.W. 3d 833, 841 (Tex. Crim. App. 2000); *Thompson*, 9 S.W.3d at

813). It concluded that Davis failed to show his counsel rendered ineffective assistance in failing to object to the exclusion of venireperson Vicki Everett Torres for cause. State Habeas R. (WR-61,445-02), ECF No. 167-3 at 33. It found that Davis failed to demonstrate the trial court erred in granting the State's challenges for cause as to venire members Patsy Lindsey and Robert Beckoff. State Habeas R. (WR-61,445-02), ECF No. 167-3 at 34. The trial court finally noted that Davis abandoned his allegation that his counsel failed to adequately preserve his claim concerning peremptory challenges. State Habeas R. (WR-61,445-02), ECF No. 167-3 at 34. The trial court accordingly recommended that the Court of Criminal Appeals deny Davis's state writ application. State Habeas R. (WR-61,445-02), ECF No. 167-3 at 34.

The Court of Criminal Appeals "agree[d] with the trial judge's recommendation and adopt[ed] the trial judge's findings and conclusions." *Ex parte Davis*, 2014 WL 969802, at *1. It denied Davis relief based on the trial court's findings and conclusions and its own review of the record. *Id.*

## J.  THIRD STATE HABEAS CORPUS APPLICATION (WR-61,445-03)

Davis raised four grounds for relief in his third state writ application. State Habeas R. (WR-61,445-03), ECF No. 167-3 at 39–77. First, he claimed he was denied a fair trial before an unbiased jury because a juror—Severiano Santini—did not disclose that he stood accused of sexually molesting two young girls, that these accusations were pending before the same office prosecuting Davis, and that he decided to find Davis guilty to curry favor in his own case. State Habeas R. (WR-61,445-03), ECF No. 167-3 at 43–58. Second, he maintained the State's failure to disclose its investigation and eventual prosecution of Juror Santini for aggravated sexual assault of a minor violated his rights to due process and a fair trial. State Habeas R. (WR-61,445-03), ECF

43

No. 167-3 at 58–65. Third, he alleged his trial counsel was ineffective for failing to challenge the pathology testimony of Dr. Stern which was erroneous but critical to the prosecution's case. State Habeas R. (WR-61,445-03), ECF No. 167-3 at 65–73. Finally, he asserted the State presented false or misleading testimony by Dr. Stern that vaginal redness and abrasions established that the intercourse between Davis and Medina was non-consensual. State Habeas R. (WR-61,445-03), ECF No. 167-3 at 73–77.

The State filed a motion to dismiss Davis's third state writ application. State Habeas R. (WR-61,445-03), ECF No. 167-6 at 1–62. It noted that Texas Code of Criminal Procedure Article 11.071, § 5(a), precluded consideration of the merits of a subsequent application for writ of habeas corpus unless the application contained sufficient specific facts establishing that:

> (1) the current claims have not been and could not have been presented in a previously considered application because the factual basis for the claim was unavailable on the date the applicant filed the previous application; (2) by a preponderance of the evidence, but for a violation of the United States Constitution, no rational juror could have found the applicant guilty beyond a reasonable doubt; or (3) by clear and convincing evidence, but for a violation of the United States Constitution, no rational juror would have answered in the State's favor one or more of the special issues that were submitted to the jury in the applicant's trial under article 37.071. *See* TEX. CRIM. PROC. CODE art. 11.071 § 5(a)(1)-(3).

State Habeas R. (WR-61,445-03), ECF No. 167-6 at 12–13. It added that a factual basis of a claim was unavailable before filing the previous writ application only "if the factual basis was not ascertainable through the exercise of reasonable diligence on or before that date." State Habeas R. (WR-61,445-03), ECF No. 167-6 at 14 (citing Tex. Code Crim. Proc. Ann. art. 11.071, § 5(e) (West)). Additionally, it observed that a "subsequent writ application must state specific, particularized facts that, if proven, would" overcome § 5(a)'s procedural bar and entitle the applicant to habeas relief. *Id*. (citing *Ex parte Campbell*, 226 S.W.3d 418, 422 (Tex. Crim. App.

2007); *Ex parte Staley*, 160 S.W. 3d 56, 63 (Tex. Crim. App. 2005)). It argued that Davis's third application should be dismissed as an abuse of the writ because Davis failed to satisfy the requirements of Texas Code of Criminal Procedure article 11.071, § 5(a). State Habeas R. (WR-61,445-03), ECF No. 167-6 at 14.

The Court of Criminal Appeals reviewed the subsequent application and agreed that Davis "ha[d] failed to satisfy the requirements of Article 11.071, § 5(a). Accordingly, [it] dismiss[ed] the subsequent application as an abuse of the writ without considering the merits of the claims." *Ex parte Davis*, 2020 WL 1645017, at *2.

Davis sought reconsideration of the decision, arguing that the Court of Criminal Appeals "never provided an analysis of the facts for the issues nor why the petitioner had failed to satisfy the provisions of Article 11.071, § 5(a)." Pet'r's Second Advisory, ECF No. 143 at 8. His request was denied over the dissent of Judge Newell. Pet'r's Third Advisory, ECF No. 144 (citing Action Taken, ECF No. 144-1).

### K.  FEDERAL HABEAS PETITION

Davis now challenges his original 2002 conviction and his 2008 punishment trial in this Court in an opposed petition for a writ of habeas corpus pursuant to 28 U.S.C. §§ 2241 and 2254. Pet'r's Am. Pet., ECF No. 165.

### STANDARD OF REVIEW

"[C]ollateral review is different from direct review," and the writ of habeas corpus is "an extraordinary remedy," reserved for those petitioners whom "society has grievously wronged." *Brecht v. Abrahamson*, 507 U.S. 619, 633–34 (1993) (citations omitted). It " 'is designed to guard against extreme malfunctions in the state criminal justice systems.' " *Id.* (quoting *Jackson v.*

*Virginia*, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring)). It provides an important, but limited, examination of an inmate's conviction and sentence. *See Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("[S]tate courts are the principal forum for asserting constitutional challenges to state convictions.").

As a result, the federal habeas courts' role in reviewing state prisoner petitions is exceedingly narrow. "Indeed, federal courts do not sit as courts of appeal and error for state court convictions." *Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986). They must generally defer to state court decisions on the merits. *See Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002). And they must defer to state court decisions on procedural grounds. *See Coleman v. Thompson*, 501 U.S. 722, 730 (1991); *Muniz v. Johnson*, 132 F.3d 214, 220 (5th Cir. 1998). They may not grant relief to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also present. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996).

## A. ADJUDICATED CLAIMS

In *Chapman v. California*, the Supreme Court held the standard for determining whether a conviction must be set aside because of a federal constitutional error is whether the error "was harmless beyond a reasonable doubt." 386 U.S. 18, 24 (1967). But in *Brecht v. Abrahamson*, the Supreme Court concluded "[t]he imbalance of the costs and benefits of applying the *Chapman* harmless-error standard on collateral review counsels in favor of applying a less onerous standard on habeas review of constitutional error." 507 U.S. at 637. It held "habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial

46

error unless they can establish that it resulted in 'actual prejudice.' " *Id*. (quoting *United States v. Lane*, 474 U.S. 438, 449, (1986); citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

Three years after *Brecht*, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Brown v. Davenport*, 142 S. Ct. 1510, 1524 (2022). For claims that were adjudicated in state court, the AEDPA imposed a highly deferential standard which demanded a federal habeas court grant relief only where the state court judgment:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Consequently, "[w]hen a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test . . . outlined in *Brecht* and the one Congress prescribed in AEDPA." *Brown*, 142 S. Ct. at 1517. So, "when a state court has applied *Chapman*, § 2254(d)(1) requires a habeas petitioner to . . . persuade a federal court that no 'fairminded juris[t]' could reach the state court's conclusion under [the Supreme] Court's precedents." *Brown*, 142 S. Ct. at 1525 (quoting *Davis v. Ayala*, 576 U.S. 257, 269 (2015)). "By contrast, under *Brecht* a petitioner may prevail by persuading a federal court that it alone should harbor 'grave doubt'—not absolute certainty—about whether the trial error affected the verdict's outcome." *Id*. Thus, "satisfying *Brecht* is only a necessary, not a sufficient, condition to relief," because "AEDPA too must be satisfied." *Id*. at 1520.

The focus of this standard "is not whether a federal court believes the state court's determination was incorrect, but whether that determination was unreasonable—a substantially

higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). A federal habeas court's inquiry into unreasonableness should focus on whether the state court's application of clearly established federal law was "objectively unreasonable" and not whether it was incorrect or erroneous. *McDaniel v. Brown*, 558 U.S. 120, 133 (2010). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102. In other words, to obtain federal habeas relief on a claim previously adjudicated on the merits in state court, a petitioner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103; *see also Bobby v. Dixon*, 565 U.S. 23, 24 (2011).

Moreover, the federal habeas court's focus is on the state court's ultimate legal conclusion, not whether the state court considered and discussed every angle of the evidence. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc); *see also Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) ("[W]e review only the state court's decision, not its reasoning or written opinion."). Indeed, state courts are presumed to "know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (collecting cases). Factual findings, including credibility choices, are entitled to the statutory presumption, so long as they are not unreasonable "in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Further, factual determinations made by a state court enjoy a presumption of correctness which the petitioner can rebut only by clear and convincing evidence. *Id.* § 2254(e)(1); *see Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006) (noting that a state court's determination under § 2254(d)(2) is a question of fact). The presumption of correctness applies not only to express findings of fact, but also to "unarticulated

findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001) (collecting cases).

In sum, the federal writ serves as a " 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102–03 (quoting *Jackson*, 443 U.S. at 332 n.5). "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102.

## B.  UNADJUDICATED CLAIMS

A state prisoner must exhaust available state remedies before seeking federal habeas corpus relief, thereby giving the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *See* 28 U.S.C. § 2254(b)(1) (explaining that habeas corpus relief may not be granted "unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State"); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).

If a state prisoner presents unexhausted claims, the federal habeas court should dismiss the petition. *Whitehead v. Johnson*, 157 F.3d 384, 387 & n.7 (5th Cir. 1998) (citing 28 U.S.C. § 2254(b)(1)(A)); *Rose v. Lundy*, 455 U.S. 509, 519–20 (1982)). If a state prisoner presents a "mixed petition" containing both exhausted and unexhausted claims, the federal habeas court may *stay* the proceedings or *dismiss* the petition without prejudice to allow the petitioner to return to state court and exhaust his claims. *Rhines v. Weber*, 544 U.S. 269, 278 (2005). Alternatively, the federal habeas court may *deny* relief on an unexhausted or mixed claim on the merits, notwithstanding the petitioner's failure to exhaust the remedies available in state court. 28 U.S.C. § 2254(b)(2). A federal habeas court may *grant* relief on an unexhausted or procedurally defaulted claim *only* if the

petitioner demonstrates cause for the default and actual prejudice arising from the default—or shows the failure to consider the claim would result in a fundamental injustice. *Coleman*, 501 U.S. at 749–50; *Barrientes v. Johnson*, 221 F.3d 741, 758 (5th Cir. 2000). This means that before a federal habeas court may grant relief on an unexhausted claim, the petitioner must show that some objective, external factor prevented him from complying with the state procedural rule. *Martinez v. Ryan*, 566 U.S. 1, 13–14 (2012). When reviewing an unexhausted claim on the merits, the deferential standard of review does not apply. Instead, the federal habeas court examines unexhausted claims under a *de novo* standard of review. *Cullen v. Pinholster*, 563 U.S. 170, 185–86 (2011); *Carty v. Thaler*, 583 F.3d 244, 253 (5th Cir. 2009).

### C.  PROCEDURALLY BARRED CLAIMS

"In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. "A procedural rule is adequate when it is 'firmly established and regularly followed,' even if there is an occasional aberrant state court decision." *Balentine v. Thaler*, 626 F.3d 842, 856 (5th Cir. 2010) (quoting *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991)). "Cause" requires a petitioner to prove that some "external" factor impeded his counsel's efforts to comply with state procedural rules. *Coleman*, 501 U.S. at 753. Actual prejudice requires a showing that, based on the success of the underlying defaulted claim, the result of the proceeding would somehow have been different. *Barrientes*, 221 F.3d at 769. "The movant makes this showing where he demonstrates that, but for the error, he might not have been

convicted." *United States v. Guerra*, 94 F.3d 989, 994 (5th Cir. 1996). "If a petitioner fails to demonstrate cause, the court need not consider whether there is actual prejudice." *Matchett v. Dretke*, 380 F.3d 844, 849 (5th Cir. 2004) (citing *Rodriguez v. Johnson*, 104 F.3d 694, 697 (5th Cir. 1997)). "[T]he miscarriage of justice exception would allow successive claims to be heard if the petitioner 'establish[es] that under the probative evidence he has a colorable claim of factual innocence.' " *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992) (quoting *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986)).

### D.  INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL CLAIMS

A petitioner's ineffective assistance of counsel claim is analyzed under the two-pronged test in *Strickland v. Washington*, 466 U.S. 668 (1984). *United States v. Willis*, 273 F.3d 592, 598 (5th Cir. 2001). To prevail, a petitioner must demonstrate (1) his counsel's performance was deficient and (2) the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 689–94.

To establish deficient performance, a petitioner must present evidence that his counsel's assistance fell " 'below an objective standard of reasonableness.' " *United States v. Conley*, 349 F.3d 837, 841 (5th Cir. 2003) (quoting *Strickland*, 466 U.S. at 688). But he must recognize judicial scrutiny of counsel's performance is "highly deferential," with every effort made to avoid "the distorting effect of hindsight." *Strickland*, 466 U.S. 689–90; *see also Harrington*, 562 U.S. at 105 ("It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' ") (citations omitted); *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.") (citations omitted). "*Strickland's* first prong sets a high bar." *Buck v. Davis*, 137 S. Ct.

759, 775 (2017).

To establish prejudice, a petitioner "must show . . . there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. At the sentencing phase of a death penalty trial, a petitioner must establish "there is a reasonable probability, that absent the errors, the sentencer . . . would have concluded the . . . balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *see also Wong v. Belmontes*, 558 U.S. 15, 26 (2009) ("reviewing court must consider all the evidence—the good and the bad—when evaluating prejudice"); *Wiggins*, 539 U.S. at 534 ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.").

If a petitioner fails to prove one prong, the reviewing court need not analyze the other. *See Carter v. Johnson*, 131 F.3d 452, 463 (5th Cir. 1997) ("Failure to prove either deficient performance or actual prejudice is fatal to an ineffective assistance claim.").

In addition to applying the *Strickland* two-prong test, a federal habeas court must also review a state petitioner's ineffective assistance of counsel claim "through the deferential lens of [28 U.S.C.] § 2254(d)." *Pinholster*, 563 U.S. at 190 (internal quotation marks and citation omitted). This means a court must consider not only whether the state court's determination was incorrect, but also "whether that determination was unreasonable—a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citing *Schriro*, 550 U.S. at 473); *see also Harrington*, 562 U.S. at 101 ("The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable."). As a result, a court's review of a state

court's resolution of an ineffective assistance of counsel claim is " 'doubly deferential.' "
*Pinholster*, 563 U.S. at 190 (quoting *Knowles*, 556 U.S. at 123); *see also*; *Dunn v. Reeves*, 141 S.
Ct. 2405, 2410 (2021).

### E.  EVIDENTIARY HEARING

Rule 8(a) of the Rules Governing Section 2254 Proceedings provides that if a petition is
not dismissed, "the judge must review the answer, any transcripts and records of state-court
proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary
hearing is warranted." Rule 8(a) of Rules Governing Section 2254 Proceedings. Pursuant to 28
U.S.C. § 2254(e)(2):

> If the applicant has failed to develop the factual basis of a claim in State court
> proceedings, the court shall not hold an evidentiary hearing on the claim unless
> the applicant shows that—
>
> (A) the claim relies on—
>
>> (i) a new rule of constitutional law, made retroactive to cases on collateral
>> review by the Supreme Court, that was previously unavailable; or
>>
>> (ii) a factual predicate that could not have been previously discovered through
>> the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and
> convincing evidence that but for constitutional error, no reasonable factfinder
> would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). "Section 2254(e)(2) imposes a limitation on the discretion of federal
habeas courts to take new evidence in an evidentiary hearing." *Pinholster*, 563 U.S. at 185.
Moreover, "[a] defendant is entitled to an evidentiary hearing on his § 225[4] motion only if he
presents 'independent indicia of the likely merits of [his] allegations.' " *United States v. Reed*,
719 F.3d 369, 373 (5th Cir. 2013) (quoting *United States v. Cavitt*, 550 F.3d 430, 442 (5th Cir.

2008)).

## ANALYSIS

### A.  INTRODUCTION

Davis asserts nine grounds for relief in federal habeas petition arising from his 2002 merits and his 2008 sentencing trials. Pet'r's Am. Pet., ECF No. 165. First, he maintains he was denied a fair trial before an unbiased jury. *Id*. at 18–30. Second, he contends the State failed to disclose its investigation and eventual prosecution of a juror for indecency with a minor at his first trial. *Id*. at 30–38. Third, he maintains his trial counsel failed to investigate and present mitigating evidence of his abusive father and dysfunctional family life. *Id*. at 39–86. Fourth, he claims his counsel were ineffective for failing to challenge testimony from the pathologist regarding her conclusion that Davis had sexually assaulted Medina. *Id*. at 86–98. Fifth, he asserts the evidence of his interest in Satanism was improperly admitted into evidence. *Id*. at 98–111. Sixth, he contends the trial court erroneously denied his motion to suppress and admitted his confession into evidence. *Id*. at 111–15. Seventh and eighth, he argues his counsel rendered ineffective assistance during voir dire at both his trials. *Id*. at 115–19. Finally, he avers the trial court erroneously rejected his challenges under. *Id*. at 119–23.

### B.  DAVIS'S CLAIM THAT JUROR SANTINI WAS BIASED IS PROCEDURALLY DEFAULTED AND WITHOUT MERIT

Davis first alleges he "was denied a fair trial before an unbiased jury" during his first trial. Pet'r's Am. Pet., ECF No. 165 at 9. He claims Juror Severiano Santini "did not disclose that he stood accused of a serious crime, that these accusations were pending before the same office prosecuting Davis, and that he decided to find Davis guilty to curry favor in his own case." *Id*. He contends Santini was selected and sat on his jury while local police were investigating him for

sexually molesting two young girls. *Id.* He notes Santini claimed in his juror questionnaire he "had never been accused of a felony." *Id*. at 11; *see* Jury Questionnaire, ECF No. 167-6 at 105.[4]  He adds "Santini never informed the court of either of the felony accusations leveled at him." *Id*. He alleges Santini received "a favorable plea deal after he found Davis guilty." *Id*. at 12. He argues Santini's bias was actual. *Id*. at 24–28. He also argues Santini's bias was implied by law. *Id*. at 18–24 (citing *Smith v. Phillips*, 455 U.S. 216, 223 (1982) (O'Connor, J., concurring); *Brooks v. Dretke*, 418 F.3d 430 (5th Cir. 2005)). He maintains Santini's failure to disclose the information deprived him of his right to challenge Santini for cause—and violated his right to a trial by a fair and impartial jury. *Id*. at 29–30. He provides a declaration from Santini, dated September 29, 2017—or more than 15 years after Davis's trial—which supports his claims of bias:

> . . . I lived with my common-law wife Irma Hyder, Irma's son Joe Daniel, Joe's girlfriend Camille [Dickson], and Joe and Camille's twin daughters.   . . .
>
> In the winter of 2001, I was at home and I heard Camille tell Irma that I messed around with the girls, touching their privates. Camille was angry and loud about it, so I left the house and stayed somewhere else for a while.   . . . I knew at the time that she went to the police about it, but nothing came of it at that point, so I figured the cops didn't believe them.
>
> In 2002 I got called for jury duty. After we filled out a questionnaire, the lawyers asked us questions in the courtroom. One of the questions on the questionnaire was if I was ever convicted or accused of a felony. I thought about whether I had to say anything about what happened the year before, but I didn't. I don't think the lawyers asked me about it. They did talk about how one of the charges in this case was that the defendant sexually assaulted the girl.

---

[4] Santini responded to the following questions in the following manner:

> Have you ever been accused of, charged with, or arrested for any type of felony offense?
> [ ] yes [√] no
> Are you currently charged with any type of felony offense?
> [ ] yes [√] no

> A few days after that, there was another incident at home. Camille accused me of masturbating near the girls when they were asleep. She said she was going to call the cops or kill me herself.   . . .
>
> A few days after that they brought all of us back to pick the jury. I thought about telling the judge what happened. I knew maybe I was supposed to but decided not to. The DA's office for this trial was the same one that would decide what to do in my case. I figured that being on the jury and finding the guy guilty was my chance to prove to them that I'm a law-abiding citizen.   . . . I didn't have any deal with the prosecutors, and I have no idea what they knew about those accusations.

Decl. of Severiano Santini, ECF No. 112-1 at 1. Davis also provides an unsigned and undated

declaration from Dickson—prepared by a retained mitigation specialist after an interview with

Dickson on July 8, 2016—which Davis maintains supports his claim that Santini knew Dickson

had accused him of a serious crime—and reported him to the police—before he filled out the juror

questionnaire:

> Back in 2001, when my girls were six years old, they told me that Santini had touched their privates. I reported it to the police and they did an investigation. But they told me they closed the case because it was the girls' word against his. I taught my girls from a very young age to always tell me the truth, and when they told me what Santini did to them I strongly believed them. While I can't say for certain whether Santini knew that I reported him to the police this time, I believe he did because of what the police told me.

Decl. of Camille Dickson, ECF No. 112-4 at 4. Davis argues "Dickson's statement is powerful

evidence that Santini knew full well that he was 'accused of . . .' a felony, and that his failure to

reveal that fact at Mr. Davis's trial was a deliberate choice." Pet'r's Reply, ECF No. 175 at 23.

### 1. Defendant's Right to an Impartial Jury

The Sixth Amendment—which applies to the states through the Due Process Clause of the

Fourteenth Amendment—provides that every defendant has the right to trial by an impartial jury.

*Morgan v. Illinois*, 504 U.S. 719, 727 (1992). Its goal is "jury impartiality with respect to both

contestants: neither the State nor the defendant should be favored." *Holland v. Illinois*, 493 U.S. 474, 483 (1990).

"Perhaps the most important device to serve this end is the jury challenge, a device based on voir dire examination." *King v. Lynaugh*, 828 F.2d 257, 259 (5th Cir. 1987), *opinion vacated on reh'g*, 850 F.2d 1055 (5th Cir. 1988). Indeed, an objective of voir dire is to "elicit information which would establish a basis for a challenge for cause because the venireman is . . . is biased or prejudiced for or against one of the parties or some aspect of the relevant law." *Sanchez v. State*, 165 S.W.3d 707, 710–11 (Tex. Crim. App. 2005) (citing Tex. Code Crim. Proc. art 35.16 (West)).

A prospective juror's bias "may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as [a] matter of law." *Solis v. Cockrell*, 342 F.3d 392, 395 (5th Cir. 2003) (quoting *United States v. Wood,* 299 U.S. 123, 134 (1936)). "A claim of alleged bias is ordinarily addressed in a hearing where the judge examines the juror and obtains assurances of the juror's impartiality." *Hatten v. Quarterman*, 570 F.3d 595, 600 (5th Cir. 2009) (citing *Brooks,* 444 F.3d at 330). "Where a juror has a close connection to the circumstances at hand, however, bias may be presumed as a matter of law." *Buckner v. Davis*, 945 F.3d 906, 910 (5th Cir. 2019) (citing *Brooks*, 444 F.3d at 330). The presence of a biased juror "may require a new trial as a remedy." *Hatten*, 570 F.3d at 600 (citations omitted). "In the majority of situations, the party seeking a new trial must demonstrate bias through admission or factual proof." *United States v. Bishop*, 264 F.3d 535, 554 (5th Cir. 2001) (citing *United States v. Scott*, 854 F.2d 697, 699 (5th Cir. 1988)).

### (a) Actual Bias

A prospective juror harbors an actual bias—and may be challenged for cause during voir dire—when "his 'views would prevent or substantially impair the performance of his duties as a

juror in accordance with his instructions and his oath.' " *Hatten*, 570 F.3d at 600 (quoting *Soria v. Johnson*, 207 F.3d 232, 242 (5th Cir. 2000)). "In evaluating claims of juror partiality, [a court] must consider whether the jurors in a given case had 'such fixed opinions that [he] could not judge impartially the guilt of the defendant.' " *Chavez v. Cockrell*, 310 F.3d 805, 811 (5th Cir. 2002) (quoting *Patton v. Yount*, 467 U.S. 1025, 1035 (1984)).

Under the framework in *McDonough Power Equip., Inc. v. Greenwood*, a petitioner must "first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause" to obtain a new trial. 464 U.S. 548, 556 (1984). "The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *Id*. So, under the *McDonough* framework, a habeas petitioner must first point to a clear voir dire question that a juror failed to answer truthfully. *Hatten*, 570 F.3d at 602. Allegations based on "subjective," "vague and ambiguous" questions are insufficient. *Id*. (citing *United States v. Collins*, 972 F.2d 1385, 1403–04 (5th Cir. 1992)). Then the petitioner must show—based on the record before the state court—that the juror clearly lied, not that the juror provided an inaccurate or incomplete answer. *See id*. *Id*.

### (b) Implied Bias

A prospective juror harbors an implied bias—and may be challenged for cause—"only in a narrow set of circumstances." *Solis*, 342 F.3d at 399 n.42. Most cases finding implied bias "have done so because the juror had a close relationship with one of the important actors in the case or was otherwise emotionally involved in the case, usually because the juror was the victim of a similar crime." *Id*. at 398–399.

58

In *Smith v. Phillips*, the habeas petitioner argued he was entitled to a new trial because of the possible partiality of a juror who had applied for a job in the prosecutor's office during his trial. 455 U.S. at 212. "The District Court granted the writ, and the Court of Appeals for the Second Circuit affirmed on a somewhat different ground." *Id*. at 211. But the Supreme Court reversed. *Id*. at 221. It observed the Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation . . . [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Id*. at 217. It added "[f]ederal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension. No such wrongs occurred here." *Id.* at 221.

Justice O'Connor concurred in the opinion, but observed that "in certain instances a hearing may be inadequate for uncovering a juror's biases." 455 U.S. at 222 (O'Connor, J., concurring). She then provided illustrations of implied bias:

> Some examples might include a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction. Whether or not the state proceedings result in a finding of "no bias," the Sixth Amendment right to an impartial jury should not allow a verdict to stand under such circumstances.

*Id*.

In *Brooks v. Dretke*, the Fifth Circuit held "the doctrine of implied bias is clearly established Federal law as determined by the Supreme Court." 444 F.3d at 329. It then vacated a death sentence because of a juror's implied bias. *Id.* at 430–31. It explained a juror named Garcia was arrested for unlawfully carrying a gun into the courthouse and knew he faced a future prosecution by the same district attorney's office then prosecuting Brooks. *Id*. Based on "the sum

of all factual circumstances," the Fifth Circuit found implied bias and vacated the District Court's

judgment denying Brooks federal habeas:

> We do not suggest that being charged with unlawfully carrying a weapon alone disqualified Garcia for jury service under state law or that any outstanding misdemeanor charge should support a finding of implied bias. It is rather the sum of all factual circumstances surrounding this juror—in particular, the power of the District Attorney, and the timing and sequence of events—that compels this conclusion. As Lord Coke put it, a juror must be as "indifferent as he stands unsworne." That there is no evidence that the District Attorney did anything to exploit his power over juror Garcia is of no moment. That the power presents an intolerable risk of working its will without the raising of a hand or a nod is the vice here.

*Id*. at 435 (citations omitted). "[I]n practical ways," the Fifth Circuit said, Garcia's future was more

in the "hands" of the district attorney's office than if he had been an employee of that office. *Id*.

### 2.  Davis's Claim Juror Santini Was Biased Is Procedurally Defaulted

Davis first raised his claim—that he was denied a fair trial before an unbiased jury because

of Juror Santini's participation—in his federal petition. Pet'r's Pet., ECF No. 12 at 15.

Recognizing his claim was unexhausted, he filed motion to stay and abate his federal proceedings

so he could present it to the state courts. Pet'r's Mot., ECF No. 137. His motion was granted.

Order, ECF No. 140. He submitted a third state writ application raising this and three other

previously unexhausted claims. *Ex parte Davis*, No. WR-61,445-03, 2020 WL 1645017, at *1

(Tex. Crim. App. Apr. 1, 2020). His application was dismissed "as an abuse of the writ" after the

Court of Criminal Appeals determined that he failed to satisfy the requirements of Texas Code of

Criminal Procedure Article 11.071, § 5(a). *Id*. at *2.

Article 11.071, § 5(a), provides "a court may not consider the merits of or grant relief based

on the subsequent application unless the application contains sufficient specific facts establishing"

(1) the claim could not have been presented in a previous application "because the factual or legal

basis for the claim was unavailable on the date the applicant filed the previous application"; (2) "by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt," or (3) "by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury." Tex. Crim. Proc. Code art. 11.071 § 5(a) (West). "[A] factual basis of a claim is unavailable on or before a date [the applicant filed his previous application] if the factual basis was not ascertainable through the exercise of reasonable diligence on or before that date." *Id.* § 5(e).

"If a state court clearly and expressly bases its dismissal of a prisoner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the prisoner has procedurally defaulted his federal habeas claim." *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997) (citing *Coleman*, 501 U.S. at 731–32; *see Harris v. Reed*, 489 U.S. 255, 262–63 (1989)). The Fifth Circuit Court of Appeals has "held that, since 1994, the Texas abuse of the writ doctrine has been consistently applied as a procedural bar, and that it is an independent and adequate state ground for the purpose of imposing a procedural bar." *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008) (collecting cases). It has also noted that a court "may not review the merits of procedurally defaulted claims absent a showing of cause and prejudice to excuse the default." *Prible v. Lumpkin*, 43 F.4th 501, 513 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 2644 (2023). As a result, when a Texas prisoner's state writ application has been dismissed as an abuse of the writ, he may not obtain a federal habeas review of his claim absent a showing that (1) he has cause for the default and actual prejudice, or (2) the federal court's failure

to consider his claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

"[A] failure to raise a claim in an earlier habeas petition may not be excused for cause 'if the claim was reasonably available' at the time of the first petition." *Ford v. Davis*, 910 F.3d 232, 237 (5th Cir. 2018) (quoting *Fearance v. Scott*, 56 F.3d 633, 636 (5th Cir. 1995)). So, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). "A factor is external to the defense if it 'cannot fairly be attributed to' the prisoner." *Davila v. Davis*, 582 U.S. 521, 528 (2017) (quoting *Coleman*, 501 U.S. at 753). "Examples of these objective factors include 'interference by officials that makes compliance with the State's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel.' " *Canales v. Stephens*, 765 F.3d 551, 562 (5th Cir. 2014) (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991) (citation and internal quotation marks omitted)). "[T]he question is whether petitioner possessed, or by reasonable means could have obtained, a sufficient basis to allege a claim in the first petition and pursue the matter through the habeas process." *Id.* (quoting *McCleskey*, 499 U.S. at 498).

"In addition to cause, [a habeas petitioner] must show actual prejudice to overcome the procedural bar." *United States v. Guerra*, 94 F.3d 989, 994 (5th Cir. 1996) (citing *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991)). Actual prejudice requires a showing that—based on the success of the underlying defaulted claim—the result of the proceeding would somehow have been

different. *Barrientes*, 221 F.3d at 769. "The movant makes this showing where he demonstrates that, but for the error, he might not have been convicted." *Guerra*, 94 F.3d at 994.

Davis asserts he has good cause for default. Pet'r's Reply, ECF No. 175 at 19. He argues he "did not know about the crimes that [Santini] and the prosecution team did not reveal [them], and he had no reason to go looking." *Id*. (citing *Strickler v. Greene*, 527 U.S. 263, 287 (1999) ("[A] defendant cannot conduct the 'reasonable and diligent investigation' mandated by *McCleskey* to preclude a finding of procedural default when the evidence is in the hands of the State.")). He maintains "prejudice is established by the merits of the claim." *Id*. at 20 (citing *Williams v. Taylor*, 529 U.S. 420, 444 (2000)).

### (a) Davis Does Not Have Cause for His Default

First, as to cause, Davis cannot show the publicly available records of Santini's indictments, convictions, and sentences were not reasonably available before he filed his first direct appeal or his first state writ application. *Cf. De Angelis v. City of El Paso*, 265 F. App'x 390, 398 (5th Cir. 2008) ("Reasonable people cannot have a genuine dispute regarding whether the City improperly disseminated secret grand jury testimony when the document at issue is not secret grand jury testimony but a public record that is clearly labeled 'indictment.' "). A search of El Paso County criminal records readily available on the internet show that Santini was indicted in two cases for indecency with a child on November 20, 2002—approximately five months after Davis's first trial. *See* El Paso County Case Records Search, Register of Actions, https://casesearch. epcounty.com/PublicAccess/CaseDetail.aspx? (search for "Santini," last visited September 1, 2023). They further show Santini pleaded guilty and was sentenced ten years of deferred-adjudication community supervision on November 5, 2003—approximately two weeks

after Davis submitted his first appellate brief. *Id*. Santini's indictments, convictions, and sentences were "public events . . . documented in court records." *U.S. Dept. of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 753 (1989). Hence, Davis cannot show some external factor impeded his counsel's efforts to comply with state procedural rules. *Coleman*, 501 U.S. at 753. As a result, Davis cannot demonstrate cause for his procedural default. *Id*. at 750.

The Supreme Court did observe in *Williams v. Taylor* that counsel's failure to check public records pertaining to every juror did not amount to a lack of due diligence for purposes of supplementing the record through an evidentiary hearing under the "at fault" provision in 28 U.S.C. § 2254(e)(2). 529 U.S. 420, 443 (2000). It opined it "would be surprised . . . if a district court familiar with the standards of trial practice were to hold that in all cases diligent counsel must check public records containing personal information pertaining to each and every juror." *Id*. at 443. But the Supreme Court later explained in *Shinn v. Ramirez* that "§ 2254(e)(2) applies only when a prisoner has failed to develop the factual basis of a claim" in the state courts before initiating a petition in a federal court. 142 S. Ct. 1718, 1734 (2022). So, supplementation of the record under 28 U.S.C. § 2254(e)(2) is only appropriate if the petitioner's claim relies on (1) a new rule of constitutional law, or (2) new facts previously undiscoverable, and the applicant "demonstrates that the new evidence will establish his innocence 'by clear and convincing evidence.' " *Id*. at 1728 (quoting § 2254(e)(2)(B)). Davis does not argue either exception is applicable here.

Moreover, the record reflects—and Santini acknowledges in his declaration—that neither the prosecutor nor Davis's defense counsel specifically asked any questions during voir dire that would have required Santini to disclose information about what had transpired with Dickson and

64

her daughters. Rep. R. (2002) vol. 12 at 179–241; Decl. of Severiano Santini, ECF No. 112-1 at 1.

Additionally, Davis provides no evidence that his state counsel—trial, appellate, or habeas—made

any effort to investigate matters pertaining to the jury. *See id*. at 442–43. He excuses his lack of

diligence by claiming his "counsel only knew to look for the indictments after they had already

become aware of facts underlying this claim, which occurred through happenstance, not through

the available record." Def.'s Reply, ECF No. 136 at 5. But the Supreme Court's point in *Williams*

was that some effort—even if unsuccessful—was a prerequisite to overcoming the "at fault"

provision of § 2254(e)(2). *Williams*, 529 U.S. at 440 ("We conclude petitioner has met the burden

of showing he was diligent in efforts to develop the facts supporting his juror bias . . ."); c*f. In re*

*Rodriguez*, 885 F.3d 915, 918 (5th Cir. 2018) (explaining that where the petitioner sought

authorization to litigate a successive claim premised on a lawsuit filed against the medical

examiner—and the lawsuit involving the medical examiner's credibility was a matter of public

record and "immediately available" to petitioner during his initial federal habeas

proceedings—"[i]t is certainly arguable that petitioner did not exercise 'due diligence' in failing to

discover and pursue timely the implications of this suit"). Given the lack of evidence that Davis

made any attempt to investigate the jurors in his 2002 trial until he initiated his federal habeas

review in 2014, *Williams* undermines the argument that he had no obligation to investigate the

jurors.

Additionally, the decision by the Court of Criminal Appeals to dismiss Davis's third writ

application for a failure to satisfy the requirements of Texas Code of Criminal Procedure Article

11.071, § 5(a), is an implicit finding that an external factor did not impede his counsel's efforts to

comply with state procedural rules. *Coleman*, 501 U.S. at 750. In other words, the decision

suggests the Court of Criminal Appeals found that the factual predicate of Davis's claim—that the police were investigating Santini for sexually molesting two young girls—was available to him at the time of his first appeal or his first two state writ applications. *See* Tex. Code Crim. Proc. Ann. art. 11.071, § 5(a) (West) ("If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits . . . unless the application contains sufficient specific facts establishing that . . . the current claims . . . could not have been presented previously . . . because the factual or legal basis for the claim was unavailable . . ."). And a decision involving an "implicit factual finding is subject to the presumption of correctness." *Ford v. Davis*, 910 F.3d 232, 235 (5th Cir. 2018) (citation omitted). Furthermore, "[o]n federal habeas review, state court findings concerning a juror's impartiality are factual determinations entitled to a presumption of correctness." *Buckner v. Davis*, 945 F.3d 906, 910 (5th Cir. 2019). Then, even assuming Davis could show that a juror was unconstitutionally biased, he must also show that the state court's contrary determination was not only wrong but was so wrong that it contravened the re-litigation bar in 28 U.S.C. § 2254(d).

In sum, Davis has failed to demonstrate an objective external factor impeded his counsel's efforts to comply with state procedural rules. *Murray*, 477 U.S. at 488 (1986). And for the reasons discussed below, he cannot demonstrate prejudice.

### (b) Davis Cannot Show Prejudice

Next, as to prejudice, the timeline of events undermines Santini's assertion that he was biased. To be sure, the record shows Santini was first accused by Dickson of "mess[ing] around with the girls, touching their privates" in 2001. Decl. of Severiano Santini, ECF No. 112-1 at 1. But although Santini thought Dickson went to the police, he also believed that "nothing came of

it." *Id*. Santini accordingly claimed in his responses to the juror questionnaire—which he completed on May 5, 2002—that he had not been "accused of, charged with, or arrested for any type felony offense." Juror Questionnaire, ECF No. 167-6 at 105. He also agreed to the following statement:

> I HAVE NEVER BEEN CONVICTED OF ANY FELONY AS AN ADULT OR JUVENILE. I HAVE NEVER BEEN CONVICTED OF ANY KIND OF THEFT OR SHOPLIFTING (REGARDLESS OF AMOUNT) AS AN ADULT OR JUVENILE. I AM NOT UNDER INDICTMENT, NOR AM I UNDER ANY LEGAL ACCUSATION FOR ANY GRADE OF THEFT OR ANY FELONY.

*Id*. at 115. Additionally, Santini was never asked direct questions during his general or individual voir dire which required him to disclose information concerning the events that transpired with Dickson and her daughters. Rep. R. (2002) vol. 12 at 179–241. Consequently, Davis cannot show that Santini failed to answer a material question on voir dire honestly—as Sandrini had not yet been accused by the State of a felony—and he cannot demonstrate actual bias. *McDonough*, 464 U.S. at 556.

Santini was selected as a juror on June 18, 2002. Rep. R. (2002) vol. 25 at 11. "A few days after that," Dickson accused Santini of masturbating near her daughters while they slept and told him she was "going to call the cops." Decl. of Severiano Santini, ECF No. 112-1 at 1. It was not until July 11, 2002—approximately eighteen days after Davis's trial ended—that Santini was arrested. Pet'r's Am. Pet., ECF No. 165 at 33. In November 2002—approximately five months after Davis's first trial—Santini was indicted on one count of aggravated sexual assault of a child which occurred on or about January 1, 2001, and two counts of indecency with a child which occurred on or about June 12, 2002. Indictment, ECF No. 167-6 at 67; Indictment, ECF No. 167-6 at 77–78. On November 5, 2003—after Davis submitted his first appellate brief on October 14,

2003—Santini pleaded guilty to the offenses and was assessed ten years of deferred-adjudication community supervision on all three counts, with ninety days confinement as a condition of probation. J., ECF No. 167-6 at 75–76; J., ECF No. 167-6 at 86–87. Santini's subsequent failure to register as a sex offender resulted in his confinement for two years in prison. J., ECF No. 167-6 at 89–90. Davis's second trial began on January 9, 2008.

Consequently, Santini was not accused by the State of a serious crime by the same office prosecuting Davis until after Davis's trial. So, Davis cannot demonstrate that Santini failed to answer a material question on voir dire honestly—as he had never been accused by the State of a felony. *McDonough*, 464 U.S. at 556. The timeline of events also undermines Santini's purported admission of actual bias. The notion that Santini wanted to curry favor with prosecutors who had yet to initiate charges against him on crimes for which he had yet to be arrested lacks credulity. It is further undermined by other statements in Santini's affidavit, acknowledging that "I didn't have any deal with the prosecutors, and I have no idea what they knew about those accusations." Decl. of Severiano Santini, ECF No. 112-1 at 1.

The Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation . . . [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Smith v. Phillips*, 455 U.S. at 217. Based on "the sum of all factual circumstances," the Court finds Davis has failed to establish Santini's bias. *Brooks*, 418 F.3d at 435.

Finally, the evidence presented during Davis's first trial overwhelmingly favored the prosecution. When viewed in the light most favorable to the jury's verdict, the evidence at the guilt-innocence of Davis's trial established Davis admitted he strangled Medina. Rep. R. (2002)

vol. 26 at 273. Medina had a blunt-force injury to the head which caused a subarachnoid hemorrhage. Rep. R. (2002) vol. 27 at 145, 148. Medina had numerous abrasions on her torso and her right pulmonary artery was torn, which caused the pericardial sac around her heart to fill with blood. Rep. R. (2002) vol. 27 at 155–56. Medina had a brown nylon shirt tired around her neck which left a ligature furrow in her skin. Rep. R. vol. 27 at 151. Medina also had scrapes called "mucosal abrasions" inside her vagina, which were consistent with penile penetration near the time of her death. Rep. R. (2002) vol. 27 at 161–63, 162, 163, 176–77, 177. Dr. Stern concluded that Medina was sexually assaulted; Medina fought her attacker; and Medina's brain injuries, torn pulmonary artery, and strangulation could have independently or in combination caused her death. Rep. R. (2002) vol. 27 at 163–65, 172, 181. There is no reasonable probability that, but for Santini's presence on the jury, the jury's verdict of "guilty" would have been different. *See Canfield v. Lumpkin*, 998 F.3d 242, 248–49 & n.25 (5th Cir. 2021).

Moreover, even if he had not defaulted on his claim, he would not be entitled to habeas relief.

### 3. Santini's Declaration Falls Under the Proscription of Federal Rule of Evidence 606(b) and Dickson's Statement Does Not Meet the Requirements of 28 U.S.C. § 1746

Santini recalled in his 2017 declaration that he thought about disclosing the 2001 incident with Dickson and her daughters—which resulted in no action against him—during his 2002 voir dire. Decl. of Severiano Santini, ECF No. 112-1. But he decided not to report that information on his juror questionnaire or during individual voir dire. *Id*. Then, a few days after his individual voir dire, he was accused by Dickson of masturbating near the girls when they were asleep, and he was told she was going to call the cops. *Id*. At this point he concluded that by not disclosing the

information, serving on Davis's jury, and voting to convict Davis, he could somehow "prove" to the District Attorney's Office that he was a "law-abiding citizen." *Id*. This, he believed, would somehow help him in any future criminal prosecution. *Id*. He conceded in his declaration that he "didn't have any deal with the prosecutors, and [he had] no idea what they knew about those accusations." *Id*.

> Federal Rule of Evidence 606(b)(1) provides:
>
> During an inquiry into the validity of a verdict . . ., a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

The only exceptions to this prohibition are where "extraneous prejudicial information was improperly brought to the jury's attention"; "an outside influence was improperly brought to bear on any juror"; or "a mistake was made in entering the verdict on the verdict form." Fed. R. Evid. 606(b)(2)(A)-(C).

"[I]nformation is deemed 'extraneous' if it derives from a source 'external' to the jury." *Warger v. Shauers*, 574 U.S. 40, 51 (2014) (citation omitted). " 'External' matters include publicity and information related specifically to the case the jurors are meant to decide, while 'internal' matters include the general body of experiences that jurors are understood to bring with them to the jury room." *Id*. (citations omitted).

Rule 606(b) preludes a court from considering juror testimony concerning an internal matter "during a proceeding in which a party seeks to secure a new trial on the ground that a juror lied during *voir dire*." *Warger*, 574 U.S. at 44. The only exception is "when, after the jury is discharged, a juror comes forward with compelling evidence that another juror made clear and

explicit statements indicating that racial animus was a significant motivating factor in his or her vote to convict." *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 211 (2017).

Santini has not made any fact-specific allegation of a clear statement of race-based animus by any juror sufficient to invoke the exception identified by the Supreme Court. Santini claimed, "I figured that being on the jury *and finding the guy guilty* was my chance to prove to them that I'm a law-abiding citizen." Decl. of Severiano Santini, ECF No. 112-1 at 1 (emphasis added). Santini has not suggested he discussed his legal predicament or his mental processes concerning the verdict in Davis's case with any other juror, the state court, or member of the prosecution team. Santini's declaration about his mental processes concerning his verdict falls squarely within the prohibition of Federal Rule of Evidence 606(b)(1). *See Warger*, 574 U.S. at 44.

Furthermore, while Dickson's unsigned declaration does not fall under the Rule 606(b) prohibition, the Court cannot consider it because it is neither signed nor dated—and it does not state it was made under penalty of perjury. *See* 28 U.S.C. § 1746; *Nissho-Iwai American Corporation v. Kline*, 845 F.2d 1300, 1306 (5th Cir. 1988) ("It is a settled rule in this circuit that an unsworn affidavit is incompetent to raise a fact issue precluding summary judgment. A statutory exception to this rule exists under 28 U.S.C. § 1746, which permits unsworn declarations to substitute for an affiant's oath if the statement contained therein is made 'under penalty of perjury' and verified as 'true and correct.' ").

Additionally, Dickson's declaration adds nothing to Davis's claim. Regarding the first incident, Dickson claims she could not "say for certain whether Santini knew [she] reported him to the police." Decl. of Camille Dickson, ECF No. 112-4 at 4. About the second incident, she maintains she told Santini, "If I catch you, you are going to die. If not the cops will catch you." *Id.*

Given that Santini was apparently not questioned by the police after the first incident, he had little reason to believe he was in legal trouble until he was actually arrested by the police after Davis's trail. Indeed, Santini testified at his pretrial hearing that he did not know why the police came to his house:

> Q. So Mr. Santini, that morning the officers went and they picked you up from your house, right?
>
> Q. Yes, sir. I was barely getting up.
>
> Q. Okay. And they didn't tell you what you're being arrested for?
> A. No, sir. All they did, knock, Joe Daniel was outside and they thought he was me, Santini. Then my wife walked in and said there's two police officer looking for you.
>
> Q. Did they – they didn't give you your warnings?
>
> A. No. None whatsoever, sir.
>
> Q. So you had no idea what was going on?
>
> A. No, sir.
>
> Q. They just took you to the station and same thing happened when you got to the station, nobody talked to you, you didn't know what the heck was going on?
>
> A. No, sir.

Tr., Hearing on Santini Mot. to Suppress, ECF No. 26-4 at 57–58.

As Davis has no other evidence of juror misconduct, this ground for review does not provide him with a basis for relief. Indeed, without the Santini and Dickson declarations, he fails to (1) describe circumstances which would support a claim of implied bias or (2) meet the standard for demonstrating actual bias.

But even if the Court considered the Santini and Dickson declarations, it would not grant Davis relief on his claims.

### 4.  Davis's Implied Bias Claim is Meritless

Davis claims Santini's bias is implied because "[n]o juror in Santini's situation could be unbiased. He was accused of a serious felony, caught in the act. He was being investigated by police before he was chosen and while he sat as juror." Pet'r's Am. Pet., ECF No. 165 at 18.

Davis's argument hinges on Santini's subjective statements in his declaration—which are barred under Rule 606(b)—and Dickson's alleged statements in her unsigned declaration—which are incompetent under 28 U.S.C. § 1746. Furthermore, implied bias—that a juror is presumed biased as a matter of law—is reserved for "extreme situations." *Solis*, 342 F.3d at 395. Santini's failure to reveal an accusation made more than a year before Davis's trial–which did not result in a police interaction with him—does not rise to the level of an extreme situation. Santini's failure to disclose an accusation which occurred after voir dire—particularly considering that he had no contact with the authorities until after Davis's trial—also is not an extreme situation. The circumstances here are not such that bias can be implied.

### 5.  Davis's Actual Bias Claim is Meritless

Davis claims Santini's bias is actual because he decided "to save himself by 'finding the guy guilty' without regard to the evidence. Pet'r's Am. Pet., ECF No. 165 at 25.

To demonstrate actual bias, a petitioner must show "a juror failed to answer honestly a material question on voir dire" and "that a correct response would have provided a valid basis for a challenge for cause." *McDonough*, 464 U.S. at 556.

Davis has not shown Santini was asked direct questions during his general or individual voir dire which required him to disclose information concerning the events that transpired with Dickson and her daughters. Rep. R. (2002) vol. 12 at 179–241. Davis has not shown—based on the

73

record before the state court—that Santini clearly lied or provided an inaccurate or incomplete answers during his voir dire. *Hatten*, 570 F.3d at 602. Consequently, Davis has failed to meet his burden of showing that Santini failed to answer a material question honestly on voir dire—as Santini had not yet been accused by the State of a felony—and he therefore cannot demonstrate actual bias. *McDonough*, 464 U.S. at 556.

### C.  DAVIS'S CLAIM THAT THE PROSECUTION SUPPRESSED EVIDENCE IS PROCEDURALLY DEFAULTED AND WITHOUT MERIT

Davis next contends the State violated his rights to due process and a fair trial at his first trial when it failed to disclose its investigation and eventual prosecution of Santini for indecency with minors. Pet'r's Am. Pet., ECF No. 165 at 30–38. Davis claims "the El Paso police received the first accusation that Severiano Santini had sexually assaulted two young girls living in his home" on or about January 1, 2001. *Id*. at 30. Davis notes Bill Anderson—an El Paso County assistant district attorney—was present for both girls' interviews but agreed not to pursue either case. *Id*. at 31. Davis adds the prosecutor for his first trial in 2002—Penny Hamilton—was Anderson's supervisor. *Id*. Davis asserts "[o]n June 12, 2002—nine days after Santini was individually questioned by the prosecution and defense at Davis's trial but before the jurors had been chosen—El Paso police received a second accusation that Santini had sexually molested the two girls." *Id*. Davis adds on the morning of June 18, 2002, a detective interviewed the girls' mother, Dickson, and "prepared a report that identified Santini by full name, date of birth, home address, and complete physical description . . . " *Id*. at 32. Notably, Davis does not suggest an assistant district attorney was present during this interview with Dickson or the subsequent interviews with the two victims two days later. *See id*. Davis observes jury selection continued that afternoon, but "[n]either Penny Hamilton nor her co-counsel reported the Santini investigation to

the trial court or to defense counsel, nor did [they] attempt to remove Santini with a peremptory strike." *Id*. Davis further observes his trial ended on June 23, 2002, and the detective obtained a warrant for Santini's arrest on July 11, 2002. *Id*. at 33.

Davis "candidly acknowledge[s] the absence . . . of direct evidence that El Paso Assistant District Attorney Penny Hamilton knew about the accusations and investigation involving Juror Santini before and during Mr. Davis's trial." Pet'r's Reply, ECF No. 175 at 31 (emphasis omitted). Still, he argues that Hamilton's failure to disclose the investigation of Santini's conduct violated his rights to due process and a fair trial:

> Hamilton[ ] knew during jury selection and during Davis's trial that juror Severiano Santini was accused of committing a serious felony by a credible witness who caught him in the act, that El Paso police were actively investigating the accusation, and that Santini himself did not reveal this to the court or to anyone else in the Davis trial. Hamilton's failure to disclose what she knew was prosecutorial misconduct.

Pet'r's Am. Pet., ECF No. 165 at 34.

### 1.   Prosecutor's Obligation to Disclose Known Juror Bias

"When specific guarantees of the Bill of Rights are involved, [the Supreme] Court has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). As a result, according to *Brady v. Maryland*, a prosecutor's suppression of defense-requested evidence "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). And, according to *Smith v. Phillips*, "a prosecutor must disclose unrequested evidence which would create a reasonable doubt of guilt that did not otherwise exist." 455 U.S. at 219.

Since failure by a prosecutor to disclose evidence of potential juror bias is not material either to guilt or to punishment, it does not raise a *Brady* issue. *See Gutierrez v. Quarterman*, 201 F. App'x 196, 202 (5th Cir. 2006) ("The prosecution's failure to disclose information about a prospective juror is *not* exculpatory, material evidence under *Brady*.") (emphasis in original) (citation omitted). But it still raises the issue of prosecutorial misconduct. *Smith v. Phillips*, 455 U.S. at 219–21. So, a prosecutor's failure to disclose *known* juror bias has been recognized by the Supreme Court as implicating the right to a fair and impartial jury and due process—and may justify a new trial if it rises to a level of a constitutional violation. *Id.*

In Texas "[p]rosecutorial misconduct is an independent basis for objection that must be specifically urged to preserve error." *Viscaino v. State*, 513 S.W.3d 802, 810 (Tex. App.—El Paso 2017, no pet.) (citation omitted). A defendant is entitled to reversal based on an unpreserved claim of prosecutorial misconduct only when " 'there is serious and continuing prosecutorial misconduct that undermines the reliability of the factfinding process . . . resulting in deprivation of fundamental fairness and due process of law.' " *Bautista v. State*, 363 S.W.3d 259, 263 (Tex. App.—San Antonio 2012, no pet.) (quoting *Jimenez v. State*, 298 S.W.3d 203, 214 (Tex. App.—San Antonio 2009, pet. ref'd); citing *Berger v. United States*, 295 U.S. 78, 84 (1935)).

### 2. Davis's Claim is Procedurally Defaulted

Davis raised his claim—that the State failed to disclose its investigation and eventual prosecution of Santini—in his third state habeas corpus application. *Ex parte Davis*, 2020 WL 1645017, at *1. His application was dismissed "as an abuse of the writ" because the Court of Criminal Appeals determined that he failed to satisfy the requirements of Texas Code of Criminal Procedure Article 11.071, § 5(a), and his application was, therefore, procedurally barred. *Id.* at *2.

Because Davis "defaulted his federal claim[ ] in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim[ ] is barred unless [he] can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[ ] will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

### 3.   Davis Cannot Demonstrate Cause for the Default or Actual Prejudice

Davis asserts he has good cause for his failure to exhaust his claim before his third state writ application because the prosecution withheld material evidence concerning Santini's criminal conduct in its possession. Pet'r's Reply, ECF No. 175 at 19.

The record shows Santini was selected as a juror on June 18, 2002. Rep. R. (2008) vol. 25 at 11. On July 11, 2002—approximately 18 days after Davis's trial ended—Santini was arrested. Pet'r's Am. Pet., ECF No. 165 at 33. In November 2002—approximately five months after Davis's first trial—Santini was indicted on one count of aggravated sexual assault of a child on or about January 1, 2001, and two counts of indecency with a child on or about June 12, 2002. Indictment, ECF No. 167-6 at 67; Indictment, ECF No. 167-6 at 77–78. On November 5, 2003, Santini pleaded guilty to the offenses and was assessed ten years deferred-adjudication community supervision on all three counts, with ninety days confinement as a condition of probation. J., ECF No. 167-6 at 75–76; J., ECF No. 167-6 at 86–87. Santini's subsequent failure to register as a sex offender resulted in his confinement for two years in prison. J., ECF No. 167-6 at 89–90.

Davis conceded his claim was premised on supposition. He admitted "[w]hile concrete direct evidence that Hamilton knew about the accusations and ongoing investigations into Santini before and after Davis's trial may not have yet surfaced, the record as a whole more than provides

sufficient circumstantial evidence of her knowledge." Pet'r's Am. Pet., ECF No. 165 at 37 (emphasis omitted).

Davis accordingly filed a motion for discovery in this Court, pursuant to Rule 6(a) of the Rules Governing Section 2254 Cases, with a view toward establishing the prosecutor engaged in misconduct and showing cause for his failure to comply with the state's procedural rules. Specifically, he asserted he wanted to develop evidence to support his claim that the prosecutor failed to disclose to his counsel, before and during his jury selection, that the Office of the District Attorney was investigating Santini for allegedly sexually assaulting a child and engaging in indecency with a child. *See generally* Pet'r's Mot. for Discovery, ECF No. 53. As a result of the motion for discovery, his counsel was instructed by the Court to prepare and serve a subpoena on the District Attorney. Order, ECF No. 84.

The District Attorney moved to quash the subpoena, requested an in camera review, and sought a protective order. Mot. to Quash, ECF No. 91. He argued the records were confidential and protected from disclosure by the Texas Family Code. *Id*. at 4.

Davis's counsel countered the Family Code was irrelevant. Order, ECF No. 102 at 3. They asked "what is the harm" in releasing the records, and noted Santini's victims were now adults. *Id*. They also suggested the requested records were not protected by the work-product privilege. *Id*.

The Court ordered the District Attorney to deliver the complete, unredacted "files involving accusations against Severiano Santini for acts alleged to have occurred prior to June 23, 2002, against the daughters of Camille Dickson," for it to review. Order, ECF 93. The Court subsequently conducted an in camera review of the requested information. Order, ECF No. 102 at 3. From that review, the Court was unable to identify any document or statement in the files which

shed further light on the concerns raised by Davis in his federal habeas petition. *Id*. But because the Court was not privy to all aspects of Davis's claim—or fully aware of the information Davis was seeking to develop his claim—it conducted a hearing on the matter. *Id.* At the hearing, the Court explained that it found nothing to connect the prosecutor—Hamilton—to the investigation of Santini:

> THE COURT: . . . The problem I've got is that there's nothing leading up to Mr. Santini . . . being selected as a juror that shows any knowledge of this criminal offense that Mr. Santini was looking at, nor is there anything between June 12th and July 18th [2002] indicating that Mr. Santini, other than the fact that the mother was upset and said "I'm calling the police," knowing that he was under investigation. I will tell you that the reports do indicate Ms. -- I could find nothing that involves Ms. --
>
> MR. SPENCER: Hamilton.
>
> THE COURT: -- Hamilton. The prosecutor in [Santini's] case appears to be Rebecca Tarango. It's on the judgment.
>
> MR. SPENCER: Right.
>
> THE COURT: And so there's no connection that I can see from this file that connects Ms. Hamilton to the [Santini] case.

Hearing Tr., ECF No. 108 at 14.

After Davis's counsel suggested that Santini immediately knew he was under investigation after Dickson caught him the second time on or about June 12, 2002, the Court stated:

> THE COURT: Well, but that's a huge assumption. Because June 12th, the mother makes the outcry, calls the police. The police may interview her, interview the children. But then they begin their investigation on that date. They didn't actually interview Mr. Santini until July 18th, which is when he's arrested, right?
>
> MR. SPENCER: Correct.
>
> THE COURT: So to assume somehow, number one, that Mr. Santini had any knowledge of what the police were doing other than the fact that she said "I'm calling the police" is a huge assumption.

And secondly, that the DA -- unless you're telling me that the DA sits in on every investigation, the fact that Mr. Santini was a suspect and being investigated for these charges doesn't necessarily impute anything to the District Attorney's Office.

And as I said, if there was something in the file that indicated that, I could certainly see why you would want to see that. But I've gone through the entire file, and there's nothing here that would impute that kind of knowledge to them.

You know, as I said, there's police reports of the investigation. They pretty much follow this exact timeline that you're talking about. But other than these very sort of police reports for this and indictment for that, there's no note saying, you know -- from Ms. Hamilton, saying, "You need to check out Mr. Santini. He's on my panel. And I have a concern that he's under criminal investigation." If that were here, I could understand your concern.

But it is a very -- it's just a case file is basically all it is, with no -- no notes.

I mean, a jury wasn't selected in [Santini's] case. He pled guilty. You know, there's nothing about plea bargaining here to say, well, he helped us out on one thing, so he gets a break on another thing, which is, I think, something that you were concerned about.

. . . .

There's no correspondence between DA and govern- -- and El Paso Police Department. There's no correspondence between assistant DA to assistant DA. There's no correspondence between DA and CPS. There's no emails. There's no nothing in this file.

*Id*. at 16–17, 19.

The Court concluded—after reviewing the evidence and listening to the arguments of counsel—that it was unable to identify any information contained in the District Attorney's files which revealed information relevant to the concerns raised by Davis.[5] Order, ECF No. 102 at 4. It accordingly granted the District Attorney's motion to quash. *Id.*

---

[5] Santini's declaration—"I didn't have any deal with the prosecutors, and I have no idea what they knew about those accusations"—corroborates this conclusion. Decl. of Severiano Santini, ECF No. 112-1 at 1.

The Court's reasoning still applies here. Because there was nothing in the District Attorney's files that would have supported Davis's prosecutorial misconduct claim, the failure to disclose those files does not establish cause for Davis's failure to raise his claim earlier. *See Coleman*, 501 U.S. at 750.

Furthermore, the decision by the Court of Criminal Appeals to dismiss Davis's application for a failure to satisfy the requirements of Texas Code of Criminal Procedure Article 11.071, § 5(a), is an implicit finding that the prosecutors at Davis's trial (1) had no knowledge of an investigation of Santini for his alleged indecency with minors, (2) did not violate Davis's rights to due process and a fair trial, and (3) did not violate the Constitution. *Coleman*, 501 U.S. at 750. The Court of Criminal Appeals' decision involving an "implicit factual finding is subject to the presumption of correctness"—and Davis has failed to rebut that presumption. *Ford*, 910 F.3d at 235.

### D.  THE STATE COURTS REASONABLY REJECTED DAVIS'S CLAIM THAT HIS TRIAL COUNSL WERE INEFFECTIVE FOR NOT INVESTIGATING AND PRESENTING MITIGATING EVIDENCE AT HIS SECOND TRIAL

Davis's next argument is that his trial counsel provided ineffective assistance at his second trial when they failed to investigate and present mitigating evidence of his seriously abusive and dysfunctional family life. Pet'r's Am. Pet., ECF No. 165 at 39–86. He asserts an appropriate investigation would have disclosed at least five significant mitigating factors. First, he had a "history of suicide attempts, self-mutilation, . . . low self-esteem, lack of self-worth, and sense of hopelessness." *Id*. at 71. Second, he "experienced prolonged and severe physical, verbal, and psychological abuse from his father." *Id*. at 74. Third, he "was a victim of repeated sexual abuse by at least four different caretakers and adults, including his father, starting when he was six years old

and continuing until he was around 15 years old." *Id*. Fourth, his "extreme exposure to physical violence occurred within the context of traumatic neglect by his mother, which persisted through his childhood into his adolescence." *Id*. at 75. Finally, his mother "failed to take measures to protect [him] from his father's or brother's violence, . . . validate his fear and distress, or to help soothe and repair the damage of these experiences." *Id.*

Davis argues his counsel's performance fell short of their professional obligations when—among other alleged deficiencies—they failed to (1) collect social service, medical, or mental health records; (2) conduct searching interviews of Davis's mother and siblings; (3) investigate Davis's father; (4) interview readily available mitigation witnesses; (5) retain the services of a mitigation specialist; or (6) develop evidence of Davis's childhood trauma. *Id*. at 80–81. He contends:

> The jurors that sentenced [him] to death had only a grossly incomplete picture of [his] life history . . . They never knew the horrifying depths of the physical and sexual abuse he suffered at his father's hands. They never were given a clear picture of how [he] was failed time and again by the adults responsible for protecting him from the horrors he suffered. They never heard how the trauma [he] suffered impacted his mental health and damaged his brain.

*Id*. at 78. He further argues "[i]f counsel had reasonably investigated and presented the available mitigation evidence, there is more than a reasonable probability that the jury would have chosen not to sentence [him] to death." *Id*. at 83.

### 1. Defense Counsel's Duty to Investigate

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "In assessing counsel's investigation, we must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent

consideration of the challenged conduct as seen 'from counsel's perspective at the time.' "
*Wiggins*, 539 U.S. at 523 (quoting *Strickland*, 466 U.S. at 689–89). In the context of penalty phase
mitigation in capital cases, the Supreme Court has held it is unreasonable not to investigate further
when counsel has information available to him that suggests additional mitigating evidence—such
as mental illness or a history of childhood abuse—may be available. *See, e.g., Porter v. McCollum*,
558 U.S. 30, 40 (2009) ("Counsel thus failed to uncover and present any evidence of [defendant's]
mental health or mental impairment, his family background, or his military service. The decision
not to investigate did not reflect reasonable professional judgment.") (citing *Wiggins*, 539 U.S. at
534). So, for example, the Supreme Court found in *Wiggins* that trial counsel failed to discover,
develop, and present available mitigating evidence showing:

> Wiggins experienced severe privation and abuse in the first six years of his life
> while in the custody of his alcoholic, absentee mother. He suffered physical
> torment, sexual molestation, and repeated rape during his subsequent years in foster
> care. The time Wiggins spent homeless, along with his diminished mental
> capacities, further augment his mitigation case. Petitioner thus has the kind of
> troubled history we have declared relevant to assessing a defendant's moral
> culpability.

*Wiggins*, 539 U.S. at 535.

## 2. Davis's Second State Writ Application

Davis raised this claim—that his trial counsel provided ineffective assistance at his second
trial when they failed to investigate and present mitigating evidence—in his second state habeas
corpus application. State Habeas R. (WR-61,445-02) at 45. Specifically, he claimed:

> (2) [His] death sentence violates the Sixth Amendment to the United States
> Constitution because [he] was deprived of the effective assistance of counsel at
> the punishment phase of his trial in that his trial counsel failed to investigate
> and present substantial, readily available evidence in mitigation of the death
> penalty, including evidence of a seriously abusive and dysfunctional family
> life.

> (3) [His] death sentence violates the Sixth Amendment to the United States
> Constitution because [he] was deprived of the effective assistance of counsel at
> the punishment phase of his trial in that his trial counsel failed to obtain and
> present for jury consideration in mitigation of his fault expert testimony
> describing the psychological implications of febrile seizures suffered by him
> during his infancy, the abuses he experienced from his father during his
> developmental period, his practice of self-mutilation as a young man, his
> suicide attempts, and his treatment for depression.

State Habeas R. (WR-61,445-02) at 45.

### 3.  Findings and Conclusions of the State Habeas Courts

The trial court reviewed transcripts of phone calls between Davis, his mother, and a few

other people which occurred before or during his retrial. State Habeas R. (WR-61,445-02) at 334–

372.

In one recording, Davis told his mother that his defense counsel, Macias, wanted to call

witnesses from "down there" to testify. State Habeas R. (WR-61,445-02) at 341. Davis said he told

his lawyer Frank Macias to "[j]ust call people that live here [in El Paso]." State Habeas R.

(WR-61,445-02) at 341. Davis said he believed Macias wanted to call more witnesses to "cover[]

his own butt" so he is not "hit on ineffective assistance of counsel." State Habeas R.

(WR-61,445-02) at 341. Davis stated it would be a waste of time and he did not "want to disrupt

people's lives anymore." State Habeas R. (WR-61,445-02) at 342. Davis told his mother in another

conversation that he informed Macias he would file an ineffective assistance complaint if Macias

did not do as he wished. State Habeas R. (WR-61,445-02) at 358. Davis reiterated in still another

call with his mother that he asked Macias not to bring back any witnesses because "I really just

don't want to go through the whole deal because it's a sham." State Habeas R. (WR-61,445-02) at

369–70. He claimed, "I'd rather take the death penalty so my appeals will start all back over." State

Habeas R. (WR-61,445-02) at 372. He further asserted "I said, don't call no witnesses, don't call nobody. Don't bring -- I said, don't drag people back here for this crap. It's nothing. It's worthless. So I mean, really, you all don't have to show up." State Habeas R. (WR-61,445-02) at 372.

The trial court accordingly made the following findings regarding counsels' failure to present more mitigating evidence:

> 247. Statements made by [Davis] during jail recordings reflect that [he] attempted to hinder, or did hinder, trial counsels' attempts to locate and interview witnesses by instructing trial counsel not to contact any such witnesses and by threatening to file ineffective assistance claims if trial counsel did not comply with his wishes.

> 248. Statements made by [Davis] during jail recordings reflect that [he] may have been reluctant or uncooperative with pursuing a defense that did not focus on, or would have been inconsistent with, personal accountability.

State Habeas R. (WR-61,445-02), ECF No. 167-3 at 13.

The trial court also held an evidentiary hearing—with Davis's counsel Frank Macias and Ruben Morales present—and entered findings of fact and conclusions of law on his claims in his second writ application. State Habeas R. (WR-61,445-02), ECF No. 167-2 at 160; ECF No. 167-3 at 34. It found Davis's claimed history of suicide attempts, self-mutilation, low self-esteem, lack of self-worth, and sense of hopelessness, was overstated:

> 214. Attorney Macias' credible testimony at the writ evidentiary hearing establishes that during his pretrial investigation, he learned that [Davis] had previously engaged in the practice of self-mutilation ("cutting") and had attempted suicide.
> . . .

> 240. This Court finds credible Attorney Macias' testimony that [Davis's] decision to take the stand and ask the jury to impose a sentence of death affected how trial counsel pursued their defensive strategy of personal accountability and of humanizing the applicant.  . . .

> 245. In his jail-recorded telephone conversations that were recorded while [Davis] was awaiting retrial, [Davis] stated that he grew up "spoiled," that he "didn't really

want for anything," that he lived in nice homes, lived in good neighborhoods, and went to good schools.

246. [Davis's] statements during his jail recordings undercut his allegation that he grew up in a seriously abusive and dysfunctional home.  . . .

273. This Court finds not credible any allegation by [Davis] that he had previously attempted to commit suicide.

See State Habeas R. (WR-61,445-02), ECF No. 167-3 at 9, 12–13, 16. It also determined Davis's

claims that he experienced prolonged and severe physical, verbal, and psychological abuse from

his father, were not supported by the record:

162. Attorney Morales' credible testimony at the writ evidentiary hearing establishes that during the course of his pretrial investigation, he had learned that [Davis's] father had been a "mean drunk." . . .

168. This Court finds not credible any allegation by [Davis] that [his] father physically and verbally abused him in the manner alleged in his writ application. . . .

176. The record reflects that at his retrial, [Davis] specifically related to the jury that on one occasion, when he and his half-brother, Carl Fuller, broke the lawnmower, he pointed the finger at Carl, and their father stripped Carl of his clothes and beat him until he was screaming.  . . .

178. At trial, the TDCJ records, which were admitted into evidence, included a "Case Summary" that noted: ". . . home; stability poor due to separation of parents at an early age . . ."

179. Evidence that [Davis] and his family moved frequently was presented at trial.

180. By its answers to the death-penalty special issues, the jury apparently determined that evidence of any abuse suffered by [Davis] was not a sufficient mitigating circumstance to warrant a life sentence.

See State Habeas R. (WR-61,445-02), ECF No. 167-3 at 3–5. It observed Davis's claim that he

was a victim of repeated sexual abuse by at least four different caretakers and adults, including his

father, starting when he was six years old and continuing until he was around 15 years old, was not

credible:

> 184. This Court finds not credible any allegation by [Davis] that he was sexually abused by his father.   . . .
>
> 187. Attorney Morales' credible testimony establishes that the only incident of sexual abuse or exploitation [Davis] shared with Attorney Morales involved a sexual relationship [Davis] had had with an older woman while he was still a minor.
>
> 188. The record reflects that evidence of [Davis's] sexual exploitation by an older woman while he was still a minor was presented at trial.
>
> 189. Attorney Morales' credible testimony establishes that during his consultations with [Davis's] family members, they never gave him any reason to believe that [Davis] had been sexually abused by his father.
>
> 190. Attorney Macias' credible testimony at the writ evidentiary hearing establishes that he questioned [Davis's] mother, grandmother, and uncle about whether [Davis's] father had treated his children with unusual harshness and whether [Davis's] father had sexually abused them.   . . .
>
> 196. The record reflects that not once during his lengthy narrative-format testimony at his retrial did [Davis] ever intimate that his father had sexually abused him.
>
> 197. [Davis] did not attest in any affidavit or testify at the writ evidentiary hearing that he had ever been sexually abused by his father.
>
> 198. In his affidavit, Dr. James Schutte, [Davis's] expert psychologist, attested that [Davis] had previously reported to him a history of childhood sexual abuse, but did not identify the abuser or elaborate on the nature of this sexual abuse.
>
> 199. Dr. Schutte's attestation that [Davis] had previously reported a history of childhood sexual abuse does not establish that he was sexually abused by his father.

*See* State Habeas R. (WR-61,445-02), ECF No. 167-3 at 6–7. It found Davis's claim about his

extreme exposure to physical violence within the context of traumatic neglect by his mother, and

his claim that his mother failed to take measures to protect him from his father's or brother's

violence, were not credible:

168. This Court finds not credible any allegation by [Davis] that [his] father physically and verbally abused him in the manner alleged in his writ application. . . .

253. This Court finds the affidavit of Carol Davis, [Davis's] mother, to not be credible.  . . .

255. This Court finds Carol's attestations that she suffered "extreme" physically abuse [sic] by [Davis's] father to not be credible.

256. This Court finds not credible Carol's attestations that [Davis] was physically abused by his father.  . . .

262. This Court finds not credible Carol's attestation that trial counsel did not ask her about [Davis's] social history, family history, medical history, or psychological history and failed to ask about any and all instances of verbal, physical, and sexual abuse.  . . .

264. This Court finds the affidavit of Oscar Davis, [Davis's] twin brother, to not be credible.

265. This Court finds Oscar's attestations that [Davis's] father physically abused him and [Davis] to not be credible.  . . .

267. This Court finds not credible Oscar's attestations that [Davis] had previously attempted to commit suicide and that Oscar would have related this information to trial counsel.

268. This Court finds not credible Oscar's attestation that the extent of trial counsels' interviews with him prior to the first trial was a 10-minute discussion on the side of the road in North Carolina.

269. This Court finds not credible Oscar's attestation that his mother neglected him and [Davis] because of her alcoholism.

*See* State Habeas R. (WR-61,445-02), ECF No. 167-3 at 4, 14–15. The trial court also entered the

following additional findings:

205. This Court finds credible Attorney Macias' testimony that he asked [Davis] why he raped and murdered Melissa Medina and that [Davis] never told him that he had been fueled by any knowledge that his father had been falsely accused of sexually assaulting a female neighbor when he [] was a child.

206. The record reflects that not once during his lengthy narrative-format testimony at his retrial did [Davis] ever intimate that he murdered Melissa based on his knowledge that his father had been falsely accused of rape when he was a child. . . .

210. The record does not affirmatively demonstrate that trial counsel rendered deficient performance by failing to investigate and present evidence that a child protective-services agency opened an investigation of [Davis's] household in California and North Carolina.   . . .

213. [Davis] failed to present any evidence and to prove that records pertaining to any investigation by a child-protective-services agency would have benefitted his mitigation defense.

229. The record reflects that at the retrial, [Davis] testified that since he took a life, he should give his in return, that he was not asking the jury to spare his life, and that he did not "come here looking for salvation;" rather, he "came here looking for an execution." . . .

231. This Court finds credible Attorney Morales' testimony that he knew, prior to [Davis's]  retrial, that there was a strong likelihood that [Davis] would take the stand and ask the jury to impose a death sentence because [Davis] had expressed his intent to do so.   . . .

239. This Court finds credible Attorney Macias' testimony that, against the advice of counsel, [Davis] chose to take the stand and ask the jury to impose a sentence of death.   . . .

244. Attorney Macias' credible testimony establishes that despite [Davis's] dictates to the contrary, trial counsel conducted their own independent investigation for evidence for [Davis's] mitigation defense.   . . .

274. This Court finds the affidavit of Veronica Davis, [Davis's] sister, to not be credible.

275. This Court finds not credible Veronica's attestation that trial counsel failed to inquire into [Davis's] family history or any history of domestic violence or abuse and failed to request family photographs, family videos, report cards, and [Davis's] academic achievements.   . . .

278. This Court finds not credible Veronica's attestation that aside from a 15-20 [minute] meeting with Attorney Macias, no member of the defense team spoke to her during their investigation.

279. This Court finds the affidavit of Carl Fuller, [Davis's] half-brother, to not be credible.   . . .

289. This Court finds that Attorneys Macias and Morales adequately investigated [Davis's] case prior to his punishment retrial in 2008.

290. [Davis] fails to demonstrate that trial counsel rendered deficient performance in failing to present any of the complained-of mitigation evidence.

291. The record reflects that the State presented extensive evidence in aggravation of death, specifically, the brutal facts of the offense, [Davis's] disciplinary and criminal history, his writings and drawings exhibiting a preoccupation with rape, violence (particularly towards women), and death, and his conversion to Satanism while incarcerated.

*See* State Habeas R. (WR-61,445-02), ECF No. 167-3 at 8–9, 11–13, 16–17. It also entered

specific findings of fact on Davis's claim that his counsel provided ineffective assistance when

they failed to investigate his background:

117. The record does not affirmatively demonstrate that Attorneys Macias and Morales failed to "investigate and present substantial, readily available evidence in mitigation of the death penalty, including evidence of a seriously abusive and dysfunctional family life."

118. The record does not affirmatively demonstrate that trial counsel failed to adequately investigate [Davis's] case prior to his punishment retrial in 2008.

119. The record does not affirmatively demonstrate that the scope of trial counsels' investigation fell below an objective standard of reasonableness.

120. The record does not affirmatively demonstrate that trial counsel rendered deficient performance by failing to retain the services of a mitigation specialist.

121. The record does not affirmatively demonstrate that the applicant was prejudiced by trial counsels' decision not to retain the services of a mitigation specialist.

State Habeas R. (WR-61,445-02), ECF No. 167-2 at 173.

138. The record does not affirmatively demonstrate that trial counsel rendered deficient performance by failing to contact and interview particular witnesses, including [Davis's] family members.

139. The record does not affirmatively demonstrate that [Davis] suffered prejudice as a result of any failure by trial counsel to interview particular witnesses.   . . .

143. This Court finds not credible any allegation by [Davis] that trial counsel failed to interview necessary witnesses.

144. This Court finds not credible any allegation by [Davis] that trial counsel did not adequately interview or consult with [him].

145. This Court finds not credible any allegation by [Davis] that trial counsel did not adequately interview [Davis's] family members.   . . .

235. At the writ evidentiary hearing, trial counsel opined that a mitigation defense that focused on personal accountability and humanizing [Davis] was a legitimate mitigation strategy to pursue in a death-penalty case.

236. Attorney Morales' credible testimony at the writ evidentiary hearing establishes that trial counsel consulted with [Davis] about what defensive strategies to pursue at the retrial.   . . .

244. Attorney Macias' credible testimony establishes that despite [Davis's] dictates to the contrary, trial counsel conducted their own independent investigation for evidence for [Davis's] mitigation defense.

State Habeas R. (WR-61,445-02), ECF No. 167-3 at 1, 12–13.

The trial court concluded "because the aggravating factors were severe, the omitted mitigation evidence, if believed, was not that strong." State Habeas R. (WR-61,445-02), ECF No. 167-3 at 32. It observed the evidence of Davis's "abusive childhood was admitted before (and rejected by) the jury." *Id*. It further found Davis "failed to show a reasonable probability that the complained-of mitigation evidence would have tipped the scale in his favor." *Id*. As a result, it concluded Davis failed to meet his burden of showing his counsel provided ineffective assistance. *Id*. (collecting cases).

The Court of Criminal Appeals "agree[d] with the trial judge's recommendation and adopt[ed] the trial judge's findings and conclusions. *Ex parte Davis*, 2014 WL 969802, at *1. It

denied Davis relief based on the trial court's findings and conclusions and its own review of the record. *Id*.

### 4. Davis's New Evidence is Barred

In support of his claim in his federal petition, Davis provides twenty-five exhibits not previously considered by the state courts—including additional declarations from family and neighbors, prison records, police reports, Child Protective Services (CPS) records, medical records, and several assessments by experts including psychological and neuropsychological reports. Pet'r's Ex. F, ECF No. 112-6 through Pet'r's Ex. CC, ECF No. 112-31.

The Supreme Court held in *Cullen v. Pinholster*, that a federal habeas court's review of a claim which has been "adjudicated on the merits in State court proceedings . . . under § 2254(d)(1) is limited to the record that was before the state court." 563 U.S. at 181. "*Pinholster* thus confirms limitations on a federal habeas court's consideration of new evidence when reviewing claims that have been adjudicated on the merits in state court. In such circumstances, the petitioner must demonstrate that habeas relief is warranted under § 2254(d) *on the state court record alone*." *Broadnax v. Lumpkin*, 987 F.3d 400, 406–07 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 859 (2022).

The rule in *Pinholster* is subject to two limited exceptions when a petitioner has failed to develop his claim in state court proceedings:

> Either the claim must rely on (1) a "new" and "previously unavailable" "rule of constitutional law" made retroactively applicable by this Court, or (2) "a factual predicate that could not have been previously discovered through the exercise of due diligence." §§ 2254(e)(2)(A)(i), (ii). If a prisoner can satisfy either of these exceptions, he also must show that further factfinding would demonstrate, "by clear and convincing evidence," that "no reasonable factfinder" would have convicted him of the crime charged. § 2254(e)(2)(B). Finally, even if all of these requirements are satisfied, a federal habeas court still is not required to hold a hearing or take any evidence. Like the decision to grant habeas relief itself, the decision to permit new

evidence must be informed by principles of comity and finality that govern every
federal habeas case.

*Shinn*, 142 S. Ct. at 1734 (citing § 2254(e)(2)(A)(i), (ii)).

Davis's new evidence does not fundamentally alter the ineffective assistance of counsel
claim raised in his second state writ application. State Habeas R. (WR-61,445-02) at 45. The
reports and declarations he submitted with his state application detailed (1) his mental, physical,
and sexual abuse experienced mainly at the hands of his father; (2) his father's extreme mental and
physical discipline; (3) his family's dysfunction; (4) his self-mutilation and depression; (5) his
brother Carl's sexual abuse by their father; (6) his emotional and social problems; (7) his mother's
neglect; (8) his father's abuse of his mother; (9) his involvement with Child Protective Services;
(10) his father's criminal history, including his court-martial for raping a woman; and (11) his
parents' extreme alcohol abuse. State Habeas R. (WR-61,445-02), ECF No. 167-2 at 160–ECF No.
167-3 at 34. Many of his new exhibits address the same issues. *See*, *e.g.*, Pet'r's Ex. H, ECF No.
112-9; Pet'r's Ex. I, ECF No. 112-10; Pet'r's Ex. K, ECF No. 112-12; Pet'r's Ex. Q, ECF No.
112-17; Pet'r's Ex. T, ECF No. 112-21; Pet'r's Ex. V, ECF No. 112-24. Davis does not assert his
claim relies on a new constitutional rule, he does not rely on "a factual predicate that could not
have been previously discovered through the exercise of due diligence," and he presented his
ineffective assistance of counsel claim in his second state writ application.

Consequently, the Court is foreclosed from considering Davis's new evidence in assessing
the reasonableness of the state court's decision to deny his ineffective assistance of counsel claim.
*See Pinholster*, 563 U.S. at 181.

**5.  The Court of Criminal Appeals Reasonably Concluded Davis's Counsel
Provided Effective Assistance**

The state trial court reviewed Davis's ineffective assistance of counsel claim in his second state writ application, examined the available evidence, held an evidentiary hearing with Davis's counsel Frank Macias and Ruben Morales present, and entered detailed findings of fact and conclusions of law on his claim. State Habeas R. (WR-61,445-02), ECF No. 167-2 at 160–174; ECF No. 167-3 at 1–34. It concluded Davis failed to meet his burden of showing his counsel provided ineffective assistance. State Habeas R. (WR-61,445-02), ECF No. 167-3 at 32. The Court of Criminal Appeals denied Davis relief based on the trial court's findings and conclusions—and its own review of the record. *Ex parte Davis*, 2014 WL 969802, at *1.

Davis suggests his counsel should have overwhelmed the jury with witnesses to describe his seriously abusive and dysfunctional family life—rather than the strategy they actually employed. He argues the mitigation evidence was compelling:

> The mitigation evidence that counsel missed was extraordinary. Death row prisoners often have tragic life histories, but very, very few capital petitioners have mitigation this compelling. If Irving Davis's lawyers had done their job, at least one juror would likely have voted against the sentence of death.

Pet'r's Am. Pet., ECF No. 165 at 86.

But the state courts reasonably concluded that his argument was flawed for four reasons. First, they found Davis's claimed history of suicide attempts, self-mutilation, low self-esteem, lack of self-worth, and sense of hopelessness, was overstated. *See* State Habeas R. (WR-61,445-02), ECF No. 167-3 at 9–16. Second, they observed the jury was made aware of the behavior of Davis's father. *See* State Habeas R. (WR-61,445-02), ECF No. 167-3 at 3–5. Third, they concluded Davis's claim he was a victim of repeated sexual abuse by at least four different caretakers and adults, including his father, starting when he was six years old and continuing until he was around

94

15 years old, was not true. *See* State Habeas R. (WR-61,445-02), ECF No. 167-3 at 6–7. Finally, they found Davis's claim that his extreme exposure to physical violence occurred within the context of traumatic neglect by his mother, and that she failed to take measures to protect him from his father's or brother's violence, was incredible. *See* State Habeas R. (WR-61,445-02), ECF No. 167-3 at 4–15.

Importantly, Davis's claim is undermined by the fact that he testified in his behalf and had free rein to go in the direction he wanted. *See United States v. Mullins*, 315 F.3d 449, 454 (5th Cir. 2002) ("The decision of whether to testify belongs to the defendant and his lawyer cannot waive it over his objection"). Davis spoke about his father's cruelty and abuse, highlighting specific events related to that issue. Rep. R. (2008) vol. 28 at 210–227. Davis could have expanded on the issue by going into even further detail of alleged abuse against him and others in his family. And he ignores the inconsistency between his current claim and the strategy employed at trial. *Yarborough*, 540 U.S. at 8 ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."). Trying to explain his actions as the product of a horrific childhood and dysfunctional family—thereby diverting attention away from personal responsibility—would have undermined what Davis hoped to achieve at trial.

Perhaps more importantly, when Davis went before the jury he did not blame his family circumstances for his behavior. Instead, Davis asked the jury to give him a death sentence. Rep. R. (2008) vol. 28 at 243. Davis's statement alone "is likely enough to require us to defer to the state court's 'no prejudice' determination." *See Luna v. Lumpkin*, 832 F. App'x 849, 853 (5th Cir.

2020); *Schriro*, 550 U.S. at 475–481 (rejecting an ineffective assistance of counsel claim where the defendant testified no mitigating evidence existed, instructed his attorney to present none, and told the sentencing court, "I think if you want to give me the death penalty, just bring it right on. I'm ready for it."). Davis's argument that his counsel provided ineffective assistance for failing to present more mitigating evidence is unavailing.

Finally, the mitigation special issue provides:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

Tex. Code Crim. Proc. art. 37.071, § 2(e)(1) (West). "This statute requires the jury to look at all of the evidence and not just evidence a juror might consider to be mitigating." *Luna v. State*, 268 S.W.3d 594, 610 (Tex. Crim. App. 2008) (citing *Scheanette v. State*, 144 S.W.3d 503, 508 (Tex. Crim. App. 2004)).

The evidence from the medical examiner showed that Davis beat and strangled Medina so badly that she could have died one of three ways: massive head injuries, asphyxiation from a knotted ligature around her neck, or a blow to the chest that ruptured her pulmonary artery and caused lethal internal bleeding. Rep. R. (2002) vol. 27 at 142–58. It then showed Davis cut off Medina's fingertips and lacerated her wrist with shears to avoid capture. Rep. R. (2002) vol. 27 at 7, 58, 62–63, 159–61.

Given the extent of Medina's injuries, additional evidence of Davis's dysfunctional family would likely not have persuaded a jury to return a life sentence. *See United States v. Bernard*, 762

F.3d 467, 476 (5th Cir. 2014) ("[G]iven the horrific nature of the crime, reasonable jurists could

not debate that the additional, cumulative evidence would in reasonable probability have

influenced the jury's balancing of aggravating and mitigating factors."); *Martinez v. Quarterman*,

481 F.3d 249, 259 (5th Cir. 2007) (holding that the unpresented mitigating evidence "was not so

compelling, especially in light of the horrific facts of the crime, that the sentencer would have

found a death sentence unwarranted"); *Miniel v. Cockrell*, 339 F.3d 331, 347 (5th Cir. 2003)

(holding petitioner not prejudiced "[w]hen we compare [petitioner's] violent history including the

cruel manner in which he killed [his victim] with the potential testimony of his family members

that centered on his childhood abuse and substance abuse").

Davis has failed to meet his burden of rebutting the state court's factual finding that his

counsel provided constitutionally effective assistance by clear and convincing evidence. Davis

has also failed to show that the Court of Criminal Appeals' decision involved an "unreasonable

application" of the *Strickland* standard. *Nobles v. Johnson*, 127 F.3d 409, 416 (5th Cir. 1997)

(quoting 28 U.S.C. § 2254(d)(1)). He is not entitled to relief on this claim.

## E.  DAVIS'S CLAIM THAT HIS TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO CHALLENGE THE PATHOLOGIST'S TESTIMONY IS PROCEDURALLY BARRED AND WITHOUT MERIT

Davis contends that his trial counsel at both trials were ineffective for failing to challenge

testimony of the pathologist, Dr. Corinne Stern, regarding her conclusion that Davis sexually

assaulted Medina. Pet'r's Am. Pet., ECF No. 165 at 86–98.[6] He claims that "[a]t trial, it was

undisputed that Davis killed [Medina], and it was undisputed that before he killed her, they had

---

[6]  Lumpkin asserted Davis's claim was time barred under 28 U.S.C. § 2244(d). Resp't's Second Am. Answer, ECF No. 170 at 101–106. However, Davis first raised this claim in his "Amended Petition for Writ of Habeas Corpus" filed on March 11, 2015—one day before the limitations ran. Pet'r's Am. Pet., ECF No. 18 at 66–67.

sexual relations. But it was disputed—and remains so to this day—whether the sexual contact was consensual." *Id*. at 86. He adds that "[t]he prosecution's main evidence it was not consensual was the testimony of pathologist Dr. Corinne Stern, the medical examiner who performed the autopsy." *Id*. at 87. He argues that Dr. Stern relied on "junk science" to reach her conclusion that vaginal abrasions and redness were evidence of nonconsensual sex:

> At Davis's 2008 capital resentencing, Dr. Stern testified that her opinion was that the victim had been sexually assaulted because her sexual contact with Davis was non-consensual; her conclusion of non-consent, in turn, rested squarely on her autopsy finding that the victim's vagina had abrasions and redness. . . . When asked what scientific evidence she relied on to reach her expert opinion that the sex was not consensual, she stated, "the evidence that we have is that she has some serious injuries to her vaginal mucosa. That's the scientific evidence we have." . . . She told the jury "Healthy consensual sex shouldn't leave injuries."

*Id*. at 85, 87.

In support of his argument, Davis provides a declaration from Dr. Lindsey Thomas, who he describes as "a nationally renowned forensic pathologist":

> There have been numerous articles published in the medical literature documenting the findings of injuries just like Ms. Medina's with sexual intercourse that is consensual. Dr. Stern was wrong in her testimony in light of the science available at the time of the trial, at the time of the resentencing, and even more so now.  . . .

> My opinion, to a reasonable degree of medical certainty, is that Dr. Stern's assertion that the abrasions and erythema of the vagina are inconsistent with consensual sex was unreliable and incorrect. The evidence that she relied on to conclude that the victim had been raped did not provide any support for her conclusion.

*Id*. at 91, 92 (quoting Dr. Thomas Decl., Ex. FF, ECF No. 112-34 at ¶¶ 3, 25).

### 1.  The Court of Criminal Appeals Determined the Evidence Was Sufficient to Support the Jury's Verdict

In his first appeal, Davis asserted the evidence was legally insufficient to support the jury's verdict on guilt. *Davis*, 2007 WL 1704071, at *1. He claimed it was inadequate to show he murdered Medina "while committing or attempting to commit aggravated sexual assault." *Id.*

> [Davis] argues that the State failed to prove the sexual assault element of the indicted capital murder as alleged in the indictment.  . . .  Dr. Stern opined . . . based on her autopsy that Medina's injuries were consistent with sexual assault, but she was not certain. Further, the testimony of Detective Vega . . . established consensual sex. At the time that Medina told [Davis] she would "cry rape," [Davis] according to Vega, killed Medina. In other words, the evidence shows a sequence of consensual sex, a cessation of consensual sex, and then the alleged killing—according to Detective Vega's accounting and according to the confession. For these reasons, [Davis] argues that the State has failed in its burden of proof regarding the sexual assault element (in the course of committing or attempt[ing] to commit aggravated sexual assault) of the offense of capital murder.

Appellant's Br. in First Direct Appeal at 49.

The Court of Criminal Appeals overruled the objection. *Davis*, 2007 WL 1704071, at *2. It reasoned the jury could have reasonably inferred Medina was sexually assaulted "[f]rom the evidence of Medina's injuries and the medical examiner's testimony about them." *Id*. Accordingly, "[v]iewing the evidence in the light most favorable to the verdict, [it held] that the jury could have found beyond a reasonable doubt that [Davis] murdered Medina during the course of committing or attempting to commit aggravated sexual assault." *Id*.

## 2.  Davis's Third State Writ Application

In his third state writ application, Davis alleged his trial counsel was ineffective for failing to challenge the pathology testimony of Dr. Stern that was erroneous and critical to the prosecution's case. State Habeas R. (WR-61,445-03), ECF No. 167-3 at 65–73.

The Court of Criminal Appeals reviewed the application and determined that Davis "had failed to satisfy the requirements of Article 11.071, § 5(a). Accordingly, [it] dismiss[ed] the

subsequent application as an abuse of the writ without considering the merits of the claims." *Ex parte Davis*, 2020 WL 1645017, at *2.

### 3.   Davis's New Evidence is Barred

Davis relies on a declaration from Dr. Thomas, prepared on October 11, 2017, to support Davis's claim that his counsel provided ineffective assistance when they purportedly failed to challenge Dr. Stern's testimony at his trials in 2002 and in 2008. Am. Pet., ECF No. 165 at 91–92; Dr. Thomas Decl., Ex. FF, ECF No. 112-34, at 8.

Review of a claim "adjudicated on the merits in State court proceedings . . . is limited to the record that was before the state court." *Pinholster*, 563 U.S. at 181. When a petitioner fails "to develop the factual basis of a claim in State court proceedings," a federal court may hold "an evidentiary hearing on the claim" to further develop it in only two limited scenarios. *Shinn*, 142 S. Ct. at 1734 (quoting 28 U.S.C. §§ 2254(e)(2)(A)(i), (ii)). "Either the claim must rely on (1) a 'new' and 'previously unavailable' 'rule of constitutional law' made retroactively applicable by [the Supreme] Court, or (2) 'a factual predicate that could not have been previously discovered through the exercise of due diligence.' " *Id*. (quoting 28 U.S.C. §§ 2254(e)(2)(A)(i), (ii)).

Dr. Thomas cited three studies available at the time of Davis's first trial in 2002 which concluded genital injuries like Medina's could occur during consensual sexual activities. Dr. Thomas Decl., Ex. FF, ECF No. 112-34 at 3–4. She cited three more articles available at the time of Davis's second trial. *Id.* at 4–5. She concluded, in her "opinion, to a reasonable degree of medical certainty, . . . Dr. Stern's assertion that the abrasions and erythema of the vagina are inconsistent with consensual sex was unreliable and incorrect. The evidence that she relied on to conclude that the victim had been raped did not provide any support for her conclusion." *Id*. at 7.

100

Davis does not assert his claim relies on a new constitutional rule, he does not rely on "a factual predicate that could not have been previously discovered through the exercise of due diligence," and he presented his ineffective assistance of counsel claim in his second state writ application. *See Shinn*, 142 S. Ct. at 1734.

Consequently, the Court is foreclosed from considering Davis's new evidence in assessing the reasonableness of the state court's decision to deny his ineffective assistance of counsel claim. *See id.*

### 4.  Davis's Counsel Did Challenge Dr. Stern's Testimony

Furthermore, Davis's counsel did challenge Dr. Stern's opinion that Medina was sexually assaulted on cross-examination during Davis's first trial. Rep. R. (2002) vol. 27 at 172–173. In response to their questioning, Dr. Stern acknowledged that the presence of vaginal injuries alone did not prove a lack of consent. Rep. R. (2002) vol. 27 at 172. But she reiterated her opinion that Medina was sexually assaulted based on *all* of the injuries Medina suffered—including the fatal injuries to her head, neck—not just the injuries she sustained in her vagina, and chest. Rep. R. (2002) vol. 27 at 172–173.

Additionally, in his fifth point of error in his first direct appeal, Davis argued the evidence was legally insufficient to support the jury's verdict on his guilt. *Davis*, 2007 WL 1704071, at *1. Specifically, he claimed the evidence was inadequate to show he murdered Medina "while committing or attempting to commit aggravated sexual assault." *Id.*

The Court of Criminal Appeals overruled the objection. *Id.* at *2. It reasoned the jury could have reasonably inferred Medina was sexually assaulted "[f]rom the evidence of Medina's injuries and the medical examiner's testimony about them." *Id.* Accordingly, "[v]iewing the evidence in

the light most favorable to the verdict, [it held] the jury could have found beyond a reasonable doubt that [Davis] murdered Medina during the course of committing or attempting to commit aggravated sexual assault." *Id*.

During Davis's second trial, Dr. Stern explained that Medina suffered multiple abrasions to her face; blunt-force trauma to her head, which resulted in severe internal head injuries, including a subarachnoid hemorrhage in her brain; multiple abrasions to her torso, including a large abrasion that was consistent with being struck with a pipe-shaped object; a particularly severe blow to the chest that bruised her heart and ruptured her pulmonary artery and filled her pericardial sac with blood; and strangulation. Rep. R. (2008) vol. 24 at 64–65, 69, 71–79, 85, 94–103; States Exs. (2008) 71, 278. She added she performed a speculum examination of Medina's "vagina, and in the mid-upper vaginal vault, or the opening of the vagina, she had multiple abrasions of the mucosa with surrounding erythema." Rep. R. (2008) vol. 24 at 90. She opined that Medina's vaginal injuries were consistent with penile penetration and that Medina had been sexually assaulted prior to her death. Rep. R. (2008) vol. 24 at 92.

When Defense counsel challenged Dr. Stern's opinion that Medina was sexually assaulted, she testified that, while she believed Medina's serious and painful vaginal injuries were not likely the result of consensual sex, she could not be certain those injuries were not caused by consensual sex. Rep. R. (2008) vol. 24 at 106, 128. Specifically, Dr. Stern testified:

> Q. But as far as the scientific evidence is concerned, you cannot tell us if this was consensual sex or not, can you?

> A. Not with a hundred percent certainty.

> Q. And you cannot tell us if this was -- this consensual sex took place two hours before these other injuries or two minutes before these other injuries?

A. That's correct.

Rep. R. (2008) vol. 24 at 128.

Davis's claim—that his counsel at both trials were ineffective for failing to challenge Dr. Stern's testimony—is not supported by the record and is, therefore, without merit. Furthermore, Davis's claim was dismissed by the Court of Criminal Appeals because he failed to satisfy the requirements of Texas Code of Criminal Procedure Article 11.071, § 5(a). *Ex parte* Davis, 2020 WL 1645017, at *1. Davis has not rebutted the Court of Criminal Appeals' "implicit factual finding" that his counsel provided constitutionally effective assistance, which is entitled to a "presumption of correctness," by clear and convincing evidence. *See Ford*, 910 F.3d at 235. Davis has also failed to show that the Court of Criminal Appeals' decision involved an "unreasonable application" of the *Strickland* standard. *See Nobles*, 127 F.3d at 418–19 (quoting 28 U.S.C. § 2254(d)(1)). Davis is not entitled to relief on this claim.

### F. THE STATE COURTS REASONABLY REJECTED DAVIS'S CLAIM THAT THE ADMISSION OF EVIDENCE OF HIS SATANISM AT HIS SECOND TRIAL VIOLATED HIS CONSTITUTIONAL RIGHTS

Davis contends that "[t]he state's theory relating [his] future dangerousness at his penalty retrial was that his religious affiliation [with the Church of Satan] demonstrated the probability that he would be a continuing threat to society." Pet'r's Am. Pet., ECF No. 165 at 98–111. He adds that the prosecution "therefore argued . . . that proof of Davis's religious affiliation was admissible, as long as [it] could demonstrate that Davis's religious group had engaged in or approved of violent activities." *Id.* at 98. He explains that in order to connect him with the Church of Satan, the prosecution offered as evidence his prison request to change his religious preference from

Buddhism to Satanism and Thaumaturgy,[7] his written request for items necessary to perform satanic rituals in his cell, books on Satanism seized from his prison cell, and a glimpse of the pentagram tattooed on his chest. *Id.* at 99. He adds that "[t]o establish that the Church of Satan is violent or advocates violence, the state's sole evidence came from Donald Vaughn Haley, a former employee of the Virginia prison system and various law enforcement offices," who had never before testified as an expert. *Id.* at 99, 101. He notes that Haley's "testimony was . . . limited to his amateur personal interpretation of primary Satanic writings." *Id.* at 103. He complains that "Haley's testimony that members of Satanic churches advocate human sacrifice, based on an amateur literalist reading of isolated passages from the satanic Bible and other texts, was . . . preposterous." *Id.* at 107. He maintains that "Haley's testimony [did] not meet any of the criteria of materiality required by the First and Eighth Amendments." *Id.* Moreover, he asserts that the Court of Criminal appeals made and objectively unreasonable determination of the facts:

> In upholding the introduction of Haley's testimony at Davis's punishment trial, the Texas Court of Criminal Appeals held on direct appeal, "some members of the satanic religion advocate violence, that satanic religious publications like the ones found in [Davis's] cell discussed 'rituals of destruction' for performing 'human sacrifice' on undesirable [and] obnoxious individual[s],' and that various people had committed murder and mutilation 'in the name of Satan.'" *Davis v. State*, 329 S.W.3d 798, 805 (Tex. Crim. App. 2010). This is an objectively unreasonable determination of the facts, because the state presented no evidence that the Church of Satan had ever committed or endorsed any acts of violence. Whether some individuals professing to believe in Satanism committed murder or other violent acts is irrelevant for the same reason that the fact that crimes have been perpetrated by individuals in the name of their Christian religion do not make evidence of a capital defendants Christianity admissible to prove future dangerousness.

*Id.* at 108–09 (alterations in original).

## 1.   Admission of Evidence of Religious Affiliation

---

[7] Davis claims he changed his religious preference back to Buddhism in 2015. *See* Pet'r's Am. Pet., ECF No. 165 at 99 n.12.

The First Amendment of the Constitution provides "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech." U.S. Const. amend. I. It "protects the right of all persons to associate together in groups to further their lawful interests." *Pro. Ass'n of Coll. Educators, TSTA/NEA v. El Paso Cty. Cmty. Coll. Dist.*, 730 F.2d 258, 262 (5th Cir. 1984) (citations omitted). It applies "to the States through the Fourteenth Amendment." *Bigelow v. Virginia*, 421 U.S. 809, 811 (1975) (citing *Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147, 160 (1939)).

In *Dawson v. Delaware*, the Supreme Court made it clear, however, that "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." 503 U.S. 159, 165 (1992). Instead, it "upheld the consideration . . . of evidence of racial intolerance and subversive advocacy where such evidence was relevant to the issues involved" in both capital and non-capital sentencing proceedings. *Id*. at 164–65. So, for example, in *United States v. Abel*, it held the Government could impeach a defense witness by showing that the witness and defendant—both members of the Aryan Brotherhood—were sworn to lie on behalf of each other. 469 U.S. 45, 48–49 (1984). Then in *Barclay v. Florida*, it held a sentencing judge in a capital case may consider "the elements of racial hatred" in the defendant's crime as well as "[the defendant]'s desire to start a race war." 463 U.S. 939, 948–49 (1983). Nevertheless, in *Dawson* it held the use of associational evidence violated the defendant's First Amendment rights where (1) both parties stipulated to the defendant's membership in the Aryan Brotherhood prison gang, but (2) the prosecution offered no evidence of the gang's violent tendencies relevant to sentencing.

*Dawson*, 503 U.S. at 162, 165. The *Dawson* Court, however, qualified its holding with an important caveat:

> Because the prosecution did not prove that the Aryan Brotherhood had committed any unlawful or violent acts, or had even endorsed such acts, the Aryan Brotherhood evidence was . . . not relevant to help prove any aggravating circumstance. In many cases, for example, associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society. A defendant's membership in an organization that endorses the killing of any identifiable group, for example, might be relevant to a jury's inquiry into whether the defendant will be dangerous in the future.

*Id*. at 166.

In *Fuller v. Johnson*, the Fifth Circuit considered the implications of *Dawson*. 114 F.3d 491 (5th Cir. 1997). It noted that at the punishment phase of the capital proceeding the State "did not merely stipulate that the defendant was in the Aryan Brotherhood. It [also] introduced evidence that the defendant was a member of a gang that had committed unlawful or violent acts, including homicides, multiple stabbings, drug dealing, and aggravated assaults." *Id.* at 498. The Fifth Circuit found this distinction significant and, accordingly, upheld the admission of such evidence, stating:

> A reasonable juror could conclude that membership in the Aryan Brotherhood is relevant to future dangerousness. *Dawson* established that a state may not employ a defendant's abstract beliefs at a sentencing hearing when those beliefs are not relevant to the issue being tried. In this case, however, Texas did not violate [the defendant]'s First Amendment rights because it introduced relevant evidence of his future dangerousness. The fact that [the defendant] was within his rights in joining the gang does not bar the use of relevant evidence at trial.

*Id*.

### 2.  Second Direct Appeal

In his second direct appeal, Davis argued the trial court erred when it allowed the State to present evidence that he "had become a Satanist while imprisoned on death row." *Davis*, 329 S.W.3d at 802–03. He specifically complained that the trial court blundered by admitting State's

"Exhibits 247, 248, and 285 through 301, permitting the testimony of state's expert witness Donald Haley, and requiring [him] to display to the jury the tattoo of a pentagram on his chest." *Id.* at 803. He raised "both constitutional and statutory claims, arguing that the trial court violated the First Amendment to the United States Constitution and Rules 401 and 403 of the Texas Rules of Evidence." *Id.*

The Court of Criminal Appeals overruled the objection. *Id.* at 806. It explained evidence of religious beliefs "may be admissible if it is shown to be relevant to the issues involved in the case." *Id.* (citing *Mason*, 905 S.W.2d at 576–77). It added in a capital murder trial, "[f]uture dangerousness is an issue that is relevant to the sentencing stage." *Id.* (citing *Mason*, 905 S.W.2d at 577). It further explained, '[i]n order to prove the relevance of a defendant's membership in an organization or group, the state must show: (1) proof of the group's violent and illegal activities, and (2) the defendant's membership in the organization." *Id.* (citing *Mason*, 905 S.W.2d at 577).

The Court of Criminal Appeals noted that the State introduced prison records showing Davis "had identified himself as a Satanist since 2005." *Id.* It observed that Haley testified some members of the Satanic religion advocated violence. *Id.* It further noted that "[a]lthough [Davis's expert] Melton disagreed with Haley's definition of the term 'destroy' and his description of Satanic philosophy, Melton acknowledged that in some instances people had been killed in the name of satanism." *Id.*; *see also* Rep. R. (2008) vol. 27 at 251. It concluded that "[i]t was within the zone of reasonable disagreement for the trial court to decide that the evidence of Satanism was relevant to the issue of future dangerousness and outside the protection of the First Amendment." *Id.* at 805–806.

The Court of Criminal Appeals then observed:

> In the instant case, [Davis] brutally raped, beat, and strangled a fifteen-year-old girl and then cut off her fingertips to remove potential DNA evidence. The state presented evidence that, in the past, [Davis] had displayed aggressive behavior, had been in trouble at school, and had been placed on probation for a theft offense in North Carolina. Defense counsel argued, "Maybe he wasn't a good person back then, but he's a good person now," pointing out that "he's been trying to do the right things" since he was incarcerated and that he had no documented incidents of violence in prison. The evidence that [Davis] became a Satanist while in prison helped to rebut that defense argument.

*Id*. at 806.

The Court of Criminal Appeals concluded "the trial court did not abuse its discretion in admitting this evidence." *Id*.

### 3. The Court of Criminal Appeals Reasonably Rejected Davis's Claim that Evidence of his Satanism Violated His Constitutional Rights

Davis suggests that, as in *Dawson*, the evidence of his interest in Satanism was not connected in any way to his crime, and thus its sole relevance was to show that his beliefs were morally reprehensible. Pet'r's Am. Pet., ECF No. 165 at 105–06. As such, he argues, the admission of the evidence of Satanism violated his First Amendment rights and his conviction must be reversed. *Id.* at 111. Davis further claims the Court of Criminal Appeals unreasonably applied *Dawson* or unreasonably determined facts unsupported by the evidence presented in the state court proceedings. *Id.* at 108–09.

The jury was asked to consider "whether there is a probability that [Davis] would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. Ann. art. 37.071, § 2(b)(1) (West).

As evidence of Davis's continuing threat to society, the State offered books, writings, and drawings that were found in Davis's death-row prison cell, which suggested he was involved with the Church of Satan. Rep. R. (2008) vol. 27 at 36–47; State's Exs. 285–91, 297–300. It also

submitted violent drawings by Davis of women with slashed throats, bound and gagged, and covered in blood. Rep. R. (2008) vol. 27 at 42–44, 47–48, 60–61; State's Exs. 276, 294–296, 301. The State then presented the testimony of Haley, who read a passage from *The Satanic Bible* of the Church of Satan, which suggested that human sacrifice could be used "to dispose of a totally obnoxious and deserving individual," meaning "[a]nyone who had unjustly wronged you or has gone out of his way to hurt you." Rep. R. (2008) vol. 27 at 200–01. Haley claimed Rule Eleven of LaVey's Eleven Satanic Rules of the Earth shows that if a person "annoys you, [you may] treat him cruelly." Rep. R. (2008) vol. 27 at 204. And if the person does not stop his annoying behavior, you may "destroy" him. Rep. R. (2008) vol. 27 at 204. On cross-examination, Haley asserted the brutal way Davis murdered Medina was consistent with the term "destroy," and that "destroy" meant "to die." Rep. R. (2008) vol. 27 at 210–211.

Defense witness Melton was presented to rebut Haley's testimony. Melton claimed that passages in *The Satanic Bible* should not be taken literally, and he opined that LaVey's Eleven Satanic Rules of the Earth and Nine Satanic Statements were non-violent in nature. Rep. R. (2008) vol. 27 at 253, 269–72. But Melton conceded that an individual reading *The Satanic Bible* could take the words literally. Rep. R. (2008) vol. 27 at 253. And he further conceded that people had been killed "[i]n the name of satanism." Rep. R. (2008) vol. 27 at 251.

Davis testified that Satanism did not advocate violence. Rep. R. (2008) vol. 28 at 117. He explained *The Satanic Bible* lays out spells—compassion spells, destruction spells, and lust spells. Rep. R. (2008) vol. 28 at 202. He claimed he used his "spells for compassion." Rep. R. (2008) vol. 28 at 202. He said Rule Eleven of the Satanic Rules of the Earth provided "If someone bothers you, ask him to stop. If he does not stop, destroy him." Rep. R. (2008) vol. 28 at 204–05. He maintained

"destroy" in this context did not mean you actually hurt another, but you could defend yourself "through your words." Rep. R. (2008) vol. 28 at 205.

As a result—in contrast with *Dawson*—the State combined evidence of Davis's Church of Satan involvement, Haley's literalist reading of *The Satanic Bible*, and Melton's concession that people had been killed in the name of Satanism to show that Satanism encouraged its adherents to engage in violence against those who they believed had wronged them. Hence, the State presented evidence which was relevant to Davis's future dangerousness. Moreover, considering this evidence, the Court of Criminal Appeals applied *Dawson* and reasonably found that there was no First Amendment violation.

Assuming that the state trial court's admission of evidence—which established Davis's brief association with the Church of Satan and Satanism—violated his First Amendment rights, the error did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638. Indeed, where—as here—a defendant had the opportunity to cross-examine the State's expert and present rebuttal testimony through his own expert, the admission of the State's expert testimony did not render his trial fundamentally unfair. *Barefoot v. Estelle*, 463 U.S. 880, 898 (1983), *superseded by statute on other grounds as recognized in Slack v. McDaniel*, 529 U.S. 473 (2000)). Further, Davis had the opportunity to testify the Church of Satan advocates against violence. Rep. R. (2008) vol. 28 at 117. Finally, as discussed repeatedly throughout this memorandum opinion and order, Davis was convicted on overwhelming evidence that he sexually assaulted, murdered, and dismembered 15-year-old Medina. Consequently, Davis faced an insurmountable sum of aggravating evidence. Based on that evidence alone, the jury could reasonably conclude there was a probability that Davis would commit future criminal acts of

violence that would constitute a continuing threat to society. *Cf. Johnson v. Cockrell*, 301 F.3d 234, 239 (5th Cir. 2002) ("[I]n light of the overwhelming evidence . . . there was no prejudice, even if we assume [there was a constitutional error].").

Furthermore, "when a state court has applied *Chapman*, § 2254(d)(1) requires a habeas petitioner to prove that the state court's decision was unreasonable." *Brown*, 142 S. Ct. at 1525. To meet this burden, "a petitioner must persuade a federal court that no 'fairminded juris[t]' could reach the state court's conclusion under [the Supreme] Court's precedents." *Id.* (quoting *Davis*, 576 U.S. at 269).

Davis has not met his burden of showing that the Court of Criminal Appeals decided a federal issue contrary to clearly established federal law as determined by the Supreme Court, or that the state court's decision was based on an unreasonable determination of the facts considering the record. *See Harrington*, 562 U.S. at 100–01. He is not entitled to relief on this claim.

## G. THE COURT OF CRIMINAL APPEALS REASONABLY DETERMINED THAT THE TRIAL COURT DID NOT ERR IN ADMITTING DAVIS'S CONFESSION

Davis maintains his constitutional rights were violated because the trial court erroneously admitted his confession at his first trial. Pet'r's Am. Pet., ECF No. 165 at 111–115. He notes he testified at his suppression hearing that the police ignored his requests for an attorney. *Id.* at 112–113 (citing Rep. R. (2002) vol. 4 at 153, 155, 157, 168). He adds Detective Licon told him, "you don't need a lawyer unless you're guilty." *Id.* at 113 (citing Rep. R. (2002) vol. 4 at 156–57). He claims when he spoke to his mother on the phone, he told her that the police would not provide him with an attorney. *Id.* (citing Rep. R. (2002) vol. 4 at 168). He observes his mother, Carol Davis, testified that Detective Licon informed her over the phone that her son had asked for an attorney.

*Id.* (citing Rep. R. (2002) vol. 4 at 143). Davis also claims he "did not sign a confession, but signed an empty piece of paper . . . which turned out to be the second page of the written statement." *Id.* (citing Rep. R. (2002) vol. 4 at 171). He argues his "conviction should be reversed because it was secured on the basis of a confession that, under the United States Constitution, was unlawfully presented to the jury." *Id.* at 115.

### 1. Right to Counsel

In *Miranda v. Arizona*, the Supreme Court held a person subjected to custodial interrogation by law enforcement has (1) the right to remain silent and (2) the right to have an attorney present during an interrogation. 384 U.S. 436, 439–40 (1966). It explained these rights were meant to protect against compelled self-incrimination by acknowledging "the compulsion inherent in custodial surroundings." *Id.* at 458. In *Edwards v. Arizona*, it added that when a suspect invokes his Fifth Amendment right to counsel, the police may not engage in a custodial interrogation unless (1) the suspect initiates further conversations with police or (2) has an attorney present. 451 U.S. 477, 484–85 (1981). It also concluded statements obtained in violation of a suspect's *Miranda* rights must be suppressed. *Id.* at 485.

In *Oregon v. Mathiason*, however, the Supreme Court made it clear that these protections did not apply where a defendant was not in custody. 429 U.S. 492, 494–95 (1977). It explained *Miranda* did not apply because:

> there is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way. He came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a ½-hour interview respondent did in fact leave the police station without hindrance. It is clear from these facts that Mathiason was not in custody "or otherwise deprived of his freedom of action in any significant way."

*Id.* at 495.

### 2. Davis's Motion to Suppress

Davis moved to suppress any oral or written statements made by him before his trial. Rep. R. vol. 4 at 14. He maintained he was already a suspect and under arrest at the time of his interview. Rep. R. vol. 4 at 183. He said he asked for an attorney—as he had on three prior occasions when he was in trouble with the law. Rep. R. vol. 4 at 183–84. He further claimed he was never "free to leave from the minute they took him into custody." Rep. R. vol. 4 at 183–84.

At a hearing on the motion, Detective Nanos testified that he went to Davis's house on the morning of June 5, 2001, and explained to Davis that he had some questions for him. *Davis*, 2007 WL 1704071, at *4. Detective Nanos said he obtained Davis's voluntary agreement to accompany him to the police station, but before they left, he read Davis his *Miranda* rights. *Id.* Detective Nanos explained that he did not handcuff Davis and when they arrived at the station, he again advised Davis of his *Miranda* rights and got Davis's written acknowledgment of those rights. *Id.* Detective Nanos observed that he took Davis outside the police station to smoke a cigarette while they waited for other detectives to arrive. *Id.*

Detective Licon testified that when he arrived at the station he met with Davis, who was not handcuffed. *Id.* Detective Licon said that he showed Davis the form he had previously signed acknowledging his *Miranda* rights and asked Davis if he understood his rights. *Id.* Detective Licon claimed that he obtained Davis's agreement to waive those rights and speak with him. *Id.* He explained that they began to discuss Davis's whereabouts the night before and his interaction with Medina. According to Detective Licon, Davis was free to leave, had he wished to do so. *Id.*

Detective Vega testified that when she entered the interview room and started asking Davis questions, Davis became extremely nervous and asked to go home for an hour to see his mother because he was concerned about her health. *Id.*

Detective Licon said he then asked Davis, "Well, what are you saying at this point? Do you want to terminate the interview? Is it that you want it to cease, to stop?" *Id.* Detective Licon claimed Davis answered, "No," that he just wanted to get this over with. *Id.* Detective Licon explained he called Davis's mother on the telephone and allowed Davis to speak with her. *Id.* Detective Licon then testified that after Davis finished speaking with his mother, he agreed to continue the interview and confessed to killing Medina. *Id.*

Detective Nanos said he stopped Davis to advise him of his *Miranda* rights once again. *Id.* Detective Nanos claimed he obtained Davis's agreement that he understood his rights, waived them, and would give a written statement. *Id.*

The trial court found that Davis was not in custody at the time he made the oral and written statements. *Id.* at *5. It further found that Davis was not coerced, threatened, or made promises in exchange for his statement. *Id.* It also found Davis was coherent and understood what was happening while giving his statement. *Id.* It concluded that Davis had been advised of his rights—although he was not in custody—and had intelligently and voluntarily waived them. *Id.*

### 3. Davis's First Direct Appeal

In his first direct appeal, Davis argued the trial court should have granted his motion to suppress his oral and written confessions. *Davis*, 2007 WL 1704071, at *3. He claimed the trial court erred in admitting his confession at trial because the police officers should have terminated

his interview when he told them he wanted to go home. *Id*. He argued the officers were obligated to " 'scrupulously honor' [his] invocation of *Miranda* rights." *Id.*

The Court of Criminal Appeals overruled the objection. It explained "[a] person is in 'custody' for *Miranda* purposes 'if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest.' " *Id.* at *3 (citing *Dowthitt*, 931 S.W.2d at 254). It concluded, after reviewing the record, that Davis "was not in custody at the time his statements were made." *Id.* at *5. And because Davis "was not in custody, law enforcement officials had no obligation under *Miranda* to scrupulously honor a request to terminate questioning." *Id.* (citing *Dowthitt*, 931 S.W.2d at 257).

### 4.  The State Court's Findings Are Presumed Correct

Davis's assertion that he was in custody—and the protections of *Miranda* applied—is based on testimony presented by his counsel at his hearing on his motion to suppress. Pet'r's Am. Pet., ECF No. 165 at 114–115.

Following the hearing, the trial court found—"based on the evidence presented"—that Davis was not under arrest at the time he gave his confession. Rep. R. (2002) vol. 4 at 189. Moreover, the trial judge added:

> [I]n evaluating all of the evidence and the witnesses that came before me my job is to evaluate the credibility of the witnesses and I find that the greater weight of the credible evidence shows that the Defendant did not ask for the attorney and thus he was not deprived of his right to counsel. I find that he intelligently and knowingly waived any rights and that the statement is admissible.

Rep. R. (2002) vol. 4 at 189.

A state trial judge is afforded great deference in making credibility determinations based on the statements and demeanor of witnesses. *Pippins v. Dretke*, 434 F.3d 782, 792 (5th Cir. 2005)

115

("A trial court's credibility determinations made on the basis of conflicting evidence are entitled to a strong presumption of correctness and are virtually unreviewable by the federal courts.") (internal quotations and citations omitted). Moreover, factual determinations made by a state court enjoy a presumption of correctness which a petitioner can rebut only "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Clark*, 457 F.3d at 444.

Davis offers only his previously rejected hearing testimony to rebut the presumption of correctness afforded the state court's findings. He has accordingly not met his burden of providing clear and convincing evidence which shows that the trial court erred in denying his motion to suppress. *See Pippin*, 434 F.3d at 792.

As a result, the Court finds the denial of Davis's claim by the state courts was not objectively unreasonable. *See id.* The Court further finds Davis is not entitled to relief on this claim.

## H. THE STATE COUTS REASONABLY REJECTED DAVIS'S CLAIM THAT HIS COUNSEL WERE INEFFECTIVE WHEN THEY FAILED TO REQUEST ADDITIONAL PEREMPTORY CHALLENGES AT HIS FIRST TRIAL

Davis asserts his trial counsel rendered ineffective assistance at his first trial during voir dire. Pet'r's Am. Pet., ECF No. 165 at 115–117. He notes prospective "Juror Castillo stated . . . that he expected the defense to put on a case, imposing on the defense a burden it did not have and demonstrating his inability to presume Davis['s] innocence." *Id.* at 116. He adds prospective "Juror Sigala stated that she could not consider a sentence of probation if she found the defendant guilty of a lesser included murder charge." *Id.* He further notes his counsel challenged Castillo and Sigala for cause—but his challenges were denied. *Id.* He explains his counsel requested additional peremptory challenges, but the trial court denied the requests as premature because both parties

would exercise their peremptory challenges at the end of individual voir dire. *Id.* at 115. He says both sides exercised their peremptory challenges at the end of voir dire, but his counsel did not renew the request for additional peremptory challenges. *Id*. at 116. He adds:

> Both of these jurors served on Davis's first trial where he was found guilty even though both demonstrated an inability to follow the law. Trial counsel's failure to preserve this error for appeal was ineffective, and Davis's conviction for capital murder must be reversed.

*Id*. at 116–17.

### 1.   Right to Impartial Jurors

"The constitutional standard of fairness requires that a defendant have 'a panel of impartial, 'indifferent' jurors.' " *Murphy v. Florida*, 421 U.S. 794, 799 (1975) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). "*Voir dire* examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges." *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991). The trial court is granted broad discretion in conducting voir dire limited only by the requirement that the criminal defendant be afforded due process. *Id*. at 423, 425–26. "[A]bsent 'special circumstances' that create a particularly compelling need to inquire into racial prejudice, the Constitution leaves the conduct of *voir dire* to the sound discretion of state trial judges." *Turner v. Murray*, 476 U.S. 28, 38 n.12 (1986).

### 2.   Davis's First Direct Appeal

In his first direct appeal, Davis asserted the trial court erred in denying his challenges for cause for Castillo and Sigala. *Davis*, 2007 WL 1704071, at *2.

The Court of Criminal Appeals overruled the objection. *Id*. It explained that in order for Davis to show harm from the trial court denying his challenges for cause, the record must show he:

(1) exhausted his peremptory challenges, (2) made a request for more peremptory challenges that was denied, (3) exercised a peremptory challenge against the complained-of juror (if he had a peremptory strike available to do so), and (4) identified an objectionable juror who served on the jury.

*Id.* (citation omitted). It observed the record showed Davis "did not use a peremptory strike on either Castillo or Sigala, and he had available strikes with which to do so." *Id.* (citation omitted). Moreover, "he did not request additional strikes after he exercised his peremptory challenges." *Id.* (emphasis omitted). Consequently, it concluded that Davis "was not harmed by the trial court's failure to grant his challenges for cause." *Id.*

### 3. Davis's First State Writ Application

In his first state writ application, Davis claimed he "did not receive effective assistance of counsel at the guilt/innocence phase because trial counsel did not preserve error when he came to challenging jurors for cause." State Habeas R. (WR-61,445-01) at 21.

The trial court entered the following findings in response to this claim:

43. Venireperson Jerry Castillo gave equivocating responses when asked by the parties if he would require Davis to actively present a defense at trial.

44. Castillo told the prosecutor that he would not expect Davis to testify or present a defense, and would not hold his failure to do so against him.

45. Castillo told defense counsel that he would expect Davis to present a defense case.

46. Defense counsel challenged Castillo for cause because Castillo indicated that he would require Davis to present an active defense case.

47. This Court denied Davis's for-cause challenge to Castillo.

48. Defense counsel did not use a peremptory challenge against Castillo.

49. Jerry Castillo sat as a juror in this case.

50. Davis did present a defense case at trial.

118

51. Venireperson Yzela Sigala gave equivocating responses when asked if she could consider the full range of punishment for the lesser-offense of murder.

52. Sigala told the prosecutor that she could consider the full range of punishment—including the minimum of five years' probation—if Davis was found guilty of the lesser-offense of murder.

53. Sigala told defense counsel that she could imagine a set of facts where she would not consider giving probation to someone convicted of murder.

54. This court denied Davis's for-cause challenge to Sigala.

55. Defense counsel did not use a peremptory challenge against Sigala.

56. Sigala sat as a juror in this case.

57. Davis was found guilty of capital murder, not murder, so a sentence of probation was not an option.

58. Trial counsel did not request additional peremptory challenges or identify an objectionable venireperson who sat on the jury.

State Habeas R. (WR-61,445-01) at 180–181. The trial court then concluded Davis could not show

he was prejudiced by his counsel's failure to preserve the purported error:

31. Because venirepersons Castillo and Sigala vacillated regarding their ability to follow the law, the Court of Criminal Appeals (as the reviewing court on direct appeal) would be required to defer to this Court's judgment by upholding this Court's denial of trial counsel's for-cause challenges to Castillo and Sigala. *See Brown v. State*, 913 S.W.2d 577, 578 (Tex. Crim. App. 1996) (when a prospective juror vacillates or equivocates on his ability to follow the law, the reviewing court must defer to the trial court's judgment with respect to its denial of a challenge for cause to that juror).

32. Because the Court of Criminal Appeals is bound, on direct appeal, to defer to this Court's decision to deny the for-cause challenges to venirepersons Castillo and Sigala, the outcome of the direct appeal would not have changed even if Davis's trial counsel had preserved error with respect to this Court's denial of his for-cause challenges to the identified venirepersons. *Brown*, 913 S.W.2d at 580.

34. Because this Court's denial of trial counsel's for-cause challenges to the two vacillating jurors is effectively unreviewable on direct appeal, Davis cannot prove his ineffective-assistance claim because he cannot affirmatively show that he was prejudiced by counsel's failure to preserve error for direct appeal. [*Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).]

State Habeas R. (WR-61,445-01) at 190–91.

### 4. The Court of Criminal Appeals Reasonably Concluded Davis's Counsel Provided Effective Assistance

Davis provided two statements from the record by Castillo and Sigala without providing full context, claimed they could not follow the law, and concluded a reversal of his conviction was warranted. Pet'r's Am. Pet., ECF No. 165 at 116–17. But Castillo gave vacillating responses on whether he believed the defendant was required to present a case—not on his ability to follow the law. Rep. R. (2002) vol. 9 at 104. And Sigala equivocated on the issue of probation. Rep. R. (2002) vol. 14 at 123. Sigala said she would be able to consider probation as an appropriate sentence in a case like Davis's, but could imagine a set of facts where she would not consider probation. Rep. R. (2002) vol. 14 at 123–24. Davis offered nothing to show that the trial court erred in denying his challenges for cause, let alone that his trial counsel's failure to preserve error resulted in prejudice. *See Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (rejecting as conclusory a claim that trial counsel failed to preserve error because petitioner did not assert any prejudice).

It is clear from the trial court's findings that Davis would not have prevailed on appeal. The Court of Criminal Appeals accordingly adopted the trial court's findings and conclusions. *Ex parte Davis*, 2014 WL 969802, at *1. It then denied Davis relief. *Id*.

Davis has failed to meet his burden of rebutting by clear and convincing evidence the Court of Criminal Appeals' factual finding that he was not prejudiced by counsel's failure to preserve

error for direct appeal—and that his counsel provided constitutionally effective assistance. Davis

has also failed to show that the Court of Criminal Appeals' decision involved an "unreasonable

application" of the *Strickland* standard. *Nobles*, 127 F.3d at 416 (quoting 28 U.S.C. § 2254(d)(1)).

Davis is not entitled to relief on this claim.

## I.   THE STATE COURTS REASONABLY REJECTED DAVIS'S CLAIM THAT HIS COUNSEL WERE INEFFECTIVE DURING THE VOIR DIRE OF HIS SECOND TRIAL

Davis asserts his trial counsel rendered ineffective assistance at his resentencing trial

during voir dire. Pet'r's Am. Pet., ECF No. 165 at 117–19. Specifically, he claims his "[t]rial

counsel ineffectively relinquished peremptory challenges against objectionable jurors by failing to

require that each eligible juror be passed for peremptory challenge first by the prosecution." *Id.* at

117. He explains:

> Prior to Davis's penalty phase retrial, defense counsel agreed in writing with the prosecuting attorney and the trial judge not to make the state exercise its peremptory challenges first as required by Texas Code of Criminal Procedure Article 35.13. Instead, counsel consented to exercise Davis's strikes "independently," or without knowing beforehand which members would be struck by the prosecution. This method of blind strikes is permitted by Texas law and is the typical procedure in criminal actions other than capital murder. Tex. Code Crim. Proc. Arts. 35.25, 35.26. The procedure is different for death penalty cases to provide defendants with an extra level of procedural fairness, given the grave consequences which may follow from his conviction. Davis's counsel gave up that benefit without getting anything in return. Attorney Macias performed ineffectively by waiving, and advising Davis to approve the waiver of, this important tactical advantage.

*Id.* at 117–18. He claims his defense counsel requested additional peremptory challenges at the end

of the jury selection process for use against seven objectionable venire members. *Id.* at 118. He

contends "[i]f counsel had not agreed to a jury selection procedure permitting blind strikes, [he]

would have had at least one remaining peremptory challenge to exercise against an objectionable

juror because one of its blind strikes was used against the perspective [sic] juror also struck by the prosecution." *Id*. He argues, "[a]s a result of that waiver, the jury which sentenced Davis to death included at least one juror who could have been struck as objectionable by defense counsel if they had not waived Davis's statutory right, demonstrating prejudice under the *Strickland* standard." *Id*. at 119.

### 1.  Challenges to Potential Jurors

"In non-capital cases . . ., the party desiring to challenge any juror peremptorily shall strike the name of such juror from the list furnished him by the clerk." Tex. Code Crim. Proc. Ann art. 35.25 (West). The clerk will then "call off the first twelve names on the lists that have not been stricken." Tex. Code Crim. Proc. Ann art. 35.26(a) (West). Under this procedure, "[a] trial court has the discretion to allow the parties to retract and reassign their peremptory challenges if the pool of potential jurors changes after the parties have already exercised their peremptory challenges." *Rivera v. State*, 639 S.W.3d 280, 284 (Tex. App.—Houston [1st Dist.] 2021, pet. ref'd).

In capital cases, a juror "shall be passed for acceptance or challenge first to the state and then to the defendant. Challenges to jurors are either peremptory or for cause." Tex. Code Crim. Proc. Ann. art. 35.13 (West); *see also Rocha v. State*, 16 S.W.3d 1, 6 (Tex. Crim. App. 2000). "In a capital case . . ., the court may direct that two alternate jurors be selected and that the first fourteen names not stricken be called off by the clerk. The last two names to be called are the alternate jurors." Tex. Code Crim. Proc. Ann art. 35.26(b) (West). Under this procedure, "the defendant must exercise peremptory challenges upon the examination of individual prospective jurors without the opportunity to evaluate the panel as a group." *Janecka v. State*, 739 S.W.2d 813, 833 (Tex. Crim. App. 1987). But a trial judge has the discretion "to permit the exercise of

challenges for cause by both sides before moving on to any use of peremptory challenges." *Bigby v. State*, 892 S.W.2d 864, 891 (Tex. Crim. App.1994) (White, J., concurring, joined by McCormick, P.J., and Miller, Overstreet, and Maloney, JJ.); *see also Valdez v. State*, No. AP-77,042, 2018 WL 3046403, at *30 (Tex. Crim. App. June 20, 2018) ("Six years later, the Court re-examined its decision in *Bigby*, noting that five members of this Court in a concurring opinion expressed their belief that the fairest and most objective interpretation of Article 35.13 provides trial judges the discretion during voir dire to permit the exercise of challenges for cause by both sides before moving on to any use of peremptory challenges.") (quotations omitted). "In other words, a trial court has the discretion to decide (1) whether the State must voice both a challenge for cause or a peremptory challenge before the defendant, or (2) that both sides issue any challenges for cause before the State first lodges a peremptory challenge." *Hughes*, 24 S.W.3d at 841.

### 2. Davis's Second Direct Appeal

In his second direct appeal, Davis asserted the trial court improperly denied his challenge for cause against venire member Sharon Ann Neumann. *Davis*, 329 S.W.3d at 806–807. Davis claimed Neumann was biased because she "was uncomfortable with Satanism" and she "described the religion as evil and contrary to everything [she] believe[d]." *Id.* at 807 (alterations in original).

The Court of Criminal Appeals overruled the objection. *Id.* at 813. It explained, "[b]efore venire members may be excused for cause, the law must be explained to them, and they must be asked whether they can follow that law, regardless of their personal views." *Id.* at 807 (citation omitted). It added "[t]he proponent of a challenge for cause has the burden of establishing . . . the venire member understood the requirements of the law and could not overcome his or her

prejudice well enough to follow the law." *Id*. (citation omitted). It also said it gave "a trial court's ruling . . . considerable deference because the trial judge is in the best position to evaluate a venire member's demeanor and responses." *Id.* (citation omitted). It found "Neumann ultimately stated that she could follow the law, regardless of her personal views." *Id*. at 808. Hence, it concluded Davis failed to meet his burden of showing Neumann could not overcome her prejudice well enough to follow the law—and the trial court did not abuse its discretion when it denied Davis's challenge for cause. *Id*. at 813.

### 3. Second State Habeas Corpus Application (WR-61,445-02)

In his second state writ application, Davis claimed his trial counsel provided ineffective assistance when they relinquished peremptory challenges against objectionable jurors by failing to require the State to make its peremptory challenges first. State Habeas R. (WR-61,445-02) at 45–46.

The state trial court entered findings of fact and conclusions of law on this issue:

333.   The record reflects that . . . an "Agreed Procedure for Jury Selection" was filed in this case.

334.   The jury-selection-procedure agreement was signed by [Davis] himself, the prosecutor, Attorney Macias, and the Honorable Judge Guadalupe Rivera.

335.   In the agreement, [Davis] affirmatively agreed to a jury-selection procedure in which the parties would independently make their peremptory strikes after the requisite number of jurors (46) had been qualified.

336.   [Davis] fails to provide any credible evidence to support his assertion that trial counsel ineffectively waived, or advised him to waive, the jury-selection procedure specifically set forth in Tex. Crim. Proc. Code art. 35.13.

337.   [Davis] has failed to attest or testify that although he signed and approved the jury-selection procedure used in his case, he did so based on a lack of understanding or on trial counsels' bad advice.

338.   The record reflects that the same procedure was followed during [Davis's] punishment retrial.

339.   The record reflects that only one death-qualified juror, Sharon Ann Neumann, juror number 16, was struck by both the State and the defense.

340.   The record reflects that trial counsel selected a jury-selection procedure that has been approved by the Court of Criminal Appeals in *Hughes v. State*, 24 S.W.3d 833, 841 (Tex. Crim. App.), *cert. denied*, 531 U.S. 980, 121 S. Ct. 430, 148 L.Ed.2d 438 (2000).

341.   [Davis] has failed to present any credible evidence to support his assertion that trial counsel selected the jury-selection procedure employed in the retrial ". . . without realizing any plausible strategic or tactical advantage in return."

342.   Any decision to employ a jury-selection method that reserves peremptory strikes until after the requisite number of jurors have been qualified was reasonable trial strategy in that it allowed [Davis] to evaluate the qualified panel as a whole in selecting the most desirable jurors and minimized the risk that [he] would have been forced to accept a truly objectionable juror because he had prematurely used his strikes on less objectionable jurors.

343.   The record reflects that when faced with a choice as to the method of jury selection, [Davis] affirmatively chose, as evidenced by his own signature, the jury-selection method he now complains of.

344.   [Davis] has failed to demonstrate that trial counsel rendered deficient performance in using the jury-selection method employed in [Davis's] punishment retrial.

345.   [Davis] has failed to demonstrate that he suffered prejudice as a result of trial counsel's decision to use . . . the jury-selection method employed in [Davis's] punishment retrial.

State Habeas R. (WR-61,445-02), ECF No. 167-3 at 22–23. It concluded that Davis failed to meet his burden of proving his trial counsel rendered deficient performance by using the jury-selection process employed in his punishment retrial. State Habeas R. (WR-61,445-02), ECF No. 167-3 at 33. It additionally concluded that Davis "failed to show that he suffered prejudice as a result of trial

counsel's decision to use the jury-selection method employed in this case." State Habeas R. (WR-61,445-02), ECF No. 167-3 at 33.

The Court of Criminal Appeals denied Davis relief based on the trial court's findings and conclusions and its own review of the record. *Ex parte Davis*, 2014 WL 969802, at *1.

### 4.  The Court of Criminal Appeals Reasonably Concluded Davis's Counsel Provided Effective Assistance

"Peremptory challenges are not of constitutional origin." *Gray v. Mississippi*, 481 U.S. 648, 663 (1987) (collecting cases). They are not required by the Constitution; "trial by an impartial jury is all that is secured." *Stilson v. United States*, 250 U.S. 583, 586 (1919). "They are a means to achieve the end of an impartial jury." *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988). "Because peremptory challenges are a creature of statute and are not required by the Constitution, . . . it is for the State to determine the number of peremptory challenges allowed and to define their purpose and the manner of their exercise." *Id*. at 89 (collecting cases).

Davis claims "multiple jurors served who would not have served if the defense had peremptory challenges to exclude them. If counsel had not agreed to a jury selection procedure permitting blind strikes, the defense would have had at least one remaining peremptory challenge to exercise against an objectionable juror." Pet'r's Am. Pet., ECF No. 165 at 118. He does not explain how they were objectionable. Moreover, he does not suggest he did not receive a trial by an impartial jury. *Ross*, 487 U.S. at 86–88.

Davis has failed to meet his burden of rebutting—by clear and convincing evidence—the Court of Criminal Appeals' factual findings that (1) his trial counsel did *not* render deficient performance by agreeing to the jury-selection process employed in his punishment retrial, and (2) he did not suffer prejudice as a result of trial counsels' decision to use the jury-selection method

126

employed in his punishment retrial. Consequently, Davis has also failed to show that the Court of Criminal Appeals' decision to deny him relief involved an "unreasonable application" of the *Strickland* standard. *Nobles*, 127 F.3d at 416 (quoting 28 U.S.C. § 2254(d)(1)). Davis is not entitled to relief on this claim.

## J. THE STATE COURTS REASONABLY REJECTED DAVIS'S BATSON CLAIMS

Davis alleges that the State improperly exercised peremptory strikes on African American venire members—Walter Lee Murrell and Ericka Renae Bracy at his first trial, and Jason Cofield at his second trial—on account of their race. Pet'r's Am. Pet., ECF No. 165 at 119–23. He claims that the State's proffered reasons for striking these venire members were pretext for discrimination. *Id.*

### 1.  Evaluating a *Batson* Claim

In *Batson v. Kentucky*, the Supreme Court delineated a three-step analysis for evaluating a defendant's claim that a prosecutor used a peremptory strike in a racially discriminatory manner: (1) a "defendant must make a prima facie showing that the prosecutor exercised peremptory challenges on the basis of race"; (2) "the burden then shifts to the prosecutor to articulate a race-neutral reason for striking the juror in question"; and (3) "the trial court must determine whether the defendant carried his burden of proving purposeful discrimination." *Hernandez v. New York*, 500 U.S. 352, 358–59 (1991) (plurality opinion) (citing *Batson*, 476 U.S. at 96–98). This analysis "permits prompt rulings on objections to peremptory challenges without substantial disruption to the jury selection process." *Id*. at 359. The ultimate burden of persuasion lies with the defendant. *Purkett v. Elem*, 514 U.S. 765, 768 (1995).

On direct review, a trial court's denial of a *Batson* claim "is entitled to 'great deference' and 'must be sustained unless clearly erroneous.' " *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (first quoting *Batson*, 476 U.S. at 98 n.21; and then quoting *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)). On federal habeas review, 28 U.S.C. § 2254(d) "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations and internal quotation marks omitted).

## 2.  Davis's First Direct Appeal

In his first direct appeal, Davis argued the trial court did not comply with the requirements of *Batson* when it overruled his objections and allowed the prosecutor to use peremptory strikes in a racially discriminatory manner for prospective jurors Murrell and Bracey. *Davis*, 2007 WL 1704071, at *2.

The Court of Criminal Appeals overruled Davis's objection. *Id.* at *3. It noted "the prosecutor offered race-neutral explanations for using the strikes":

> As for Murrell, the State pointed out that he was "wishy-washy" with regard to his beliefs about the death penalty and stated he would hold the State to a higher burden of proof. With respect to Bracey, the State contended that she was aloof and hesitant in her answers, which gave prosecutors the impression she could not follow the law. Further, she stated she knew someone who went to prison for "dropping a baby" and minimized that person's conduct. Finally, she showed no emotion when describing her service as a witness in a rape case.

*Id*. It then observed Davis "made no attempt to rebut the prosecutor's race-neutral explanations, and the trial court overruled [Davis's] *Batson* challenges." *Id*. Consequently, the Court of Criminal Appeals concluded "[t]he trial court did not abuse its discretion in finding that [Davis] failed to carry his burden of showing purposeful racial discrimination." *Id.*

## 3.  Davis's Second Direct Appeal

In his second direct appeal, Davis argued "the State's professed reasons for striking juror Cofield were contrived in order to conceal racially discriminatory intent" and the trial court's overruling of his *Batson* objection was clearly erroneous. *Davis*, 329 S.W.3d at 815.

During voir dire, the State noted a juror could answer the special issues submitted under Texas Code of Criminal Procedure Article 37.071 in the affirmative "based upon the evidence of the crime alone." *Id.* at 816. Yet when the prosecutor asked Cofield about the burden of proof, "[h]e said he needed an enormous amount of evidence" was required to answer the special issues, and he suggested that the fact of the murder alone was not enough. *Id*. He also stated "[i]t's never too late" for someone to change his life for the better and "[a]nybody can make a change." *Id*. at 817. "At the conclusion of his voir dire questioning, Cofield agreed that he could not affirmatively answer the future-dangerousness question based on the facts of the case alone." *Id*.

The Court of Criminal Appeals overruled the objection. *Id*. It found the State's explanations for striking Cofield were facially race neutral, and Davis did not demonstrated evidence of pretext. Thus, it concluded the trial court did not abuse its discretion in denying Davis's *Batson* challenge to Cofield. *See id.* at 818.

### 4.  The Court of Criminal Appeals Reasonably Concluded Davis's Counsel Provided Effective Assistance

The trial court credited the prosecutor's race-neutral explanations and concluded Davis failed to carry his burden of proving purposeful discrimination. The Texas Court of Criminal Appeals reviewed the record at some length and upheld the trial court's findings. The state appellate court's conclusions were plainly not unreasonable.

129

As a result, there is simply no basis for the Court to reach any opposite conclusions. The Court accordingly finds Davis is not entitled to relief on this claim. *See Storey v. Stephens*, 606 F. App'x 192, 198 (5th Cir. 2015) (holding that a state court reasonably applied *Batson*).

## EVIDENTIARY HEARING

Pursuant to the AEDPA, the proper place for development of the facts supporting a claim in a § 2254 habeas petition is in the state court. *See Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir. 1997) (explaining that the AEDPA clearly places the burden on a petitioner to raise and litigate as fully as possible his federal claims in state court). In addition, where a petitioner's claims are rejected on the merits, further factual development in federal court is effectively precluded by the Supreme Court's holding in *Pinholster*:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.,* the record before the state court.

*Pinholster*, 563 U.S. at 181–82.

Davis has not argued or shown that his claims rely on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2254(e)(2)(A)(i). He has not shown the existence of "a factual predicate" for his claims "that could not have been previously discovered through the exercise of due diligence." *Id.* § 2254(e)(2)(A)(ii). Finally, Davis has not shown additional facts not previously considered by the state courts, "if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for

130

constitutional error, no reasonable factfinder would have found him guilty of the underlying

offense." *Id*. § 2244(b)(2)(B). Therefore, Davis's request for an evidentiary hearing will be denied.

## SUMMARY OF FINDINGS

Accordingly, after due consideration, the Court summarizes its findings as follows:

1. Davis's allegation that his Fifth, Sixth, Eighth, and Fourteenth Amendment rights to a fair trial before an impartial and unbiased jury were violated at his first trial because a juror, Severiano Santini, did not disclose that he stood accused of indecency with minors, that the accusations against Santini were pending before the same office prosecuting Davis, and that Santini claimed he decided to find Davis guilty to curry favor in his own case, is procedurally defaulted and meritless.

2. Davis's assertion that the State failed to disclose its investigation and eventual prosecution of Juror Santini for indecency with minors, which he alleges violated his right to due process and a fair trial, is procedurally defaulted and meritless.

3. Davis's accusation that his trial counsel failed to investigate and present at his second trial readily available mitigating evidence of the serious abuse he suffered as a child and the dysfunctional family life he endured was reasonably rejected by the state court.

4. Davis's contention that his trial counsel provided constitutionally ineffective assistance at both of his trials for failing to challenge the testimony of the pathologist regarding her conclusion that Davis sexually assaulted Medina is procedurally defaulted and meritless.

5. Davis's declaration that his constitutional rights were violated at his second trial because evidence of his affiliation with Satanism was improperly admitted was reasonably rejected by the state court.

6. Davis's claim that his Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated at his first trial because the trial court erroneously denied his motion to suppress and admitted his confession was reasonably rejected by the state court.

7. Davis's allegation that his trial counsel rendered ineffective assistance during voir dire at his first trial when they waived any error about the trial court's refusal to remove to jurors for cause was reasonably rejected by the state court.

8.  Davis's claim that his trial counsel rendered ineffective assistance at his second trial by agreeing to a jury selection procedure which permitted blind strikes during voir dire was reasonably rejected by the state court.

9.  Davis's contention that his constitutional rights were violated at both trials because the trial court erroneously rejected his challenges under *Batson*, were reasonably rejected by the state court.

10. Accordingly, Davis is not entitled to relief pursuant to 28 U.S.C. §§ 2241 and 2254.

## CERTIFICATE OF APPEALABILITY

A petitioner may not appeal a final order in a habeas corpus proceeding "[u]nless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1). He must make "a substantial showing of the denial of a constitutional right" before a certificate of appealability may issue. *Id*. § 2253(c)(2). In cases where a district court rejects a petitioner's constitutional claims on the merits, he "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484. To warrant a certificate as to claims that a district court rejects solely on procedural grounds, he must show both that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id*.

The Court finds reasonable jurists could not debate the Court's reasoning for denying Davis's claims on procedural or substantive grounds—or find that his current issues deserve encouragement to proceed in a federal court. *Miller El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack*, 529 U.S. at 484). The Court will, therefore, not issue a certificate of appealability.

## CONCLUSIONS AND ORDERS

The Court concludes, for the reasons discussed above, that Davis is not entitled to relief under 28 U.S.C. §§ 2241, 2254. The Court further concludes that Davis is not entitled to a certificate of appealability. The Court, therefore, enters the following orders:

**IT IS ORDERED** that the Davis's request for an evidentiary hearing is **DENIED**.

**IT IS FURTHER ORDERED** that Davis's "Amended Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 in a Capital Case" (ECF No. 165) is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED.**

**IT IS ALSO ORDERED** that all pending motions are **DENIED**.

**IT IS FINALLY ORDERED** that the District Clerk shall **CLOSE** this case.

**SIGNED this 13th day of September, 2023.**

**KATHLEEN   CARDONE**
**UNITED STATES DISTRICT JUDGE**